## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **Ross Hecox, individually and as next friend of his minor child R.E.H,**<br>1940 Victory Hills Way<br>Carroll County<br>Marriottsville, Maryland 21104<br><br>**Reid Hecox**<br>1940 Victory Hills Way<br>Carroll County<br>Marriottsville, Maryland 21104<br><br>**For themselves and for those similarly situated minor individuals,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**DoorDash, Inc.,**<br>303 2nd Street, Suite 800<br>San Francisco, California 94107<br>*Serve on:*   *The Corporation Trust, Inc.*<br>              *2405 York Road, Suite 201*<br>              *Lutherville-Timonium, MD 21093*<br><br>**Defendants.** | CASE NO: _____<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT FOR
## DECLARATORY JUDGMENT, MONETARY DAMAGES,
## INJUNCTIVE RELIEF, AND DEMAND FOR JURY TRIAL

Plaintiffs Ross Hecox ("Plaintiff Hecox"), individually and as next of friend of his minor child, R.E.H, and Reid Hecox ("Plaintiff R. Hecox") (collectively "Plaintiffs), for themselves and those similarly situated, by and through their undersigned counsel, based on their reasonable investigation, and pursuant to Rules 17(c) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure, bring this suit as a class action seeking appropriate declaratory and injunctive relief, and all allowable monetary damages, including reasonable attorney's fees and costs, against and from DoorDash, Inc. ("DoorDash"), for reasons set forth herein (the "Complaint").

## NATURE OF THE ACTION

1.      This case challenges certain fees that DoorDash imposes on consumers.
DoorDash is "an online marketplace platform using web-based technology that connects
contractors, restaurants and/or other businesses" principally to provide business-to-consumer
deliveries ("DoorDash App").[1] With an estimated 32 million users of its technology, DoorDash
earns billions of dollars in annual revenue.[2] But DoorDash generates its revenues not only
through heavy-handed tactics that take advantage of struggling merchants and a significant
immigrant driver workforce, but also through deceptive, misleading, and fraudulent practices that
illegally deprive consumers of millions, if not billions, of dollars annually. This lawsuit details
DoorDash's illegal pricing scheme and seeks to hold DoorDash accountable for its fraud on
consumers, including our most vulnerable segment of society, minor children.

2.      Despite its short ten-year existence, DoorDash's history is replete with predatory
tactics toward the contractors, merchants, and consumers using its technology platform. For
example, DoorDash retained part of the tips that consumers paid to the contracted drivers, called
"Dashers," for their deliveries despite DoorDash's representations that the Dashers received the
tips. DoorDash was sued for its tip retention practice.[3] While DoorDash now purportedly pays
Dashers the entire tip amount, the company still holds its Dashers' daily compensation (including

---

[1] *Independent Contractor Agreement - United States, DoorDash Dashers*, DOORDASH (Jan.
2022), https://help.doordash.com/legal/document?type=dx-ica&region=US&locale=en-US
(citing recitals).

[2] David Curry, *DoorDash Revenue and Usage Statistics (2023)*, BUSINESS OF APPS (Feb. 20,
2023), https://www.businessofapps.com/data/doordash-statistics/.

[3] *See AG Racine Reaches $2.5 Million Agreement with DoorDash for Misrepresenting that
Consumer Tips Would Go to Food Delivery Drivers*, OFFICE OF THE ATTORNEY GENERAL FOR
THE DISTRICT OF COLUMBIA (Nov. 24, 2020), https://oag.dc.gov/release/ag-racine-reaches-25-
million-agreement-doordash#:~:text=In%20a%20November%202019%20lawsuit,
DoorDash's%20payments%20to%20its%20workers.

tips) on each order for a week, despite having the ability to pay them immediately. If the drivers want to receive their earned compensation daily, Dashers must pay DoorDash a "Fast Pay" fee to release the funds daily.[4] With reportedly two million Dashers performing deliveries,[5] DoorDash stands to make millions in interest by holding its drivers' compensation weekly and then stands to make millions more by charging drivers a Fast Pay fee to receive funds those drivers already earned. Targeting immigrants to work as drivers,[6] DoorDash knows many Dashers are forced to pay the Fast Pay fee because they lack resources and need money desperately. DoorDash then leverages the drivers' desperation (by implementing the weekly hold period and levying the "Fast Pay" fee) to force the Dashers to participate in its DasherDirect program. Under the DasherDirect program, DoorDash pays its drivers their compensation daily with "no fee," but does so through a direct deposit on a VISA debit card that Stride Bank underwrites.[7] Stride Bank then pools the Dashers' funds and "deposit[s] those funds at one or more FDIC insured banks" for investment purposes.[8] DoorDash, in effect, controls most of its drivers' funds for much

---

[4] *See Independent Contractor Agreement - United States, DoorDash Dashers*, DOORDASH (Jan. 2022), https://help.doordash.com/legal/document?type=dx-ica&region=US&locale=en-US.

[5] *See* Tyler Philbrook, *DoorDash Statistics: Revenue, Usage Statistics & More*, THE RIDESHARE GUY (Mar. 15, 2023), https://therideshareguy.com/doordash-statistics/.

[6] *See, e.g.*, DoorDash, FACEBOOK (Sept. 6, 2022, 12:23 PM), https://www.facebook.com/DoorDash/; Kimiko de Freytas-Tamura, *Food delivery apps are booming, while their workers often struggle.*, N.Y. TIMES (Nov. 30, 2020), https://www.nytimes.com/2020/11/30/world/food-delivery-apps-are-booming-while-their-workers-often-struggle.html; *see also* Claudia Irizarry Aponte, *DoorDash Wanted to Teach Delivery Workers About Their Rights. It Backfired.*, THE CITY (July 31, 2022, 7:00 PM EST), https://www.thecity.nyc/queens/2022/7/31/23284495/doordash-immigrant-groups-workers (noting that immigrant drivers accused DoorDash of stealing their money).

[7] *See* DoorDash Dasher Support, *Introduction to DasherDirect*, DOORDASH, https://help.doordash.com/dashers/s/article/Introduction-to-DasherDirect?language=en_US (last visited Apr. 14, 2023).

[8] *See* DASHERDIRECT CARDHOLDER AGREEMENT (Mar. 16, 2023), https://payfare.github.io/doordash/en-us/assets/documents/dasherdirect-cardholder-agreement.pdf.

longer than a week. Upon information and belief, DoorDash then earns more money under the DasherDirect program on its share of fees generated from the invested drivers' funds and their debit card usage than DoorDash would earn by charging drivers only for Fast Pay fees.

3.      DoorDash engages in a similar pay scheme with restaurants. DoorDash represents that it is neither "a restaurant" nor in "the food preparation businesses,"[9] but DoorDash still takes food orders from consumers, collects their payments, and retains a portion of each consumer payment as a hidden "commission" on each order. DoorDash then holds its restaurants' earnings on each order for a week unless the restaurants either (1) pay to receive their earned funds earlier,[10] or (2) enroll in a premium service with higher commissions to receive those funds daily "without charge."[11] DoorDash again stands to make millions in interest during the hold period; millions more in fees by charging restaurants to receive funds daily that they already earned; and millions more from charging higher commissions that restaurants pay to receive their daily earnings "without charge." Because DoorDash's hidden commissions (which include hidden marketing and credit card transactions fees) reduce profit margins on food orders, restaurants must increase their prices.[12] In effect, DoorDash earns millions, if not more, strong-arming drivers and merchants (and forcing them to capitulate to DoorDash's questionable billing tactics), while consumers bear the unsettling burden of the increased cost from the hidden fees.

---

[9] *See Independent Contractor Agreement – United States, DoorDash Dashers*, DOORDASH (Jan. 2022), https://help.doordash.com/legal/document?type=dx-ica&region=US&locale=en-US.

[10] *See* DoorDash Merchant Support, *What is Merchant Daily Payouts?*, DOORDASH, https://help.doordash.com/merchants/s/article/Daily-Pay-FAQ?language=en_US (last visited Apr. 14, 2023).

[11] *See id.*; *see also Products and Pricing*, DOORDASH FOR MERCHANTS, https://get.doordash.com/en-us/products (last visited Apr. 14, 2023).

[12] DoorDash Merchant Support, *Level Pickup Pricing*, DOORDASH, https://help.doordash.com/merchants/s/article/What-is-level-pickup-pricing?language=en_US (last visited Apr. 14, 2023).

4.      DoorDash's consumer-facing, predatory pricing practices are unsettling in several other respects. First, DoorDash charges consumers "city" or regulatory response fees, creating the illusion for consumers that local governments impose these fees. DoorDash engages in this deceptive practice in part to circumvent limitations on food commissions in certain areas. Cities have sued DoorDash for imposing these unauthorized fees.[13] Second, DoorDash disavows that it provides any delivery service whatsoever, but still charges consumers a range of delivery fees. Third, DoorDash disavows that it controls the manner and means of delivery routes, but still charges consumers an "express" or "priority" fee for delivering "direct to you." DoorDash promises this "direct to you" service without ever informing Dashers (who may deliver for companies besides DoorDash) that the DoorDash consumers paid for a priority delivery that is advertised as going directly to them. As a result, these "express" delivery orders average around the same delivery time as standard orders. Finally, DoorDash charges consumers an "expanded range delivery" fee on orders "outside of [their] normal delivery area," but DoorDash never creates "normal delivery areas" for each consumer. Rather, DoorDash creates delivery areas around restaurants based on the restaurants' service level plan (meaning how much they pay DoorDash). And DoorDash will send certain consumers' orders (like low-cost McDonalds orders) to restaurant locations further from the consumer's home (bypassing closer locations), triggering the expanded range fee and "justifying" increased delivery costs. Moreover, DoorDash disingenuously applies the expanded range fee on DashPass accounts, which are consumer

---

[13] *See* Mary Anne Pazanowski, *DoorDash Must Defend Chicago's Consumer Deception Lawsuit (1)*, BLOOMBERG LAW (Mar. 10, 2022, 9:40 AM, updated Mar. 10, 2022, 3:40 PM), https://news.bloomberglaw.com/litigation/doordash-must-defend-chicagos-consumer-deception-lawsuit; Ashok Selvam, *As Chicago's Lawsuits Versus DoorDash and Grubhub Proceed, San Francisco May Settle*, EATER CHICAGO (July 28, 2022, 1:45 PM CST), https://chicago.eater.com/2022/7/28/23277908/chicago-doordash-grubhub-lawsuit-delivery-company-update-san-francsico-settlement.

accounts that pay DoorDash a flat monthly fee to receive discounted delivery fees. If a DashPass

account and a standard account place the same order at the same time from the same restaurant to

be delivered to the same home, DoorDash occasionally will charge the DashPass account (but

not the standard account) an "expanded range fee." Upon information and belief, DoorDash

charges DashPass accounts the expanded range delivery fee to subsidize lost revenues from

discounted fees under the DashPass program.

5.      A critical part of DoorDash's deception is its misleading "explanations" of its fees

in oddly placed informational tabs that are designed to dissuade consumers from seeking more

details about those charges. The consumer can only find "more details" about the fees by piecing

together DoorDash's statements in its legal terms and other admissions buried in various places

in its website. Each of DoorDash's illegal pricing practices not only violates a multitude of state

and federal laws, but also deprives consumers of millions, if not billions, of dollars annually.

6.      DoorDash retains all ill-gotten consumer payments from the delivery-related fees.

These fees are unquestionably deceitful, deceptive, and misleading given DoorDash vehemently

denies that it provides any delivery service, while charging consumers a premium for deliveries

it does not perform. Instead, DoorDash charges the "delivery" fees to make the "service fee" that

it charges to "operate" its technology appear smaller. After all, as even DoorDash concedes in

obscure fine print, it "has no obligation to itemize its costs" under different categories of fees.[14]

Rather, DoorDash uses this deceptive practice to trick consumers into believing Dashers receive

the "delivery-related" fees when, in reality, each and every "delivery fee" is retained in total by

DoorDash. If DoorDash in fact bundled all its delivery fees into one large service fee, that

---

[14] *See Consumer Terms and Conditions – United States (Including Puerto Rico)*, DOORDASH ¶
12(a) (Feb. 3, 2023), https://help.doordash.com/legal/document?type=cx-terms-and-
conditions&region=US&locale=en-US.

practice would raise questions in a consumer's mind about whether the cost of using DoorDash's platform is truly worth it. In other words, DoorDash utilizes a psychologically manipulative pricing structure to strategically mislead and deceive consumers into using the technology platform at a much higher, premium cost. DoorDash further manipulates consumers through "estimated" delivery windows. The delivery windows advertised before an order is placed are usually five to seven minutes less than actual delivery windows (shown immediately after an order is placed). The consistent difference between the advertised and real delivery windows suggests that DoorDash uses an algorithm to set shorter advertised delivery windows to mislead consumers into believing orders will be delivered sooner—another example of manipulation.

7.      Far worse, DoorDash directly targets minor children as part of its deceptive and deceitful scheme. DoorDash engages in advertising campaigns on television and in social media (like its Sesame Street campaign) that encourage minors to use its service. DoorDash does nothing to discourage the Play Store from advertising the DoorDash App as "E" for Everyone, or the Apple App Store from advertising it as "12+", or otherwise restrict minors from downloading the DoorDash App. Nor does DoorDash use any age verification to prohibit minors from using its technology despite having the capabilities to do so. In fact, the DoorDash App has no parental controls whatsoever, making it so easy for a child to use the platform that a two-year old ordered thirty-one hamburgers on the app.[15] And Dashers deliver to children at their high schools so frequently that some schools set up delivery tables outside for student orders, while others were forced to ban deliveries because they became disruptive and created security risks. As a result,

---

[15] Good Morning America, *2-year-old orders 31 cheeseburgers via DoorDash after taking mom's phone*, YOUTUBE (May 19, 2022), https://www.youtube.com/watch?v=Bk2vLDGJ2rw.

our most vulnerable population, minor children, falls prey to DoorDash's predatory pricing

practices when ordering from the on-demand service. But DoorDash does not care.

8.     DoorDash believes it is effectively bulletproof against consumer claims because

of its Terms and Conditions—the foundation of its illegal pricing practices. DoorDash's Terms

and Conditions transform recognized liability avoidance into illegal liability evasion. The Terms

and Conditions strip consumers of recognized protections, by: forcing consumers to waive their

right to trial; requiring them to pursue claims against DoorDash in secret arbitration (which also

deprives the public of the ability to learn about DoorDash's illegal practices); prohibiting them

from exercising their right to proceed as a class; reducing the statute of limitations for applicable

claims from years to mere months; obligating consumers to indemnify DoorDash for all liability;

and restricting consumers' right to certain relief, including injunctive relief that could prohibit

DoorDash from continuing its illegal practices. Relying on the fact that hungry consumers will

likely fail to notice, read, or understand the complex terms and conditions, DoorDash buries its

use of highly deceptive strikethrough pricing and bait and switch billing practices in pages of

legalese. With these terms of adhesion in place (coupled with the nominal cost of each consumer

transaction, and virtually no exposure from its drivers or merchants given their own similarly

restrictive contracts), DoorDash acts with impunity in its charging practices.

9.     DoorDash believes it has created the perfect predatory pricing scheme—one in

which it holds all the money while consumers, merchants, and drivers hold all risk of higher

prices and liability. In effect, DoorDash uses its Terms and Conditions as a shield and a sword to

carry out its deception. DoorDash uses its Terms and Conditions as a sword against consumers

by subjecting them to fraudulent prices and fees for services it neither performs nor provides,

because DoorDash mistakenly believes consumers tacitly agreed to its shady practices under the

terms, thereby making them legally permissible. DoorDash then uses the same Terms and Conditions to shield DoorDash from exposure through indemnification provisions, liability limitations, forced acknowledgments and waiver of rights. The results: DoorDash believes a consumer can only sue in secret arbitration, on an individual basis with a six-month statute of limitations and cannot stop DoorDash from continuing its devious practices through injunctive relief. But DoorDash's beliefs are based on a fundamentally flawed position.

10.     DoorDash believes its Terms and Conditions represent an enforceable contract with consumers, but that is wrong for at least three reasons. First, DoorDash's purported contract lacks an offer, acceptance, sufficient consideration, mutual assent, and a meeting of the minds— basic contract elements. Unlike with a clickwrap (or scroll wrap) agreement, consumers using the DoorDash platform never affirmatively acknowledge that their use of the platform creates a binding contract. And unlike with a sign-in-wrap agreement, DoorDash's sign-up language is not reasonably conspicuous. Even so, that language fails to generate sufficient inquiry notice that consumers should read the Terms and Conditions and will be bound by them contractually when creating an account. Second, because DoorDash's Terms and Conditions represent a contract of adhesion, consumers must agree affirmatively to be bound by them. But DoorDash tries to have consumers manifest their assent to agree by clicking a button whose primary purpose is not accepting the oppressive contract terms but performing the completely separate action of simply signing up to use the technology platform. Third, DoorDash's purported contract does not apply to minor children. Minors lack the capacity to contract, and DoorDash's Terms and Conditions disaffirm any contract with a minor. Absent an enforceable contract, DoorDash must answer for its actions before this Court with respect to its delivery fee, priority delivery fee, expanded range delivery fee, hidden marketing fee, and hidden commission fee.

11.     DoorDash engages in a fraudulent scheme to charge and collect misleading, premium, and hidden fees from consumers for deliveries that DoorDash does not perform and for food that DoorDash does not sell. This lawsuit seeks to end this dubious practice. Plaintiffs, for themselves and a nationwide class of individuals, including minors, now sue DoorDash for its predatory pricing practices that cost consumers hundreds of millions (if not billions) of dollars each year. In doing so, Plaintiffs seek the appropriate declaratory and injunctive relief and monetary damages of no less than $1,000,000,000.00 (One Billion Dollars) on behalf of various classes of consumers who fell prey to DoorDash's illegal pricing scheme.

**THE PARTIES**

12.     Plaintiff Hecox is a citizen of the State of Maryland and a resident of Carroll County. He is the father of Plaintiffs R. Hecox, and R.E.H. Plaintiff Hecox is a divorced, single parent who must ensure that his children are fed when in his care, while also balancing his work responsibilities and shuttling his children to school and sporting activities. Like many parents, he relies on the on-demand food delivery market to help. Plaintiff Hecox is a consumer and user of DoorDash. He signed up for DoorDash and established an account in his own name; used the delivery service to place and receive orders; and was charged and paid a misleading, deceptive and/or fraudulent delivery fee, priority or express delivery fee, marketing fee, food commission fee, and/or expanded range delivery fee. Plaintiff Hecox was also a DashPass member. The vast majority, if not all, of Plaintiff Hecox's transactions with DoorDash occurred within the State of Maryland. When he signed up for DoorDash, he did not know of the Terms and Conditions.

13.     Plaintiff R. Hecox is a citizen of the State of Maryland and a resident of Carroll County. Plaintiff R. Hecox turned 18 years old in January 2023 and he was a consumer and user of DoorDash. Before reaching the age of majority, he established a DoorDash account in his own

name; used the food ordering platform to place and receive orders under his own account; and was charged and paid a misleading, deceptive and/or fraudulent delivery fee, priority or express delivery fee, marketing fee, food commission fee, and/or expanded range delivery fee. The vast majority, if not all, of R. Hecox's transactions with DoorDash occurred within the State of Maryland. When he signed up for DoorDash, he did not know of the Terms and Conditions.

14.     Plaintiff R.E.H. is a citizen of the State of Maryland, a resident of Carroll County and under the age of 18. He was a consumer and user of DoorDash, who established an account with DoorDash in his own name; used the DoorDash platform to place and receive orders; and was charged and paid a misleading, deceptive and/or fraudulent delivery fee, expedited or express delivery fee, marketing fee, food commission fee, and/or an expanded range delivery fee. The vast majority, if not all, of Plaintiff R.E.H.'s transactions with DoorDash occurred in Maryland. When he signed up for DoorDash, he did not know of the Terms and Conditions.

15.     Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3) on behalf of themselves and all others similarly situated as defined below in paragraphs 100 through 110. As used herein, the term "Plaintiffs" refers to both the named Plaintiffs and to members of the proposed Class and Subclasses.

16.     Defendant DoorDash is incorporated in the State of Delaware and has its principal place of business in the State of California and therefore, for diversity jurisdiction, is a citizen of both states. Defendant DoorDash conducts business in Maryland. DoorDash is a technology company that does not prepare or sell food and, thus, DoorDash, the DoorDash platform, and its associated technology, is not a necessity.

**JURISDICTION AND VENUE**

17.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 and 28 U.S.C. § 1332 because there are over 100 members of the proposed class, at least one member of the proposed class has different citizenship from the Defendant, and the total amount in controversy exceeds $5,000,000.

18.     DoorDash is subject to this Court's exercise of *in personam* jurisdiction because: (a) DoorDash transacts business or performs any character of work or service in the State; (b) DoorDash contracts to supply food services in the State; and (c) DoorDash has caused tortious injury in the State by an act or omission in the State.

19.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in the District of Maryland.

20.     Venue is also proper pursuant to 28 U.S.C. § 1391(c) because DoorDash is subject to the Court's personal jurisdiction regarding this action.

**COMMON FACTUAL ALLEGATIONS**

**I.      DOORDASH'S NOBLE BEGININGS AND GROWTH**

21.     DoorDash began in 2012 as PaloAltoDelivery.com ("Palo Alto Delivery") when four Stanford University students established a website designed to provide delivery services for local restaurants. Unlike others, Palo Alto Delivery provided its own delivery force so restaurants could outsource deliveries to Palo Alto Delivery rather than develop a delivery arm themselves. Palo Alto Delivery's success quickly attracted investors. The company rebranded as DoorDash in 2013, shifting its focus to developing technology that assists business-to-consumer deliveries in the on-demand delivery market.

22.     The on-demand food delivery industry predominately impacts the country's most financially vulnerable populations. A nationwide research study conducted by Zion & Zion reveals the largest user markets for online delivery food services are the young and the poor.[16] Over the past ten years, the on-demand food delivery market enjoyed steady revenue increases before exploding in popularity during the pandemic in 2020. In 2018, the on-demand food delivery market represented a healthy $82 billion in gross revenues and is projected to exceed $200 billion by 2025.[17] The growth in this market is rapid.

23.     DoorDash has experienced a similar rapid growth. By late 2018, DoorDash had overtaken Uber Eats as the country's number two delivery service and was closing fast on number one GrubHub. According to one source, DoorDash controlled thirty-five percent of the on-demand food delivery market in the United States by September of 2019. The company had a more than fifty-nine percent monthly market share in March 2022.[18] And DoorDash's monthly market share rose from 59% in March 2022 to 65% in February 2023, less than a year later.




---

[16] *See* Aric Zion & Thomas Hollman, *Usage and Demographics of Food Delivery Apps*, ZION & ZION (2019), https://www.zionandzion.com/research/food-delivery-apps-usage-and-demographics-winners-losers-and-laggards/.

[17] *See $9.6 Billion in Investments Spurring Aggressive Expansion of Food Delivery Companies,* FROST & SULLIVAN (Oct. 25, 2019), https://www.frost.com/news/press-releases/9-6-billion-in-investments-spurring-aggressive-expansion-of-food-delivery-companies/.

[18] Tom Kaiser, *U.S. Delivery Sales, DoorDash Share Still Growing*, FOOD ON DEMAND (Apr. 28, 2022), https://foodondemand.com/04282022/u-s-delivery-sales-doordash-share-still-growing/.

24.     DoorDash's initial public offering was in December 2020, which raised $3.37 billion and in turn gave DoorDash a valuation that exceeded $70 billion.[19] The IPO made billionaires out of the three DoorDash founders, Tony Xu, Andy Fang, and Stanley Tang.

25.     During 2020 and 2021, in the height of the COVID-19 pandemic, DoorDash grew significantly. DoorDash had $2.9 billion revenue in 2020, which skyrocketed to $4.9 billion in 2021. DoorDash's trend of significantly higher year-over-year revenue and gross order value continued through 2022, reaching $6.6 billion.[20]

26.     In 2021, DoorDash had 25 million active users, most in the United States, an increase of twenty-five percent over 2020. DoorDash reported delivering 1.4 billion orders in 2021, which grew to 1.7 billion orders in 2022.[21] As of 2022, DoorDash has about 450,000 active monthly merchants and controls around fifty-seven percent of the on-demand food delivering market.[22]

## II.     HOW DOORDASH WORKS

27.     DoorDash is "an online marketplace platform using web-based technology that connects contractors, restaurants and/or other businesses, and consumers [ ]. [DoorDash]'s software permits registered users to place orders for food and/or other goods and services from

---

[19] Erin Griffith, *DoorDash Soars in First Day of Trading*, N.Y. TIMES (Dec. 9, 2020, updated Mar. 19, 2021), https://www.nytimes.com/2020/12/09/technology/doordash-ipo-stock.html#:~:text=DoorDash%20stock%20rose%2086%20percent,and%20Chipotle%20Mexican%20Grill%20combined.

[20] Daniela Coppola, *Annual revenue of DoorDash from 2019 to 2022*, STATISTA (Mar. 22, 2023), https://www.statista.com/statistics/1294498/doordash-annual-revenue/.#:~:text=In%202021%2C%20DoorDash%20generated%20revenues,2013%20in%20Palo%20Alto%2C%20California.

[21] Gennaro Cuofano, *DoorDash Orders*, FOURWEEKMBA (Feb. 20, 2023), https://fourweekmba.com/doordash-orders/.

[22] Brian Dean, *How Many People Use DoorDash in 2022? [New Data]*, BACKLINKO (June 29, 2021), https://backlinko.com/doordash-users/.

various restaurants and businesses. Once such orders are made, [DoorDash's] software notifies [a network of independent] contractors that a Delivery Opportunity is available and the [DoorDash] software facilitates completion of the delivery."[23] *See* illustration below.



**A.      Signing Up to Use the DoorDash Platform**

28.      Consumers, including minor children, who want to have food or other goods and services delivered anywhere—whether to their home, office, hotel, ballpark or elementary, middle, or high school—can access DoorDash in either of two ways: (1) through its website, www.doordash.com, or (2) through the DoorDash App, which is available either through the Apple App Store or Google Play. The website and the DoorDash App (herein "DoorDash platform") present a virtually identical user experience when registering to use the DoorDash technology.

**(1)      Signing up on Doordash.com**

29.      Logging onto www.doordash.com, a user sees a delivery address sign-in box in the center top of the home page and a "sign-in" tab for returning customers or "sign-up" tab for

---

[23] *Independent Contractor Agreement - United States, DoorDash Dashers*, DOORDASH (Jan. 2022), https://help.doordash.com/legal/document?type=dx-ica&region=US&locale=en-US (citing recitals).

new customers in the upper right-hand corner of the page. Either the address box or sign-in/up

tabs will allow a user to begin the process of accessing the platform. *See* illustration below.



30.     If the first-time user clicks on "sign-up," a prompt appears. This sign-up prompt

seeks basic personal information like the user's first and last name, an email address, a telephone

number, and a password. The sign-up prompt also allows the user to continue the sign-up process

through Google, Facebook, or Apple. There are no prompts or fields requesting that the user

verify his or her age. Nor does the website have any language urging consumers to read the

Terms and Condition or indicate that signing up or otherwise using the website platform binds

consumers or creates a contract that waives important rights. After completing the requested

information, a first-time user clicks on "sign up" and that user is now registered. But presently

located above the large, red sign-up button (in smaller, less prominent font) is inconspicuous

language that reads: "By tapping 'Sign Up' or 'Continue with Google, Facebook, or Apple,'"

you agree to DoorDash's Terms and Conditions and Privacy Policy." *See* illustration below.



31.    Upon information and belief, as recently as several months ago in January 2023, that same less prominent language was buried at the bottom of the sign-up prompt obscured by other large sign-up icons for Google, Facebook, and Apple. *See* illustration below.



32.     If a first-time user scrolls down the home page without providing an address or signing-in or signing-up, that user can learn about becoming a Dasher, a partner restaurant or downloading the DoorDash App. *See* illustration below.



33.     Scrolling down the home page further, the user can find restaurants. *See* illustration below.



34.     Clicking the "find restaurant" tab will take the user to a "Restaurant near me" landing page. Upon information and belief, the website uses location information embedded in the user's computer or mobile device to identify nearby restaurants. The sign-in and sign-up buttons remain in the upper right-hand corner and the enter a delivery address is on the upper left-hand side. *See* illustration below.

18



35.   If you click on a specific restaurant, like Shake Shack for example, a new page

loads forcing the user to enter his/her/their address for delivery. *See* illustration below.



36.   When you enter an address, a new page will load informing the user whether the

identified restaurant is within the restaurant's delivery area. If the address is outside the

restaurant's delivery area, the user is given the option to change the address, change the order to

pick-up or view other nearby restaurants.[24] *See* illustration below.

---

[24] The addresses and other confidential information listed in all screenshots have been redacted for privacy.



37.     Selecting "view other nearby restaurants" allows the user to pursue a variety of locations by specific food type and other categories of organization in what is called the DoorDash marketplace. *See* illustration below.



38.     You can then select a specific restaurant to view its menu and select a food item to add to the cart. *See* illustration below.



39.    Once the menu item is added, you can checkout in the upper right-hand corner of the page. *See* illustration below.



40.    Selecting checkout takes you to a page on which you can add your payment method in the upper right-hand corner or sign-up or sign-in or proceed with an email address. Nowhere on this page is there any reference to Terms and Conditions or any notice that by continuing the user assents to a contract with DoorDash. *See* illustration below.



41.     When entering an email address for a first-time user, a prompt appears instructing the individual to "sign-in" to an existing account or "sign-up" or "create an account" to use DoorDash. The Terms and Conditions are not referenced on this page. *See* illustration below.



42.     By clicking "create an account" or "sign-up," the first-time user is taken to a sign-up page (similar to the sign-up prompt when selecting sign-up on the home page after logging onto doordash.com). Indeed, this sign-up page seeks the same basic personal information, i.e.,

the user's first and last name, an email address (which is already populated), a telephone number and requests a password. The sign-up page also allows the user to continue the sign-up process through Google, Facebook, or Apple. Nowhere on the page is there any language that signing up creates a contract or waives rights. But above the red sign-up button, in smaller font, is language that reads, "By tapping 'Sign Up' or 'Continue with Google, Facebook, or Apple,' you agree to DoorDash's Terms and Conditions and Privacy Policy." Upon information and belief, DoorDash previously located this same language at the bottom of the page beneath the various large sign-up icons (like illustration in paragraph 31) until it recently moved the location of the language. After filling in the requested information, that first-time user clicks on "sign up" and that user is now registered. There are no prompts or fields requesting that the user verify his or her or their age.



### (2) Signing Up on the DoorDash App

43.    You can access the DoorDash App by downloading it from the Play Store, Apple Store, or from DoorDash's website. Once the app is downloaded and opened, users on either the IOS/Apple or Android/Samsung mobile platforms engage in a virtually identical registration experience. In effect, a returning user can sign into DoorDash, and a first-time user is able to

sign-up for DoorDash or continue as a guest. For IOS/Apple and Android/Samsung mobile platforms, there is language on the app's initial landing screen in smaller font near the bottom of the page obscured by much larger colorful icons that reads, "By tapping 'Sign Up' or 'Continue with Google, Facebook, or Apple,' you agree to DoorDash's Terms and Conditions and Privacy Policy." The words "Terms and Conditions and Privacy Policy" appear in an even smaller font on the IOS/Apple platform. There is no language on this page urging consumers to read the Terms and Condition or warning them that signing up or otherwise using the DoorDash App binds consumers or creates a contract that waives important rights. If you elect to sign-up or sign-in using Google, Facebook, or Apple, the user is redirected without further prompts. *See* illustrations below.



<strong>APPLE/IOS</strong>          <strong>ANDRIOD/SAMSUNG</strong>

44.    If the user selects continue with email, a sign-in/sign-up screen will appear. Toggling to the sign-up prompt, a user must enter the same personal information consisting of his or her first and last name, an email address, a telephone number, and a password. The sign-up prompt also allows the user to continue the sign-up process through Google, Facebook, or Apple.

After filling in the requested information, a first-time user clicks on "sign up" and that user is now registered. There are no prompts or fields requesting that the user verify his or her age or even acknowledge that the user is over 18 years old. Nor does the app have any language urging consumers to read the Terms and Conditions or noting that signing up or otherwise using the DoorDash App binds consumers or creates a contract and waives important rights. But above the large red sign-up button is the same less prominent language that reads, "By tapping 'Sign Up' or 'Continue with Google, Facebook, or Apple,'" you agree to DoorDash's Terms and Conditions and Privacy Policy." Upon information and belief, this same language used to be located at the bottom of the page beneath the various large sign-up icons (like illustration in paragraph 31) until DoorDash moved the location of the language earlier in 2023. *See* illustrations below.



45.     If the user continues as a guest, the user will be prompted to provide an address

and then is allowed to browse restaurants, select menu options to be added to the cart, and then

can proceed to checkout. Before continuing to check out, however, the app prompts the guest

user to create an account with the same sign-up requirements as those launched from the initial

screen when opening the DoorDash App and selecting sign-up. *See* illustrations below.



**(3)     Signing-up on the DoorDash Platform Present the Same Concerns**

46.     As the above review reflects, DoorDash does not use a scroll-wrap or clickwrap

agreement, which require a consumer to review the contract terms and/or click a box with

language such as "I Agree" to become contractually bound before using the website. Of course, DoorDash insists on using a clickwrap agreement with its merchants. Kathy Zhu, DoorDash's former Senior Director and Associate General Counsel Commercial and Legal Operations, tasked with contracting, said DoorDash "knew we wanted a clickwrap contract" for DoorDash's merchant relationship "to be a lot more precise."[25] She equivocated on DoorDash's consumer contracts stating, "in the B-to-C world [business to consumer], it's usually ok legally speaking to deal with all of your customers more or less in the same way."[26] "Usually ok legally speaking, more or less" is hardly a ringing endorsement of enforceability from DoorDash's then chief "contract counsel." But her equivocation about enforceability is indeed apt.

47.     DoorDash's wrap agreement presents several concerns. First, DoorDash located its notice language inconspicuously at the bottom of its sign-up page away from the sign-up button as reflected in the illustration in paragraph 31. That language remains in that same place for customers initially signing-up through Google, Apple, or Facebook as reflected in the illustrations in paragraphs 43 through 45. Rather than provide a notice next to each sign-up button or a prompt that informed consumers about the notice after clicking one of the sign-up buttons, DoorDash located the sign-up notice at the bottom of the sign-up page after consumers scrolled through the sign-up options. But DoorDash recently moved the location of that language closer to the sign-up button as reflected in those same paragraphs. Regardless of where the sign-up notice is located, the notice language is still deficient. The language is neither prominent, informs consumers they should read the daunting and intimidating Terms and Conditions, nor informs them that they will be "bound" contractually when creating a DoorDash account. As a

---

[25] *How DoorDash Creates Self-Service Restaurant Partnership Contracts Using Clickwrap*, IRONCLAD (1:26-1:58), https://ironcladapp.com/customers/doordash/ (last visited Apr. 14, 2023).

[26] *Id.*

result, at a minimum, the language does not generate sufficient inquiry notice about DoorDash's oppressive Terms and Conditions. Consumers, like Plaintiffs, therefore, never manifest their assent to DoorDash's Terms and Conditions.

48.     DoorDash's approach to minimizing the sign-up process is intentional. As its former contract counsel Zhu noted in an interview, DoorDash's priority is "speed" and "efficiency."[27] She did not mention legal compliance. Instead of attempting to comply with the law, DoorDash created a "contracts playbook" with talking points and even "fallback positions" about the enforceability of their agreements.[28] Here, DoorDash achieves speed and efficiency by skipping steps in its sign-up process that would ensure users received a definitive offer, a clear mode of acceptance, supported by sufficient consideration and mutual assent.

**B.     Using DoorDash's Technology**

49.     After signing up, a consumer may place orders on DoorDash. Whether using DoorDash on its website or on the DoorDash App, the user experience is virtually the same. The intuitive nature of DoorDash's technology makes it easy to use.

50.     After launching the app or website, consumers are presented with categories of merchants and below that types of food in the DoorDash marketplace. By scrolling down the page, a consumer can see restaurants and merchants organized under various categories such as "nearby" or "wallet friendly" or "try something new." *See* illustration below.

---

[27] Lawtrades, *#6 - DoorDash Head of Commercial Kathy Zhu on Staying Nimble Despite Bandwidth Constraints*, YOUTUBE (11:51) (Dec. 17, 2020), https://www.youtube.com/watch?v=ZWXbc6HCBwg.

[28] *Id.*



51.     To place an order, a consumer need only select a restaurant, like Chick-fil-A, and then browse its menu, scrolling down the page to view the various items and then touching on the menu items and adding it to your cart. You continue adding items to your cart until the consumer is finished, at which point the consumer views the cart screen to see a populated list of what is in the cart. Scrolling to the bottom of the cart screen, the consumer can see a summary of charges which typically consist of a subtotal for food, a delivery fee, a service fee, and taxes. When completed, a consumer presses continue, which will take the consumer to a screen with delivery time options (which include express, standard, or scheduled). The delivery time window advertises how long it will take for the order to reach the consumer. Scrolling further down the page, a consumer can review his or her contact information, instructions on delivery, and a summary of the order costs. *See* illustrations below.



52.     After selecting the delivery window, and confirming the contact information, a consumer can click the "next" button to proceed with the order. Once done, the consumer receives a summary of the order (including the cost of the food, each line-item fee, estimated tax, and the Dasher's tip, which the consumer can select). Near the bottom of the screen above the "Place Order" button, a consumer can enter his or her payment methodology. As soon as the "Place Order" button is touched, the screen shows the real delivery time which is different from the advertised delivery time, and you can again click to view all details of the order or add items to the order from another store. DoorDash then sends a series of text messages showing each stage of the order until it is delivered. Consumers, including minors, receive these text messages although proper consent is not obtained. *See* illustrations below.



C.      **Payment Methods**

53.     As for payment methods, DoorDash takes virtually all forms of electronic

payments. A consumer can add a credit card, Google or Apple Pay, Venmo, PayPal, gift cards, or

debit cards. As DoorDash knows, the wide range of payment methods makes it easy for minor

children to place and pay for orders on DoorDash given the proliferation of parent loaded debit

cards like Greenlight, and the ability to use gift cards. *See* illustration below.



54.     The varying electronic payments methods do not vary the user experience on the

DoorDash platform. DoorDash maintains all consumer order information. The payment method

(credit or debit card number) provides insight into the type of consumer placing an order.

D.      **The Functionality of DoorDash's Technology**

55.     DoorDash's operation relies on sophisticated engineering in everything it does. In

describing this work, DoorDash says it "is rapidly growing a logistics platform that enables

millions of orders a day globally, and none of it would be possible without our world-class

engineering team."[29] DoorDash advertises its engineering as driving its "high impact projects

---

[29] DOORDASH ENGINEERING, https://doordash.engineering/ (last visited Apr. 14, 2023).

that power our velocity, reliability, and innovation."[30] DoorDash even advises merchant

restaurants how to perform "menu engineering" with respect to their prices.[31]

56.     The heart of DoorDash's engineering rests on proprietary algorithms. "At

DoorDash, route optimization is a key component of our dispatch system, known internally

as <u>DeepRed</u>. The routing algorithm design we chose—based on the <u>ruin-and-recreate principle</u>—

helped us to scale to meet the increased demand . . . ."[32] DoorDash says,

> Route optimization is a computationally intensive process . . . . Solving this
> problem for last-mile logistics introduces additional complexity because a
> multitude of orders must be delivered same-day under a range of
> constraints, including varying delivery windows, vehicle capacity, speed,
> and Dasher, our name for delivery drivers, availability.[33]

"Fortunately, DoorDash's team was able to quickly replace its manual, ops-driven solution with

a more automated one that could handle th[e] increased demand."[34] In other words, DoorDash's

system is subject to manipulation given the varying inputs underlying the algorithms.

57.     Hidden in its website frequently asked questions, DoorDash discloses "[t]here is

not a standard delivery radius for merchants on DoorDash. The delivery radius is set by an

algorithm based on how many Dashers are in your area and consumer demand. Plus and

---

[30] Engineering Blog, DOORDASH ENGINEERING, https://doordash.engineering/blog/ (last visited
Apr. 14, 2023).

[31] Sara DeForest, *How to Improve Your Restaurant Profit Margin*, DOORDASH FOR MERCHANTS
(Feb. 23, 2023), https://get.doordash.com/en-us/blog/restaurant-profit-margin.

[32] Ben Katz, *Scaling a routing algorithm using multithreading and ruin-and-recreate*,
DOORDASH ENGINEERING (Nov. 30, 2021), https://doordash.engineering/2021/11/30/scaling-a-
routing-algorithm-using-multithreading-and-ruin-and-recreate/.

[33] *Id.*

[34] *Id.*

Premium members do get access to a larger delivery area than Basic, potentially reaching more customers."[35] In other words, DoorDash manipulates service areas based on algorithmic data.

58.     Despite its optimization efforts, DoorDash's "real-time delivery logistics system, the environment, behavior of Dashers ([its] term for delivery drivers), and consumer demand are highly volatile. Because small changes to the decision-making process of matching deliveries to Dashers can cause a cascade of different assignment decisions, it is difficult to determine the expected outcome of any algorithm iteration or product change. All of this makes it hard to determine the impact of any change via offline sizing or analysis."[36] In other words, DoorDash cannot promise anything with respect to how or when a Dasher will make a delivery.

59.     But DoorDash pays close attention to the "small changes to the decision-making process," especially for consumers. DoorDash closely studies consumer habits to determine the best manner in which to "sell" them (some might say exploit them) on their habits. To this end, DoorDash conducts consumer surveys[37] and even generates annual reports[38] providing detailed analysis insight into key consumer habits. Upon information and belief, DoorDash "engineers" its platform to optimize speed, efficiency, and consumer habits even at the sake of being transparent, accurate, or legally compliant.

---

[35] *Frequently Asked Questions*, DOORDASH FOR MERCHANTS, https://get.doordash.com/en-us/faq (last visited Apr. 14, 2023).

[36] Sifeng Lin & Yixin Tang, *The 4 Principles DoorDash Used to Increase Its Logistics Experiment Capacity by 1000%*, DOORDASH ENGINEERING (Sept. 21, 2021), https://doordash.engineering/2021/09/21/the-4-principles-doordash-used-to-increase-its-logistics-experiment-capacity-by-1000/.

[37] Allison Van Duyne, *2022 Consumer Trends in the Restaurant Industry*, DOORDASH FOR MERCHANTS (May 23, 2022), https://get.doordash.com/en-us/blog/online-ordering-habits.

[38] *2022 Restaurant Online Ordering Trends, DoorDash for Merchants*, DOORDASH FOR MERCHANTS (July 21, 2022), https://get.doordash.com/en-us/resources/restaurant-online-ordering-trends.

### III.       DOORDASH'S HISTORY OF UNSAVORY BUSINESS PRACTICES

60.       When confronted with its misdeeds, DoorDash reverts to the corporate playbook of emphasizing philanthropic efforts. In many respects, these efforts are contrived. For example, when confronted with negative press over the strong-arm tactics DoorDash used on restaurants during the pandemic, DoorDash naturally developed an advertising campaign that highlighted its role helping restaurants survive during the pandemic, particularly restaurants owned by people of color.[39] While DoorDash likes to play up its "good citizen" image, its history is far less rosy.

61.       DoorDash's history is replete with unsavory practices towards the drivers, merchants, and consumers who use DoorDash's technology. First, DoorDash improperly retained Dashers' tips.[40] The tipping policy also resulted in a class action against the company, *Arkin v. DoorDash, Inc*., No. 1:2019-cv-04357 (E.D.N.Y. 2021). Ultimately, DoorDash changed the policy and CEO Xu tweeted "The new model will ensure that Dashers' earnings will increase by the exact amount of customer tips on every order."[41]

62.       DoorDash also earned money holding its Dashers' and restaurants' compensation for a week,[42] forcing them to pay fees to receive their compensation daily.[43] DoorDash then required its Dashers and restaurants to participate in programs designed to generate more income for DoorDash if its Dashers and restaurants want their earned compensation daily without a

---

[39] *See* DoorDash, *SOUTHSIDE MAGNOLIA*, YOUTUBE (Oct. 26, 2020), https://www.youtube.com/watch?v=Q42SPkzI3Dw; s*ee also* DoorDash, *Soul of the City*, YOUTUBE (June 15, 2021), https://youtu.be/aCriukDwvI4.

[40] *Supra* ¶ 2.

[41] Andy Newman, *DoorDash Changes Tipping Model After Uproar From Customers*, N.Y. TIMES (July 24, 2019), https://www.nytimes.com/2019/07/24/nyregion/doordash-tip-policy.html.

[42] *Supra* ¶ 2.

[43] *Supra* ¶ 2.

fee.[44] Frustrated with DoorDash's approach, several states and municipalities have adopted legislation to regulate how DoorDash charges restaurants. DoorDash's fee structure has long been controversial – so much so that, in 2021, the City of Chicago sued DoorDash claiming that DoorDash was marking-up menu items and violating the City's pandemic-related cap on food delivery fees. Chicago also alleged that the imposition of a $1.50 "Chicago Fee" was an unlawful attempt to circumvent the City's delivery fee cap and confused consumers on which entity levied and collected that fee.

63.     DoorDash's litigation history is far more extensive than the Chicago case. DoorDash has been sued in multiple jurisdictions for alleged violations of the Fair Labor Standards Act and various state equivalents, including recently in a case filed in the United States District Court for the Middle District of Florida, *Silva v. DoorDash*, No. 6:23-cv-00104. In such cases, DoorDash, to protect its contractor model, stresses it is not a delivery company. DoorDash also has been subject to litigation for using the trade dress – names, logos, trademarks, and other intellectual property – of various restaurants without permission. *See Burger Antics v. DoorDash*, No. 18-cv-00133 (N.D. Ill) (alleging that DoorDash was publicizing a relationship with the restaurant and delivering its food without permission). DoorDash has been sued because its Dashers have injured people, including killing at least one person, while driving for DoorDash and reading a DoorDash communication.[45] These unsavory business practices, however, pale in comparison with DoorDash's actions towards consumers, like Plaintiffs.

---

[44] *Supra* ¶ 2, 3.

[45] Emilie Raguso, *Motorist who killed pedestrian was driving for DoorDash, lawsuit says*, BERKELEYSIDE (Aug. 31, 2021), https://www.berkeleyside.org/2021/08/31/motorist-killed-pedestrian-berkeley-doordash-lawsuit.

## IV.   DOORDASH'S FRAUDULENT AND DECEPTIVE PRICING SCHEME

64.   Plaintiffs, and other consumers, are victims of DoorDash's deceptive, misleading, and fraudulent pricing scheme.

## A.   DoorDash Charges a Deceptive and Misleading Delivery Fee

65.   DoorDash "is not in the delivery business, does not provide delivery services, and is not a common carrier." While disavowing it performs or provides deliveries, DoorDash still charges a "Delivery Fee" on most orders. DoorDash explains this fee in different places. The information icon next to the Delivery Fee merely states, "Delivery fee varies for each restaurant based on your location and other factors." In its webpage under customer support, DoorDash defines Delivery fee as, "[t]his fee is charged on delivery orders and helps DoorDash cover costs associated with getting your order directly to you and can vary depending on the merchant location, and other factors, such as demand. Delivery fees currently can vary starting at $0." None of these statements affirmatively inform the consumer that DoorDash keeps the Delivery Fee in total, and that fee is truly a revenue source under the platform. The illustration below highlights certain aspects of DoorDash's Delivery Fee.



66.     In other words, DoorDash misleads consumers, like Plaintiffs, into believing the

Delivery Fee is based on their location and the restaurants' location. DoorDash further deceives

consumers, like Plaintiffs, into believing the Delivery Fee "helps cover the cost associated with

getting your order directly to you." DoorDash's emphasis on delivery issues like the distance

(whether from the consumer's or merchant's location) and "getting the order" to the consumer

creates the logical impression that hardworking Dashers who perform the "deliveries" receive the

"Delivery" Fee. But that is not true. DoorDash keeps all delivery fees. In reality, the Delivery

Fee is part of a fraudulently engineered pricing scheme that fluidly moves around predetermined

revenue goals for orders through different categories of advertised fees. DoorDash manipulates

the Delivery Fee at its whim, even advertising $0 for some deliveries, to entice consumers to

continue using the platform while raising fees in other areas. There is no such thing as no

delivery fees. The Delivery Fee is nothing more than a deceitful sales gimmick that is part of a

fraudulent bait-and-switch pricing model. The true goal of the "Delivery" Fee is selling monthly

"DashPass" accounts because consumers pay DoorDash a flat monthly rate even if consumers do

not place a single order. The practical effect of the Delivery Fee is consumers are tricked into

believing they are paying for work performed by others and for discounts that never truly

materialize or stand contrary to DoorDash's representations.

**B.      DoorDash Charges a Deceptive and Misleading Express or Priority Delivery Fee**

67.     "Express" delivery on DoorDash purportedly represents a speed delivery option

that costs consumers, like Plaintiffs, $2.99 for orders to be delivered directly to them. Unlike

with its other fees, DoorDash provides no written description of what "Express" Delivery Fee or

"direct to you" means. This lack of explanation is intentional insomuch as DoorDash knows it

cannot make an affirmative representation on delivery times. So, DoorDash does the next best

thing, it leaves the impression that ordering "Express" means consumers will receive their orders faster. To that end, DoorDash advertises "Express" delivery as having shorter delivery time windows—always five to ten minutes shorter than a standard time window—and includes the phrase "direct to you" under the charge. Then DoorDash identifies the "Express" delivery as a "Priority Fee" when itemizing its charges during checkout. The illustration below includes screenshots from DoorDash's App, its agreement and chatrooms reflecting the discussion above.



68.    As the above illustration reflects, only one reasonable view of the Express Fee exists: if a consumer pays the fee, DoorDash will ensure that consumer will get their food quicker. But that is not true. DoorDash has no ability to provide the express service it sells for priority deliveries "direct to" consumers, like Plaintiffs. According to DoorDash, the company neither provides deliveries nor controls the manner or means in which deliveries occur (as represented in its independent contractor agreement with its drivers and in litigation against them). Upon information and belief, DoorDash does not even tell its drivers when a consumer places an Express Delivery or otherwise informs them that the order is a priority. In internet chatrooms, even drivers discuss the misleading nature of the "Express" fee for deliveries direct

to you.[46] Nothing prevents a Dasher from stacking an Express order with other orders for

DoorDash or for another delivery company—taking more time rather than less and not delivering

"direct to you." And the time windows DoorDash advertises for its express service as five to ten

minutes shorter are demonstrably false. Once an order is placed, within seconds or sooner,

DoorDash reveals the previously concealed true delivery time window from its dispatch system,

which is typically longer than the advertised "Express" window and even the standard window in

many cases. DoorDash has information that could inform the consumer the order will not be any

more express than usual, but DoorDash does not provide consumers with that information. Upon

information and belief, in furtherance of its fraud, DoorDash sets its advertised delivery windows

for all orders to appear shorter than true market conditions to avoid losing sales. Consumers

literally pay for nothing when selecting the option for Express Delivery, rendering irrelevant

whether DoorDash's actually provided a faster delivery service on any isolated, individual order.

**C.**     **DoorDash Charges a Deceptive and Misleading "Expanded Range" Delivery Fee**

69.     DoorDash charges consumers, like Plaintiffs, a fee to make "expanded range

deliveries." DoorDash defines "expanded range delivery" to consumers as one in which the

"restaurant is outside of your normal delivery area." But consumers do not have a "normal

delivery" area. DoorDash tells its merchants something far different. In advertising materials to

merchants, DoorDash defines the "delivery area" or "delivery radius" as a function of how much

money a restaurant is willing to pay. DoorDash says, "[e]ach store on DoorDash has a circular

delivery area extending out from their store. Any consumer within that delivery area will be able

to see and order from that store. DoorDash defines the delivery area for each individual store

---

[46] Doug H., *Is Express Delivery on DoorDash worth it? Here's what it really does*, RIDESHARING
DRIVER (Aug. 10, 2022), https://www.ridesharingdriver.com/doordash-express-delivery/.

based on their partnership structure on DoorDash."[47] In other words, one restaurant, like a Chick-fil-a, might be located closer to a consumer's home, but DoorDash could assign deliveries to that home to a different Chick-fil-a further away if that restaurant pays DoorDash more money under its partnership structure for a larger delivery area. DoorDash then charges consumers more for Delivery Fees and for out-of-range deliveries despite closer delivery options being available. *See* the below illustration of how Expanded Range Delivery Fee works.



70.     The illustration below reflects a test on the DoorDash platform under which DoorDash will apply the Expanded Range Fee to a DashPass account while not applying that fee to a standard account when placing the same order at the same time to the same restaurant for delivery to the same home. If the Expanded Range Fee is premised on a set geographic delivery area for a consumer, as DoorDash represents, that fee would be applied to both accounts equally. But DoorDash likely applies the Expanded Range Fee to DashPass accounts on occasions to recoup some of the discounts provided under that program.

---

[47] DoorDash Dasher Support, *What is a "Delivery Radius" or a "Delivery Area" on DoorDash?*, DOORDASH, https://help.doordash.com/dashers/s/article/What-is-a-Delivery-Radius-or-a-Delivery-Area-on-DoorDash?language=en_US (last visited Apr. 14, 2023).

 

**DashPass Account**   **Standard Account**

71.     As the above test case reveals, when ordering from a DashPass Account and a Standard Account with the same order from the same restaurant at the same time to be delivered to the same location, DoorDash makes numerous misrepresentations. DoorDash falsely tells the DashPass account holder that the delivery fee of $2.99 is reduced to zero when in fact the Delivery Fee is only $0.49 as reflected on the standard account. DoorDash reduces the service fee on the DashPass which lowers the taxes, but DoorDash then assesses an Expanded Range Fee on the DashPass account to recoup part of the discount. DoorDash falsely represents that the DashPass holder saved $4.22 on this order when that holder really saved only $0.73.

72.     Under another test of the DoorDash platform during a different time of day, when ordering from the same restaurant at the same time with the same menu cost delivered to the same location, DoorDash applied the Expanded Range Fee to a standard account but not the DashPass account. DoorDash unilaterally decides where and how to apply the Expanded Range Fee despite that fee supposedly being advertised as tied to a consumer's normal delivery area. As our test reveals, the delivery area has nothing to do with it. And DoorDash charged the standard account ($7.99) more than twice the amount of the advertised delivery cost ($3.99) to the DashPass account for the same order at the same time to the same place. Contrary to its

representations, DoorDash simply makes up charges at its whim because consumers truly do not know the standard amount since DoorDash misrepresents all its charges. *See* illustration below.



| Standard Account | | DashPass Account | |
|---|---|---|---|

**Standard Account**            **DashPass Account**

## D.   DoorDash Charges Consumers Hidden Marketing Fees

73.   DoorDash advertises menu item promotions that include hidden fees DoorDash charges consumers without disclosing them ("Marketing Fees"). In describing this scheme, DoorDash explains to merchant restaurants (but not to consumers like Plaintiffs):

> Menu item promotions are promotions that help you attract customers by using menu items in a couple of different ways to attract orders. Customers will discover your restaurant in the Offers Hub which helps surface the most relevant offers that they are most likely to choose. You can also choose to target this promotion to certain customers only based on certain factors. . . .
>
> Customers who qualify for the promotions will see them in the Offers Hub either based on the spend threshold or the items they have selected in their cart.
>
> You'll pay for the item or discount offered to the customer as well as a $0.99 marketing fee to power our Offers Hub and marketing efforts to deliver the best customers that will order from you and return as well.[48]

---

[48] DoorDash Merchant Support, *Menu Item Promotions - Merchant Promotion Overview*, DOORDASH, https://help.doordash.com/merchants/s/article/Menu-Item-Promotions-Merchant-Promotion-Overview?language=en_US (last visited Apr. 14, 2023).

Unfortunately for consumers, the "You'll pay" is truly the consumer, not the restaurant, since this undisclosed fee is included in the menu price that is charged to and paid by consumers only. Consumers pay for DoorDash's undisclosed $0.99 Marketing Fee on promotional items without ever knowing the hidden charge was included as part of a "promotion." DoorDash applies this fee in the same manner and in the same amount. *See* illustration below.

| Menu Item Promotion Structures | |
|---|---|
| Item Promos (Free over $X) | Marketing fee + item offered |
| Buy One Get One | Marketing fee + item offered |
| Buy Item Get x% or $Off | Marketing fee + discount |

**E.      DoorDash Charges Consumers Hidden Commission Fees**

74.      Embedded in every order that consumers place on DoorDash are undisclosed "commissions," which are truly nothing more than another hidden fee that consumers pay. These commissions range from 20% to 29% on delivery orders and from 8% to 10% on pickup orders (collectively "Commission Fee"). *See* illustration below.



75.     DoorDash explains to restaurants but not consumers, "[w]hen [a restaurant] list[s] [its] business on DoorDash, [it] pay[s] a percentage of the order subtotal — known as a "commission rate" — for each order processed through our platform."[49] The commission allegedly covers a range of contrived delivery and other costs, including undisclosed credit card processing surcharges paid on consumer transactions at a rate of 2.9% plus $0.30 per transaction. *See* illustration below.



76.     Regardless how DoorDash frames the issue, DoorDash charges a Commission Fee on each order that consumers pay and DoorDash collects and retains the payment without ever informing the consumer, including payments for credit card surcharges in violation of 12 C.F.R. § 1026.9(d). This approach represents the essence of deception and fraud.

**F.     DoorDash Makes Misleading and Manipulative Statements about its Fees**

77.     DoorDash's explains its fees in a manner that furthers its deception, omitting material facts about its billing practices. First, DoorDash uses small icons with a lower-case "i"

---

[49] *Frequently Asked Questions*, DOORDASH FOR MERCHANTS, https://get.doordash.com/en-us/faq (last visited Apr. 14, 2023).

enclosed in a circle to provide curt explanations of certain fees, but only if a consumer touches the icon to access it. These explanations conceal and misrepresent not only the true nature of the fees, but also the identity of who receives them. DoorDash places slightly different information about its pricing and fees where consumers would not likely look for them, i.e., on its merchant restaurant's menu page. On that page, hidden near the top, underneath the restaurant's logo and bolded name and above larger bolded icons for pickup and delivery options, DoorDash places an informational icon for pricing and fees in small grey font. When a consumer clicks on that icon, DoorDash provides various explanations of its charges including which fees all "go to DoorDash and help cover the costs of operating the DoorDash platform." By strategically locating this pricing and fee icon in the same place where hungry consumers are ordering food and where menu items prominently display pricing information under them already, DoorDash limits the likelihood consumers will see this information. Instead, consumers are more likely to see the icons next to fees during the checkout process, and for Delivery Fees, that icon merely states, "Delivery fee varies for each restaurant based on your location and other factors." There is no mention about DoorDash retaining the fee or it being part of the cost to operate the platform. Thus, the location and contradictory content of the icons are deceptive. *See* illustration below.



78.     All delivery, marketing, and commission fees that DoorDash directly or indirectly charges consumers, like Plaintiffs, are misleading, deceptive, and fraudulent. DoorDash creates these misleading and hidden fees because DoorDash knows that consumers will stop using its platform as the fees to use the platform that go directly to DoorDash increases.[50] And DoorDash, encourages (even creating the ability for) restaurants to increase menu prices for delivery items because that means more money for DoorDash, without consumers realizing that DoorDash is responsible for the increased costs.[51]

79.     DoorDash creates the misperception that Dashers receive delivery fees for the delivery services they perform when DoorDash retains the fees. Instead, DoorDash only gives Dashers a "delivery offer," which is a predetermined compensation package for each order that is separate and apart and not identified on any consumer order. The offer is directed to a specific Dasher who can accept or reject the offer, but the rejection comes with consequences as it may interfere with future delivery offers. Dasher compensation principally consists of a base pay, which DoorDash creates and advertises as ranging from $2 to $10 per trip,[52] but appears to average around $3 per trip. DoorDash may also give a Dasher promotional pay for an order and the driver might receive a tip.[53] None of these two forms of payment is guaranteed to be part of a delivery offer. While DoorDash will reveal to Dashers the promotional pay included in its offer before they accept that offer, DoorDash will conceal from Dashers whether the consumer tipped

---

[50] *The impacts of price controls*, DOORDASH (Apr. 8, 2021), https://doordash.news/company/the-impacts-of-price-controls/amp/.

[51] *Frequently Asked Questions*, DOORDASH FOR MERCHANTS, https://get.doordash.com/en-us/faq (last visited Apr. 14, 2023).

[52] DoorDash Dasher Support, *How Dasher Pay Works*, DOORDASH, https://help.doordash.com/dashers/s/article/How-is-Dasher-pay-calculated?language=en_US (last visited Apr. 14, 2023).

[53] *Id.*

on an order until after the delivery is complete. DoorDash conceals the tip, so Dashers are more likely to accept the payment offer. One of the most critical issues for Dashers is the lack of a consumer tip. The tip represents a significant portion of Dasher's compensation, making the difference between a profitable or losing job.[54] But Dashers frequently receive no or little tip because DoorDash misleads naïve consumers into believing Dashers (not DoorDash) receive the range of delivery fees for deliveries that the Dashers (not DoorDash) perform. But Dashers have little recourse for DoorDash's actions given they waive crucial rights under their DoorDash independent contractor agreement. And DoorDash mistakenly believes consumers are similarly constrained by DoorDash's Terms and Conditions.

## V.     THE DOORDASH "TERMS AND CONDITIONS"

80.     DoorDash does not require consumers, like Plaintiffs, to affirmatively acknowledge the Terms and Conditions because DoorDash knows that reading those terms (which, if enforceable, represent an unconscionable, contract of adhesion) would cause consumers to reconsider using the platform.

81.     As a threshold matter, in paragraph 2, the Terms and Conditions read,

> If you access any of our websites located at https://www.doordash.com/ . . . install or use the DoorDash or Caviar mobile application, install or use any other technology supplied by DoorDash (collectively, the "Technology"), or access or use any information, function, feature, or service made available or enabled by DoorDash (collectively, the "Services," which includes the Technology), click or tap a button or take similar action to signify your affirmative acceptance of this Agreement, or complete the DoorDash account registration process, you, your heirs, assigns, and successors (collectively, "you" or "your") hereby represent and warrant that: (a) you have read, understand, and agree to be bound by this Agreement and any

---

[54] For people using DoorDash and reading this complaint, please tip the Dashers. Tipping is how they truly make their money.

> future amendments and additions to this Agreement as published from time
> to time at https://www.doordash.com/terms/ or through the Technology. . .[55]

In other words, DoorDash only informs consumers in the Terms and Conditions that signing-up

to use DoorDash will contractually bind the consumer to various terms and forces them to make

certain acknowledgements the impact of which waives and limits important rights. DoorDash

does not even inform consumers when its Terms and Conditions change because DoorDash

believes consumers already agreed to future amendments of the Terms and Conditions. Upon

information and belief, DoorDash recently changed its terms and conditions to account for issues

raised in prior lawsuits about its deceptive billing practices.

82.    To avoid liability for illegal acts, the Terms and Conditions assert strategic

acknowledgments, such as,

> You acknowledge and agree that DoorDash is not a merchant, retailer,
> restaurant, grocer, pharmacy, chemist, delivery service, or food preparation
> business, and has no responsibility or liability for the acts or omissions of
> any Merchant or any Contractor. Merchants are the retailers of the products
> or services offered through the Services. DoorDash is not in the delivery
> business, does not provide delivery services, and is not a common carrier.
> DoorDash provides the Services to facilitate the transmission of orders by
> Users to Merchants, including orders for pickup or delivery by Contractors
> and/or Merchants.[56]

83.    The Terms and Conditions provide quasi-indemnification language, stating:

> You are the sole authorized User of any account you create through the
> Services. You are solely and fully responsible for all activities that occur
> under your password or account. You agree that you shall monitor your
> account to prevent use by minors, and you will accept full responsibility for
> any unauthorized use of your password or your account.[57]

---

[55] *See Consumer Terms and Conditions – United States (Including Puerto Rico)*, DOORDASH ¶ 2
(Feb. 3, 2023), https://help.doordash.com/legal/document?type=cx-terms-and-
conditions&region=US&locale=en-US.

[56] *Id.* ¶ 6(a).

[57] *Id.* ¶ 7.

Specific indemnification language is included in paragraph 18 of the Terms and Conditions in which DoorDash seeks consumers to indemnify DoorDash for all claims and expenses.

84.     Paragraph 14 of the Terms and Conditions (which has twelve subparts) is a forum selection provision that purports to require that all claims arising out of the terms and conditions be subject to arbitration; that purports to waive a jury trial; that purports to ban public injunctive relief; and that purports to ban class action lawsuits.

85.     The Terms and Conditions also incorporate an attempted Limitation of Liability, that purportedly caps DoorDash's liability at "the greater of amounts actually paid by and/or due from you to DoorDash in the six (6) month period immediately preceding the event giving rise to such claim" and to exclude "any indirect, punitive, special, exemplary, incidental, consequential or other damages of any type or kind . . . .").[58]

86.     DoorDash's Terms and Conditions are a contract of adhesion. The Terms and Conditions are a form or standardized contract that is entirely prepared and offered by DoorDash and entirely for its benefit. DoorDash created its Terms and Conditions with disproportionate bargaining power over consumers, like Plaintiffs, who could not, cannot, and did not negotiate any terms let alone understand them. Rather, DoorDash presents its Terms and Conditions on a take-it-or-leave-it basis. Under this approach, consumers only obtain DoorDash's services by acquiescing to the form contract.

## VI.     DOORDASH TARGETS MINORS AND KNOWS MINORS FREQUENTLY USE DOORDASH'S SERVICE

87.     In its Terms and Conditions, DoorDash says that any consumer who uses its technology "represents and warrants" that s/he is "of legal age in the jurisdiction in which you

---

[58] *Id.* ¶ 21.

reside to form a binding contract with DoorDash."[59] DoorDash's terms purport to hold parents responsible for minors who use their parents' account.[60] While disavowing any contract with minors, DoorDash does nothing to prevent minors from accessing its technology. Certainly, DoorDash has the technology to verify consumers' age as it presently does for alcohol sales. But DoorDash simply refuses to employ that technology when consumers sign-up to use its platform, despite knowing that a significant percentage of its 32 million users are minor children. Likely, millions of minors use the DoorDash platform. *See* illustration of DoorDash's alcohol use policy.



88.     In the Apple Store, DoorDash allowed its app to be rated for ages twelve and up. *See* illustration below.



---

[59] *Id.* ¶ 2.

[60] *Id.*

89.     In the Google store, there is no age limit for the app. DoorDash allowed its app to be rated E for everyone. *See* illustration below.



90.     DoorDash does not require any age verification to register to use its platform, despite having and using age verification technology in the sales process for alcohol. Nor does DoorDash use any parental control on either its app or its website. Nor does DoorDash require a credit card for transactions, which would limit minors from ordering. Instead, DoorDash allows debit cards, preloaded debit cards (like Greenlight cards), and even gift cards, all of which are payment methods that minors use frequently. Indeed, during a podcast, Jonathan Levin, Dean of Stanford Graduate School of Business, told Tony Xu, a DoorDash co-founder and its Chief Executive Officer, that Levin's 13-year-old son wanted to trade his Nike and Amazon birthday gift cards for DoorDash gift cards.[61] And DoorDash knows that if a parent has ever given a credit card to a child for any online purchase, that information is saved on the minor's mobile/online pay account, making it accessible for any minor who establishes their own DoorDash account with basic information and a cellular telephone and/or an email address.

---

[61] Stanford Graduate School of Business, *Tony Xu, MBA '13, Cofounder and CEO, DoorDash*, YOUTUBE (starting at 30 second mark) (Feb. 12, 2021), https://www.youtube.com/watch?v=5TidMV_ux_4.

91.     DoorDash also advertises to minors, including a Sesame Street-themed television ad campaign that aired during the 2021 Super Bowl. *See* illustration below.[62]



DoorDash reportedly paid $5.5 million for its Sesame Street commercial and only committed to contributing up to $1 million to Sesame Workshop. It cannot seriously be argued, therefore, that a Sesame Street-themed advertising campaign is not a campaign directed at children.

92.     In its Privacy Policy, DoorDash tacitly admits children under 18 use its delivery app. DoorDash says, "[o]ur Services are not intended for children under 16 years of age, and we do not knowingly collect personal information from children under the age of 16."[63] At a minimum, the statement implies that DoorDash's services are intended for 16 and 17 year olds who have not reached the age of majority or possess the capacity to contract.

93.     DoorDash cannot credibly contend it does not know minor children use its service. Kids commonly have cellular phones, which is truly all that is necessary to use DoorDash. According to a Stanford Medicine study, "nearly all children had phones by age 15

---

[62] Funny Commercials, *DoorDash Super Bowl Commercial 2021 Daveed Diggs Sesame Street*, YOUTUBE (Feb. 7, 2021), https://youtu.be/RWViEadCvuM.

[63] *Consumer Terms and Conditions – United States (Including Puerto Rico)*, DOORDASH (Feb. 3, 2023), https://help.doordash.com/legal/document?type=cx-terms-and-conditions&region=US&locale=en-US.

years."[64] Tellingly, DoorDash deliveries (and those of other web-based services) are becoming disruptive at schools—particularly high schools—across the country, raising security concerns and administrative nightmares. Many school districts have addressed DoorDash deliveries in schools with some banning and some allowing such deliveries, including school districts in New Jersey, Massachusetts, Kansas, California, and Maryland to name a few.[65] Dashers even talk about these problem deliveries in chat rooms.[66] One article compared DoorDash's penetration into schools to the cult-classic movie, Fast Times at Ridgemont High.[67] But this is no laughing matter. With each such delivery, another child falls victim to DoorDash's illegal practices.

---

[64] Erin Digitale, *Age that kids acquire mobile phones not linked to well-being, says Stanford Medicine Study*, STANFORD MEDICINE NEWS CENTER (Nov. 21, 2022), https://med.stanford.edu/news/all-news/2022/11/children-mobile-phone-age.html.

[65] Beccah Hendrickson, *South Jersey students ordering food to high school causing security issues, district says*, 6ABC (Feb. 1, 2022), https://6abc.com/west-deptford-school-district-food-delivery-safety-doordash-uber-eats/11530002/; Brittany Polito, *Pittsfield School Policy Panel Considers Student DoorDash Ban*, IBERKSHIRES.COM (Mar. 3, 2023, 12:29 PM), https://www.iberkshires.com/story/71088/Pittsfield-School-Policy-Panel-Considers-Student-DoorDash-Ban.html; Katie Kausch, *Students can get DoorDash deliveries. Just follow the security rules, N.J. school says.*, NJ.COM (Feb. 3, 2022, 9:44 AM, updated Feb. 16, 2023, 1:11 AM), https://www.nj.com/gloucester-county/2022/02/students-can-get-doordash-deliveries-just-follow-the-security-rules-nj-school-says.html; Audrey Menzies, *Principal, students contemplate Doordash deliveries to the school*, KC PIPER NEWS (Sept. 9, 2019), https://www.kcpipernews.com/18459/feature/principal-and-students-contemplate-doordash-deliveries-to-the-school/; Jonathan Sarabia, *Parents debate over the safety of delivering food to students in school*, KION NEWS CHANNEL 5/46 (Nov. 30, 2021, 11:52 AM), https://kion546.com/news/monterey-county/2021/11/30/parents-debate-over-the-safety-of-delivering-food-to-students-in-school/; Elaine S. Povich, *Students, bored by cafeteria fare, love food delivery services; schools don't.*, WASH. POST (June 9, 2019, 8:30 AM), https://www.washingtonpost.com/health/students-bored-by-cafeteria-fare-love-food-delivery-services-schools-dont/2019/06/07/2568d12c-8617-11e9-98c1-e945ae5db8fb_story.html.

[66] *Why are (some) schools telling students that they cannot order food deliveries through DoorDash, GrubHub or UberEats, to be delivered to their schools?*, QUORA (June 6, 2019), https://www.quora.com/Why-are-some-schools-telling-students-that-they-cannot-order-food-deliveries-through-DoorDash-GrubHub-or-UberEats-to-be-delivered-to-their-schools.

[67] Mustafa Gatollari, *High School Students DoorDash Lunch to School, Get Sent to Admin's Office in Viral TikTok*, DISTRACTIFY (Jan. 30, 2023, 12:06 PM EST), https://www.distractify.com/p/students-doordash-food-to-school.

Despite having technology to handle almost two billion orders annually (including orders for alcohol), DoorDash does absolutely nothing to verify the age of its users.

## VII.   THE TRUTH ABOUT DOORDASH'S SCHEME

94.     DoorDash is committing a massive fraud. DoorDash presents its predatory pricing scheme to consumers like Plaintiffs in a uniform manner. Regardless of the device used (Android or Apple) or the platform accessed (app or website), each consumer signs-up with DoorDash in the same basic manner and is exposed to the same deficient language about the impact of signing-up. In this respect, DoorDash treats all consumers the same, failing to provide them with a definitive offer with sufficient consideration or with proper inquiry notice or otherwise allow them to manifest their assent to a contract when registering to use the DoorDash platform. Each consumer, like each Plaintiff, interacts with DoorDash in the same manner and is subjected to the same fraudulent scheme that DoorDash advances with the same deceitful representations. In the end, consumers, like Plaintiffs, are injured in the same way by incurring monetary damages, which can be calculated based on information from DoorDash's records.

95.     Under its fraudulent scheme, DoorDash misrepresents that it is collecting delivery fees for Dashers for their delivery services when in fact DoorDash is collecting fees for itself that have nothing to do with deliveries. In making these misrepresentations, DoorDash makes a wide range of others about charges for the speed and distance of deliveries. And then DoorDash hides Marketing and Commission Fees in menu items that consumers unwittingly pay and DoorDash collects. The Commission Fee includes surcharges not only on credit card transactions, but also on debit and pre-paid debit card transactions in violation of applicable laws. DoorDash's predatory practices in effect steals consumers' hard-earned money and their precious choice to make informed decisions when using technology to order in the on-demand delivery market.

96.     Adding to its deception, without providing any true inquiry notice, and avoiding

clickwrap agreements used with merchants and drivers, DoorDash allows consumers to register

in a manner that draws no meaningful attention to its Terms and Conditions. DoorDash then uses

its Terms and Conditions to try to force unknowing consumers into strategic acknowledgements,

while DoorDash "discloses" bits and pieces of its fraudulent conduct. DoorDash buries these

feigned "disclosures" in pages of complex legalese, knowing consumers are unlikely to see them,

to preserve the argument that no fraud exists given these limited, eclectic, inconspicuous

"disclosures." DoorDash knows that even if a lay consumer could find the misleading, partial

disclosures, consumers could not understand them, or piece the entire scheme together. To that

end, DoorDash sates:

> (a) **Prices & Charges.** You understand that: (i) the prices for menu or other items
> displayed through the Services may differ from the prices offered or published by
> Merchants for the same menu or other items and/or from prices available at third-
> party websites and that such prices may not be the lowest prices at which the
> menu or other items are sold and may change at any time without notice; (ii)
> DoorDash has no obligation to itemize its costs, profits, or margins when
> publishing such prices; and (iii) pricing may change at any time, in the discretion
> of DoorDash or the Merchant (depending on which party sets the given price). . . .

> (b) **Strikethrough Pricing (United States Orders).** This Section 12(b) applies to
> United States Orders. DoorDash may use strikethrough pricing for certain items
> (for example, when presenting a discount or promotional price for items).
> DoorDash does not represent that the strikethrough price was the regular or
> former price of items for any particular period of time and the time period may
> vary widely depending on the items. DoorDash may also rely on Merchants or a
> third party to provide information about the regular or former price of items
> offered by those Merchants or a third party, and DoorDash's strikethrough price
> therefore may represent the price that DoorDash, a Merchant, or a third party
> offered the item for sale for some period of time. The strikethrough price may
> also be an introductory price that was offered for a short period of time. Unless
> otherwise specified, the strikethrough price represents a non-member discount to
> the extent the Merchant has a membership program. . . .

> (e) **Fees for Services.** DoorDash may change the fees that DoorDash charges you
> as we deem necessary or appropriate for our business, including but not limited to
> Delivery Fees, Service Fees, Small Order Fees, Expanded Range Fees, Regulatory

Response Fees, and Surge Fees. DoorDash may offer different pricing to customers based on a variety of factors, including but not limited to geographic areas or usage. DoorDash may also charge you additional fees as required by law. Further, DoorDash may charge Merchants fees on orders that you place through the Services, including commissions and other fees, and may change those Merchant fees as we deem necessary or appropriate for our business or to comply with applicable law. DoorDash may charge you a Service Fee for the convenience of ordering through the DoorDash platform.[68]

DoorDash's purported "contractual" Terms and Conditions are truly nothing more than an instrumentality of, or a part of the means for, accomplishing the fraud perpetuated on consumers.

97.     Relying on its Terms and Conditions to shield it from exposure and to bless its dubious approach, DoorDash engages in deceit. DoorDash uses strikethrough pricing (where an original price is struck and replaced with a lower price) when advertising both menu items and its fees. This approach is effectively a bait-and-switch sales gimmick because DoorDash moves the costs from one category of fee to another and consumers never truly know the standard pricing. Forgoing prominent, informational tabs with full and appropriate disclosures, DoorDash hides from consumers its concession that "DoorDash does not represent that the strikethrough price was the regular or former price of items for any particular period of time" and that its menu pricing "may not be the lowest prices at which the menu or other items are sold and may change at any time without notice."[69] Instead, DoorDash's promotes "informational" tabs with contradictory and misleading explanations that dissuade the consumer from searching further. And then DoorDash advertises delivery windows that mislead hungry consumers, who have all the attendant physical and psychological symptoms (including impacted decision making) that accompany hunger, into believing that DoorDash will delivery in a time that DoorDash already

---

[68] *See Consumer Terms and Conditions – United States (Including Puerto Rico)*, DOORDASH ¶ 12(e) (Feb. 3, 2023), https://help.doordash.com/legal/document?type=cx-terms-and-conditions&region=US&locale=en-US.

[69] *Id.*

knows it cannot meet. With these artifices in place, DoorDash unilaterally applies to orders the Delivery Fee, and Expanded Range Fee, and allows consumers to purchase the Express option for yet another fee, leaving the impression drivers are making deliveries further and faster and incurring charges along the way. But these fungible fees have nothing to do with delivery drivers. DoorDash invented them and retains them in total. Similarly, DoorDash also retains a Marketing Fee that DoorDash hides in promotional items and a Commission Fee that DoorDash hides in all menu items without ever informing consumers that they are paying these fees. In the end, DoorDash's deceit generates billions in annual revenue using tactics that manipulate, trick, deceive, and/or induce consumers, like Plaintiffs, into using DoorDash not only at a much higher and premium price, but also without receiving the true benefit of their bargain. In other words, consumers hold the risk and fund the cost of DoorDash's fraudulent game of 'Catch Me If You Can.' Plaintiffs now sue to recover their damages from DoorDash's predatory pricing practices.

98.     This case raises two fundamental questions: (1) whether DoorDash's wrap agreement creates a contract between DoorDash and consumers, including the consumers' waiver of important rights without ever expressly acknowledging such waiver;[70] and (2) if its wrap agreement can create a contract between DoorDash and consumers, whether, such a contract is effective against minor consumers. These fundamental questions are asserted on behalf of a potential class of millions of consumers nationwide and tens, if not hundreds, of thousands in Maryland alone. Each individual fell victim to DoorDash's common, fraudulent, and deceptive scheme of assessing fees it charges without providing basic contract elements (including sufficient notice) that the Terms and Conditions create a binding contract.

---

[70] Plaintiffs submit it cannot. *See generally Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014) (describing browsewrap agreements as those that allow users to continue to use a website without ever visiting the page that hosts the browsewrap agreement).

99.     Plaintiffs seek to recover these damages for themselves and a class of similarly

situated individuals who paid: (1) any and all delivery fees of any kind to DoorDash as

DoorDash's records will establish; (2) hidden marketing fees on promotional items as

DoorDash's records similarly will establish; and/or (3) any and all hidden commissions or

commission fees that DoorDash included in or took from menu items advertised to and paid by

consumers using the DoorDash platform, which also will be reflected in DoorDash's records.

## CLASS ACTION ALLEGATIONS

100.    Plaintiffs bring this action on their own behalf and as a class action on behalf of

the similarly situated class members as defined herein. This action is maintainable as a class

action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3). The class consists of tens or hundreds

of thousands, if not millions, of DoorDash users who were inappropriately and illegally charged

fees as part of the DoorDash scheme.

101.    Specifically, Plaintiffs bring this suit on behalf of the following Class: All persons

in the United States who, within the relevant statute of limitations periods, established a

DoorDash account and placed an order using either the DoorDash app or the website

DoorDash.com and who paid a "Delivery Fee," an "Express (or Priority) Delivery Fee," and/or

an "Extended Range Delivery Fee" and/or who purchased a promotional menu item that included

a hidden "Marketing Fee" and/or who purchased a menu item that included a hidden

"Commission Fee" and/or who paid any combination of these fees ("the Nationwide Class").

102.    Plaintiff Hecox, individually and/or as next of friend for his minor child R.E.H.

who is a party to this case, and Plaintiff R. Hecox who just reached age of majority, also bring

this suit on behalf of the following Subclasses:

a.      All parents and/or guardians in the United States who, within the relevant statute of limitations periods, established a DoorDash account and whose minor child or children placed an order from that account using either the DoorDash app or the website DoorDash.com and who paid a "Delivery Fee," an "Express Delivery Fee" and/or an "Extended Range Delivery Fee" and/or who purchased a promotional menu item that included a hidden "Marketing Fee" and/or who purchased a menu item that included a hidden "Commission Fee" and/or who paid any combination of these fees (the "Nationwide Parents Class").

b.      All minors in the United States who, within the relevant statute of limitations periods, established a DoorDash account and who placed an order from that account using either the DoorDash app or the website DoorDash.com and who paid a "Delivery Fee," an "Express Delivery Fee" and/or an "Extended Range Delivery Fee" and/or who purchased a promotional menu item that included a hidden "Marketing Fee" and/or who purchased a menu item that included a hidden "Commission Fee" and/or who paid any combination of these fees (the "Nationwide Minor Class").

c.      All persons resident in the State of Maryland who, within the relevant statute of limitations periods, established a DoorDash account and placed an order using either the DoorDash app or the website DoorDash.com and who paid a "Delivery Fee," an "Express Delivery Fee" and/or an "Extended Range Delivery Fee" and/or who purchased a promotional menu item that included a hidden "Marketing Fee" and/or who purchased a menu item that included a hidden "Commission Fee" and/or who paid any combination of these fees (the "Maryland Class").

d.      All parents and/or guardians resident in the State of Maryland who, within the relevant statute of limitations periods, established a DoorDash account and whose minor

child or children placed an order from that account using either the DoorDash app or the website DoorDash.com and who paid a "Delivery Fee," an "Express Delivery Fee" and/or an "Extended Range Delivery Fee" and/or who purchased a promotional menu item that included a hidden "Marketing Fee" and/or who purchased a menu item that included a hidden "Commission Fee" and/or who paid any combination of these fees (the "Maryland Parents Class").

      e.    All minors resident in the State of Maryland who, within the relevant statute of limitations periods, established a DoorDash account and who place an order from that account using either the DoorDash app or the website DoorDash.com and who paid a "Delivery Fee," an "Express Delivery Fee" and/or an "Extended Range Delivery Fee" and/or who purchased a promotional menu item that included a hidden "Marketing Fee" and/or who purchased a menu item that included a hidden "Commission Fee" and/or who paid any combination of these fees (the "Maryland Minor Class").

103.    DoorDash subjected Plaintiffs (including the Nationwide Class, Nationwide Parents Class, Nationwide Minor Class, Maryland Class, Maryland Parents Class, Maryland Minor Class) (collectively "Plaintiffs") to the same wrongdoing and harmed them in the same manner. Plaintiffs seek to enforce the same rights and remedies pursuant to the same legal theories including: declaratory relief, injunctive relief, fraud (intentional misrepresentation or deceit), negligent misrepresentation, and a violation of the Maryland Consumer Protection Act [Md. §13-301 Unfair or deceptive trade practices].

104.    Numerosity: The proposed Class and Subclasses are so numerous that joinder of all members is impracticable. While the precise number and identities of class members are unknown at this time, targeted discovery will provide the information.

105.     Typicality: The claims of Plaintiffs are typical of the claims of the Class and Subclasses because the claims arise from the same event or practice or course of conduct. Plaintiffs are advancing legal theories applicable to the Class and Subclasses. And, Plaintiffs' measure of damages is the same as the measure of damages applicable to the Class and Subclasses.

106.     Adequacy: Plaintiffs and their counsel will fairly and adequately represent and protect the interest of the Class and Subclasses. Plaintiffs' counsel have considerable and substantial experience in prosecuting and defending complex litigation, including class actions. Plaintiffs and Plaintiffs' counsel intend to vigorously pursue this litigation on behalf of themselves and the Class and Subclasses and have the financial resources to do so. Neither Plaintiffs nor Plaintiffs' counsel have any interests adverse to the interests of the Class and Subclasses.

107.     Superiority of Class Action: Plaintiffs have suffered the same harm because of DoorDash's unlawful conduct, and the same claims and defenses are at issue for all Plaintiffs. A class action is superior to other methods for the fair and efficient adjudication of the controversy. Joinder of individual members of the Class and Subclasses is impractical, inefficient, and unduly burdensome on the individual members. By employing a class action vehicle, a single court can adjudicate the issues resulting in both judicial economy and the fair and equitable handling of all class claims. And a class action conserves the parties' resources and protects the rights of the Class and Subclasses. Were these claims to be adjudicated individually, as a practical matter, the individual adjudications would be dispositive of the interests of other members not parties to the adjudication and could substantially impair and impede the ability of the other members of the Class and Subclasses to protect their interests.

108.     Common Questions of Law and Fact Predominate: To further satisfy the

requirements of Fed. R. Civ. P. 23, there are questions of law and fact common to Plaintiffs'

claims and the claims of the Class and Subclasses that predominate over any question of law or

fact that relates to any individual member of the Class or Subclasses. Common questions of law

and fact include, without limitation, at least:

- Whether DoorDash properly and appropriately informed Plaintiffs about the Terms and Conditions when they signed up for the DoorDash service, including:

    o   Whether DoorDash made a definitive offer supported by consideration.

    o   Whether by signing up for DoorDash a consumer had the requisite intent or assent to contract with DoorDash that, among other things, purported to require the arbitration of any disputes and to impose a limit on the type and amount of damages that could be recovered.

    o   If a contract was formed, whether the arbitration clause is severable from the rest of the contract and whether it is supported by sufficient consideration.

    o   If a contract is formed, whether the arbitration agreement is a contract of adhesion.

    o   If a contract was formed, whether minor Plaintiffs have disavowed or disaffirmed the contract.

- Whether DoorDash made false representations of material fact.

- Whether DoorDash knew or should have known that its representations of material fact were false.

- Whether DoorDash represented material fact with such reckless disregard for the truth that knowledge of the falsity can be imputed to DoorDash.

- Whether DoorDash falsely represented material fact with the purpose of defrauding or deceiving consumers.

- Whether Plaintiffs justifiably relied or had a presumption of reliance on DoorDash's false representations of material fact given the true nature of DoorDash's false representation was not determinable through the exercise of ordinary intelligence or diligence.

- Whether Plaintiffs suffered actual damages because of their justifiable or presumed reliance on DoorDash's false representations of material fact.

- Whether DoorDash owed a duty of care and/or candor to Plaintiffs as a matter of law.

- Whether DoorDash, in breach of its duty of care and/or candor to Plaintiffs, negligently made false representations of material fact.

- Whether DoorDash, in breach of its duty of care and/or candor to Plaintiffs, negligently made false representations of material fact with the intention that Plaintiffs would rely upon and act in response to the false representations.

- Whether DoorDash knew or should have known that Plaintiffs would rely on DoorDash's false representations of material fact.

- Whether Plaintiffs justifiably relied or had a presumption of reliance on and acted in response to DoorDash's false representations of material fact.

- Whether Plaintiffs suffered damages proximately caused by DoorDash's negligence.

- Whether DoorDash, in adopting, promoting, and/or charging its Express Delivery Fee, misrepresented material facts to consumers, like Plaintiffs, including the fact that:

    o DoorDash knew or should have known it had no ability to control the manner or means of how or when Dashers performed their deliveries;

    o DoorDash knew or should have known that "direct to you" advertisement is misleading;

    o DoorDash knew or should have known that Dashers can stack orders;

    o DoorDash knew or should have known that Dashers did not know whether a consumer had paid for an express delivery;

    o DoorDash knew or should have known that as soon as a consumer chose an expedited delivery, the time for the delivery would be extended beyond the range for a standard delivery; and

    o DoorDash knew or should have known that the pre-order delivery windows were misleading and likely to entice consumers, like Plaintiffs, into placing orders.

- Whether DoorDash, in adopting, promoting, and/or charging its Delivery Fee, misrepresented material facts to consumers, like Plaintiffs, including the fact that:

    o Dashers did not receive the Delivery Fee for their deliveries and that DoorDash retained the Delivery Fee completely;

    o DoorDash knew or should have known that its advertising tactics regarding discounts on the Delivery Fee were misleading;

    o DoorDash knew or should have known the Delivery Fee had nothing to do with the delivery of orders for consumers, like Plaintiffs, but instead related to the alleged cost to operate DoorDash's technology;

- o   DoorDash knew or should have known the Delivery Fee was an advertising sales gimmick; and

- o   DoorDash knew or should have known that the pre-order delivery windows were misleading and enticed consumers, like Plaintiffs, into placing orders.

- Whether DoorDash, in adopting, promoting, and/or charging its Extended Range Delivery Fee, misrepresented material facts to consumers, like Plaintiffs, including the fact that:

  - o   DoorDash knew or should have known that consumers like Plaintiffs did not have normal delivery areas;

  - o   DoorDash knew or should have known that they created delivery areas based on its merchants' paid relationship with DoorDash without regard to closer delivery locations for consumers, like Plaintiffs, based on their location;

  - o   DoorDash concealed a material fact from Plaintiffs that DoorDash charges the Extended Range Fee as a manner of increasing profit independent of Plaintiffs' normal delivery area; and

  - o   DoorDash knew or should have known that the pre-order delivery windows were misleading and enticed consumers, like Plaintiffs, into placing orders.

- Whether DoorDash, in adopting, promoting, and/or charging its Marketing Fee, misrepresented material facts to consumers, like Plaintiffs, including the fact that:

  - o   DoorDash knew or should have known that consumers, like Plaintiffs, could not discover the hidden Marketing Fee through the exercise of ordinary diligence or intelligence;

  - o   DoorDash knew or should have known that consumers, like Plaintiffs, paid for promotional items for which they incurred and paid an unknown $0.99 that DoorDash collected; and

  - o   DoorDash knew or should have known that the pre-order delivery windows were misleading and enticed consumers, like Plaintiffs, into placing orders.

109.   Notice: There are myriad methods for providing notice to the Class and Subclasses including internet publication, utilization of social media, and traditional published notice – all of which would be paid by DoorDash.

110.   The Class and Subclasses specifically exclude counsel, including counsels' employees, representing the Class and Subclasses, any judicial officer presiding over this matter,

the members of the judicial officers' immediate families and judicial staff, and any individual whose interests are antagonistic to the interests of other Class and Subclass members.

## CLAIMS FOR RELIEF AND CAUSES OF ACTION

111.     Based on all the allegations herein, Plaintiff respectfully demands relief under the following nine causes of action.

## FIRST CLAIM FOR RELIEF
### (DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF)

112.     Plaintiffs reassert, reallege, and incorporate herein the allegations set out in paragraphs 1 through 111 and assert the following cause of action.

113.     Pursuant to Fed. R. Civ. P. 23(b)(2), Class-wide declaratory judgment and injunctive relief is appropriate because DoorDash has acted or refused to act on grounds that apply generally to all the Plaintiffs.

114.     More specifically, DoorDash has adopted a fee structure for its delivery services that is misleading and induces consumers to act to their detriment.

115.     DoorDash's method of giving consumers, including minor consumers, notice of the Terms and Conditions that DoorDash will likely argue apply in this case was inadequate to secure the consent of any consumer and, therefore, there is no contract between DoorDash and any consumer.

116.     DoorDash's wrap agreement did not require or allow consumers, including minor consumers, to manifest assent to the terms and conditions expressly, consequently, there is no contractual relationship between DoorDash on the one hand and Plaintiffs, the Class, and Subclasses on the other. Instead, consumers were able to continue using the DoorDash platform without visiting the page hosting the wrap agreement or even having knowledge or notice of its existence. Here, Plaintiffs did not know of the Terms and Conditions.

117.    This claim for declaratory judgment seeks a determination that (a) this action may

proceed as a class action; (b) there is no contract between DoorDash and Plaintiffs, the Class,

and Subclasses; (c) Plaintiffs are entitled to recover for their injuries incurred because of

DoorDash's misleading fee structure; (d) Plaintiffs are entitled to an award of attorneys' fees and

expenses to be determined by the Court; and (e) such other and further relief as is necessary and

appropriate, including the relief outlined in paragraph 119 below.

118.    The Court must determine this issue of contract formation in which Plaintiffs for

themselves and their classes, challenge both DoorDash's purported contract and its purported

arbitration agreement. In trying to remove important determinations from the Court's purview

contrary to applicable law, DoorDash's Terms and Conditions refer to delegating issues of

"formation of this Arbitration Agreement" to the arbitrator, "including, but not limited to, any

claim that all or any part of this Arbitration Agreement is void or voidable[.]"[71] In doing so, the

arbitration agreement conflates issues of contract formation with issues of contract rescission

rendering the delegation language ambiguous and thus unenforceable, in addition to contrary to

applicable law. In seeking declaratory relief, Plaintiffs will need limited, targeted discovery on

issues relating to formation including but not limited to changes DoorDash made to its

signup/registration page over last three years and changes DoorDash has made to its terms and

conditions over last three years.

119.    To remedy the injuries that DoorDash's misleading fee structure has caused,

Plaintiffs are entitled to at least the following injunctive relief:

---

[71] *Consumer Terms and Conditions – United States (Including Puerto Rico)*, DOORDASH ¶ 14(d)
(Feb. 3, 2023), https://help.doordash.com/legal/document?type=cx-terms-and-
conditions&region=US&locale=en-US.

i.      A declaration that DoorDash adopt an open and straightforward fee

structure so that consumers will understand what they are paying for and how their fees

are distributed and allocated; and

ii.      A declaration that DoorDash cease and desist from its misleading and

fraudulent practices by charging or advertising delivery fees in any form when it does not

deliver.

## SECOND CLAIM FOR RELIEF

(DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201
THAT THE ARBITRATION AGREEMENT IS UNENFORCEABLE)

120.    Plaintiffs reassert, reallege, and incorporate herein the allegations set out in

paragraphs 1 through 119 and assert the following cause of action.

121.    In the event a court determines that a contract was formed when a consumer,

including a minor consumer, signed-up and used DoorDash's services, declaratory relief is still

necessary and appropriate.

122.    Arbitration clauses are severable from the whole of the contract in which they are

contained.[72] To be enforceable, arbitration clauses require consideration independent of any

consideration for the remainder of the Terms and Conditions.[73]

123.    In this case, the consideration for the arbitration agreement is illusory because

DoorDash reserves the right to modify the terms and conditions at any time. So, in paragraph

---

[72] *See generally Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70-71 (2010) ("[A]s a matter of 'substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract.'") (citations omitted). *See also Coady v. Nationwide Motor Sales Corp.*, 32 F.4th 288, 291 (4th Cir. 2022) ("[A]n arbitration provision is an 'independently enforceable contract' that is a 'severable part' of the larger agreement.").

[73] *See generally Jones v. Prosper Marketplace, Inc.*, No. GJH-21-893, 2022 WL 834210, at *12 (D. Md. March 21, 2022) ("To be binding and enforceable, contracts ordinarily require consideration.").

14(h), DoorDash says that "updates to these Terms and Conditions do not provide a new opportunity to opt out of the Arbitration Agreement for customers or Users who had previously agreed to a version of [these] Terms and Conditions. . . ." Thus, DoorDash retained the right to unilaterally change the terms and conditions without affording a subsequent opt-out right. As a result, the consideration is illusory.[74]

124.     Alternatively, in paragraph 3 of the Terms and Conditions, DoorDash "reserves the right to modify the terms and conditions of this Agreement . . . at any time. . . ." Because the modification agreement was contained within the same Terms and Conditions as the arbitration agreement, there was insufficient consideration to support an enforceable agreement to arbitrate.[75]

125.     Given the lack of consideration, the arbitration provision is unenforceable to Plaintiffs.

126.     This claim for declaratory judgment seeks a determination that (a) this action may proceed as a class action; (b) there is no enforceable arbitration agreement between DoorDash and the Plaintiffs; (c) Plaintiffs are entitled to recover for their injuries incurred because of DoorDash's misleading fee structure; (d) Plaintiffs are entitled to an award of attorneys' fees and expenses to be determined by the Court; (e) such other and further relief as is necessary and appropriate, including the relief outlined in paragraph 127 below.

---

[74] *Id.* at *13 ("[O]ne party's unilateral right to amend an agreement at any time can constitute an 'illusory promise'") (citations omitted).

[75] *See generally Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582, 594 (D. Md. 2013) (where one party reserves the right to alter the arbitration clause there is "'no real promise at all.'") (citations omitted). *See also Coady v. Nationwide Motor Sales Corp.*, No. 20-cv-1142-SAG, 2020 WL 6785352, at *5 (D. Md. Nov. 18, 2020) (where the arbitration provision and authority to change the terms and conditions are within the same document, a court can determine there is no consideration for the agreement to arbitrate).

127.    To remedy the injuries that DoorDash's misleading fee structure has caused, Plaintiffs are entitled to at least the following injunctive relief:

     i.    A declaration that DoorDash adopt an open and straightforward fee structure so that consumers will understand what they are paying for and how their fees are distributed and allocated; and

     ii.    A declaration that DoorDash cease and desist from its misleading and fraudulent practices including advertising or assessing any delivery fee when DoorDash does not perform delivery services.

### THIRD CLAIM FOR RELIEF

**(DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201 THAT THE ARBITRATION PROVISION IS AN UNENFORCEABLE CONTRACT OF ADHESION)**

128.    Plaintiffs reassert, reallege, and incorporate herein the allegations set out in paragraphs 1 through 127 and assert the following cause of action.

129.    In the event a court determines that a contract was formed when a consumer, including a minor consumer, signed-up and used DoorDash's services, and in the event a court determines that the consideration for the arbitration provision in the contract is sufficient, declaratory relief is still necessary and appropriate.

130.    The arbitration provision contains a waiver of significant rights including the right to a trial by jury, the right to bring an action as a class action, and the right to seek injunctive relief. It also imposes a drastically reduced statute of limitations.

131.    The arbitration provision is itself a contract of adhesion in that was "drafted unilaterally by the dominant party and then presented on a take-it-or-leave-it basis to the weaker party who has no real opportunity to bargain about its terms."[76]

132.    A court can decline to enforce an arbitration provision that is "so one-sided as to oppress or unfairly surprise an innocent party" or when "there exists an egregious imbalance in the obligations and rights imposed by the arbitration clause."[77]

133.    The arbitration provision at issue is as one-sided as a contract provision could be. DoorDash receives protection from a jury, shelter from important kinds of relief, and a shield against collective claims. The consumers get nothing in return.

134.    This claim for declaratory judgment seeks a determination that (a) this action may proceed as a class action; (b) the arbitration provision is a contract of adhesion; (c) the arbitration provision is null and void; (d) Plaintiffs are entitled to recover for their injuries incurred because of DoorDash's misleading fee structure; (e) Plaintiffs are entitled to an award of attorneys' fees and expenses to be determined by the Court; and (f) such other and further relief as is necessary and appropriate, including the relief outlined in paragraph 135 below.

135.    To remedy the injuries that DoorDash's misleading fee structure has caused, Plaintiffs are entitled to at least the following injunctive relief:

      i.      A declaration that DoorDash adopt an open and straightforward fee structure so that consumers will understand what they are paying for and how their fees are distributed and allocated; and

---

[76] *Mbongo v. Robinhood Markets, Inc.*, No. 714, 2022 WL 621797, at *4 (Md. Ct. of Spec. App. March 3, 2022).

[77] *Id.* (citations omitted).

ii.      A declaration that DoorDash cease and desist from its misleading and fraudulent practices including advertising or assessing any delivery fee when DoorDash does not perform delivery services.

## FOURTH CLAIM FOR RELIEF

(DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201 THAT THE ENTIRE TERMS AND CONDITIONS ARE UNENFORCEABLE AGAINST MINORS)

136.    Plaintiffs reassert, reallege, and incorporate herein the allegations set out in paragraphs 1 through 135 and assert the following cause of action.

137.    Under the law of the State of Maryland, as well as the law of other United States jurisdictions, minors have the right to disaffirm contracts such as those at issue here and a parent or guardian can disaffirm a contract on behalf of a minor.

138.    Plaintiffs, on behalf of any minor whose interests they represent, hereby disaffirm any contract that a court may determine to have existed between Plaintiffs and DoorDash.

139.    The contracts between Plaintiffs and DoorDash on the other are void ab initio (or alternatively void or voidable) to the extent that any minor was the person who established or used a DoorDash account given their lack of contractual capacity and given DoorDash's own specified disaffirmance of any contract with minors or allowing them to use its technology or service.

140.    There exists, therefore, an actual controversy between the parties requiring a declaratory judgment.

141.    This claim for declaratory judgment seeks a determination that (a) this action may proceed as a class action; (b) the contracts between DoorDash and minor children are void ab initio (or alternatively void or voidable at the option of the minor children or their parents or guardians); (c ) the minor children or their parents or guardians have effectively voided or

71

otherwise disaffirmed the contracts by filing this lawsuit; (d) the minor children or their parents or guardians are entitled to restitution and interest thereon; (e) Plaintiffs are entitled to an award of attorneys' fees and expenses to be determined by the Court; and (f) such other and further relief as is necessary and appropriate.

142.    Alternatively, this claim for declaratory judgment seeks a determination that (a) the arbitration clause is severable from the other Terms and Conditions; (b) the arbitration clause is unenforceable against the minor consumers; (c ) Plaintiffs are entitled to all appropriate damages; (d) Plaintiffs are entitled to an award of attorneys' fees and expenses to be determined by the Court; and (e) such other and further relief as is necessary and appropriate.

**FIFTH CLAIM FOR RELIEF**
(FRAUD OR DECEIT)

143.    Plaintiffs reassert, reallege, and incorporate herein the allegations set out in paragraphs 1 through 142 and assert the following cause of action.

144.    DoorDash made false representations or omissions of material fact to Plaintiffs, including but not limited to: DoorDash drivers would be paid delivery fees for making deliveries; DoorDash had the ability to control the time and manner of a consumer's delivery; an express order would be delivered directly to the consumer; drivers knew when orders were priority and direct to you; the Extended Range Fees arose from consumers' locations and applied to all consumers equally; advertised delivery windows represented true estimates of the prospective delivery time; advertised discounts represented actual discounts; each delivery fee was logically derived and not an unjustifiable advertisement or phantom charge passed back to the consumer by increasing a different charge/fee; promotional items did not include hidden fees that consumers paid; DashPass members received savings that were misleadingly stated; and menu items did not include commissions and fees including surcharges on credit card payments.

145.     DoorDash made false representations and omissions during each instance consumers, like Plaintiffs, placed an order on the DoorDash website or the DoorDash app and DoorDash advertised, charged and/or collected a Delivery Fee, an Express Fee, an Extended Range Fee, a Marketing Fee and/or a Commission Fee from consumers, like Plaintiffs, on their respective order.

146.     Among the false representations and omissions, in addition to those in paragraph 143, that DoorDash made include, at least, the following:

    i.      DoorDash, in adopting, promoting, and/or charging its Express Delivery Fee, knew or should have known that it had no ability to control the manner or means of how or when Dashers performed their deliveries;

    ii.      DoorDash knew or should have known that "direct to you" as used for the Express Delivery Fee advertisements was not only misleading but patently false because DoorDash knew Dashers could stack orders, Dashers did not know that a consumer had paid a direct delivery fee, and the delivery time would actually exceed that for a standard delivery;

    iii.      The inference that the Express Delivery Fee was for the Dashers;

    iv.      The Delivery Fee had nothing to do with the delivery of orders for consumers but instead related to the cost to operate the DoorDash technology;

    v.      DoorDash knew or should have known the Express Delivery Fee was simply an advertising gimmick and not a real effort to get orders to consumers sooner;

    vi.      DoorDash established the Extended Range Delivery Fee but knew or should have known consumers did not have "normal delivery areas;"

    vii.       DoorDash, in assessing the Extended Range Delivery Fee, knew or should have known the delivery fee was based on the restaurants' paid relationships with DoorDash and had nothing to do with the location of the consumer;

    viii.      DoorDash concealed that DoorDash charges the Extended Range Fee as a means of increasing profit;

    ix.       DoorDash knew or should have known the delivery windows it promised were illusory and merely intended to entice consumers into placing orders;

    x.       DoorDash incorporated a "marketing fee" into the charges to consumers, knowing that consumers, in the exercise of ordinary diligence, could not discover the hidden fee;

    xi.       DoorDash knew or should have known that consumers were paying for promotional items through payment of a $0.99 marketing fee that was undisclosed and that misled consumers to believe they were getting something for free or at a reduced price;

    xii.      DoorDash knew or should have known that it charged and collected from consumers commission fees that it did not disclose and surreptitiously included in the price of menu items;

    xiii.      DoorDash knew or should have known that the commission fees included credit card surcharges that it did not disclose and surreptitiously included in the price of menu items; and

    xiv.      DoorDash knew or should have known that it provided misleading and false pricing and savings without disclosing such information to consumers.

147.    DoorDash knew, and had actual knowledge, that the representations it made to Plaintiffs were false.

148.    Alternatively, DoorDash acted with reckless disregard of the truth of its representations to Plaintiffs such that it would be reasonable to charge DoorDash with the falsity of its representations.

149.    DoorDash intended that Plaintiffs would act in reliance on DoorDash's false representations.

150.    Plaintiffs relied on DoorDash's false presentations and Plaintiffs' reliance was justified and justifiable.

151.    As a direct and proximate result of DoorDash's fraudulent misrepresentations, Plaintiffs sustained damages.

152.    DoorDash acted with malice in making false representations and Plaintiffs are therefore entitled to recover punitive damages.

## SIXTH CLAIM FOR RELIEF
### (FRAUDULENT CONCEALMENT)

153.    Plaintiffs reassert, reallege, and incorporate herein the allegations set out in paragraphs 1 through 152 and assert the following cause of action.

154.    DoorDash took affirmative action to conceal a material fact that Plaintiffs could not have discovered even with the exercise of reasonable diligence.[78]

155.    DoorDash had a duty to disclose material facts because DoorDash's concealment of the facts underlying its express and extended range charges was intentional and effective.

---

[78] *Rhee v. Highland Development Corp.*, 182 Md. App. 516, 958 A.2d 385, 390 (Md. Ct. Special App. 2008).

DoorDash hid material facts with "the attained object of creating or continuing a false impression as to that fact. Its "affirmative suppression of the truth" was made with an "intent to deceive."[79]

156.    DoorDash also had a duty to disclose material facts when DoorDash tried to obfuscate and confuse consumers with psychologically manipulative pricing structure to conceal the real nature of the charges.[80]

157.    DoorDash failed to disclose materials facts, including (a) that it was charging an express fee with the representation the order would be directly delivery to the consumer when DoorDash had no ability to control the time or manner of deliveries: (b) that it was charging an express fee with the representation the order would be delivered faster than the predicted order time for a non-express order when, in fact, the express delivery frequently took longer to be received; and (c) that DoorDash had no factual basis for imposing the extended range delivery fee.

158.    DoorDash intended to defraud or deceive Plaintiffs.

159.    Plaintiffs took actions, namely using DoorDash's express service, in justifiable reliance on DoorDash's concealment.

160.    As a direct and proximate result of DoorDash's fraudulent concealment, Plaintiffs sustained damages.

161.    Further, DoorDash acted with malice in failing to disclose material facts and Plaintiffs are therefore entitled to recover punitive damages.

---

[79] *Id.*

[80] *Lloyd v. Gen'l Motors Corp.*, 397 Md. 108, 916 A.2d 257, 275, n.11 (Md. App. 2007).

## SEVENTH CLAIM FOR RELIEF
### (NEGLIGENT MISREPRESENTATION)

162.    Plaintiffs reassert, reallege, and incorporate herein the allegations set out in paragraphs 1 through 161 and assert the following cause of action. DoorDash owed a legal and statutory duty of care to Plaintiffs, including but not limited to a duty of care arising out of its role as an entity that directly or indirectly sold and/or marketed goods and services to Plaintiffs.

163.    In this case, Plaintiffs were wholly dependent on DoorDash and Plaintiffs were not sophisticated users operating on an equal playing field with DoorDash.

164.    DoorDash negligently made false statements of material fact about its delivery and service fees.

165.    DoorDash intended that Plaintiffs would act in reliance upon the false statements of material fact referenced in paragraph 144 to 147.

166.    DoorDash knew or should have known that Plaintiffs would rely on the false statements of material fact referenced in paragraph 144 to 147.

167.    Plaintiffs justifiably acted in reliance on the false statements of material fact referenced in paragraph 143 to 146.

168.    As a direct and proximate result of DoorDash's negligent misrepresentation, Plaintiffs sustained damages.

169.    Further, DoorDash acted with malice in making its misrepresentations and Plaintiffs are therefore entitled to recover punitive damages.

## EIGHTH CLAIM FOR RELIEF
### (UNJUST ENRICHMENT)

170.    Plaintiffs reassert, reallege, and incorporate herein the allegations set out in paragraphs 1 through 169 and assert the following cause of action. DoorDash owed a legal and

statutory duty to Plaintiffs to not unfairly or unduly take advantage of them or to commit wrongful acts to enrich itself at Plaintiffs' expense.

171.    Plaintiffs conferred a benefit on DoorDash by placing orders for the delivery of food from merchants and paying for the delivery of food by Dashers.

172.    DoorDash knew and/or appreciated the benefit that Plaintiffs conferred.

173.    DoorDash accepted or retained the benefit under circumstances that would be inequitable to allow DoorDash to retain the benefit without the paying of value in return.[81]

174.    As a direct and proximate result of DoorDash's unjust enrichment, Plaintiffs sustained damages.

## NINTH CLAIM FOR RELIEF
### (VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT)

175.    Plaintiffs reassert, reallege, and incorporate herein the allegations set out in paragraphs 1 through 174 and assert the following cause of action.

176.    Plaintiffs are consumers under the Maryland Consumer Protection Act, Md. Code Ann. Com. Law. §13-101, et seq. in that they are actual or perspective purchasers, lessees, or recipients of consumer goods, consumer services, consumer realty, or consumer credit. *See* Md. Code Ann. Com. Law. §13-101(c)(1).

177.    DoorDash is a merchant under the Maryland Consumer Protection Act, Md. Code Ann. Com. Law. §13-101, et seq. in that it directly or indirectly either offers or makes available to consumers any consumer goods, consumer services, consumer realty, or consumer credit. *See* Md. Code Ann. Com. Law. §13-101(g)(1).

---

[81] *Jackson v. 2019 Brandywine, LLC*, 180 Md. App. 535, 952 A.2d 304 (2008).

178.    DoorDash has engaged in unfair, abusive, or deceptive trade practices in violation of the Maryland Consumer Protection Act.

179.    Specifically, DoorDash has made false statements which have the capacity, tendency, or effect of deceiving or misleading consumers. *See* Md. Code Ann. Com. Law. §13-301(1).

180.    In addition, DoorDash – in violation of the Maryland Consumer Protection Act – has failed to state a material fact and its failure to state a material fact deceives or tends to deceive consumers. *See* Md. Code Ann. Com. Law. §13-301(3).

181.    And in violation of the Maryland Consumer Protection Act, DoorDash has engaged in deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same with the promotion or sale of any consumer goods, consumer realty, or consumer service. *See* Md. Code Ann. Com. Law. §13-303(9)(i).

182.    As a direct and proximate result of DoorDash's violation of the Maryland Consumer Protection Act, Plaintiffs sustained damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, the Class, and Subclasses DEMAND

A.      A jury trial on all issues so triable;

B.      Award Plaintiffs such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, temporary and preliminary injunctions, and an order freezing assets;

C.      Enter a permanent injunction to prevent DoorDash from engaging in future fraudulent or misleading pricing practices and violations of Maryland Consumer Protection Act,

including but not limited to prohibiting DoorDash from advertising or collecting any delivery fee

whatsoever of any kind unless such fee is collected for and paid to delivery drivers and

prohibiting DoorDash from advertising and collecting any hidden marketing fee;

       D.      Award such relief, including monetary damages consistent with the law, as the

Court finds necessary to redress injury to consumers like Plaintiffs resulting from Defendants'

deceptive and fraudulent actions, including but not limited to, rescission or reformation of

contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

       E.      Award Plaintiff the costs of bringing this action together with attorneys' fees, as

well as such other and additional relief as the Court may determine to be just and proper.

On this 14th day of April, 2023.          Respectfully submitted:

                                          */s/ Thomas R. Bundy III*
                                          Thomas R. Bundy III
                                          Federal Bar No. 15265
                                          LAWRENCE & BUNDY LLC
                                          8115 Maple Lawn Boulevard
                                          Suite 275
                                          Fulton, MD 20789
                                          Telephone:    (240) 500-3595
                                          Facsimile:     (240) 657-1109
                                          Thomas.Bundy@lawrencebundy.com

                                          Leslie J. Bryan
                                          (*Pro hac vice* To be submitted)
                                          LAWRENCE & BUNDY LLC
                                          1180 West Peachtree Street, NW
                                          Suite 1650
                                          Atlanta, Georgia 30309
                                          Telephone:    (404) 400-3350
                                          Facsimile:     (404) 609-2504
                                          Leslie.Bryan@lawrencebundy.com

                                          Andrew D. Herman
                                          (*Pro hac vice* To be submitted)
                                          LAWRENCE & BUNDY LLC
                                          1775 Pennsylvania Ave., NW
                                          Suite 650

80

Washington, D.C. 20006
Telephone:     (202) 350-3397
Andrew.Herman@lawrencebundy.com

*Counsel for Plaintiffs*