## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND



**Ross Hecox, individually and as next ~~of~~ friend ~~of~~** *for
**his minor child R.E.H~~,~~**
~~1940 Victory Hills Way~~
~~Carroll County~~
~~Marriottsville, Maryland 21104~~

**Reid Hecox~~,~~**

~~1940 Victory Hills Way~~
~~Carroll County~~
~~Marriottsville, Maryland 21104~~

**For themselves and for those similarly situated
minor individuals,**

        **Plaintiffs,**

v.

**DoorDash, Inc.,**
~~**DEMANDED**~~

~~303 2nd Street, Suite 800~~
~~San Francisco, California 94107~~
~~Serve on:     The Corporation Trust, Inc.~~
~~2405 York Road, Suite 201~~
~~Lutherville-Timonium, MD 21093~~

        **Defendants.**

\* *for* ..,

\*,

**JURY TRIAL DEMANDED**

\*

CASE NO: 1:23-cv-1006-JRR

\* ~~**JURY TRIAL**~~

## FIRST AMENDED CLASS ACTION COMPLAINT FOR
## DECLARATORY JUDGMENT, MONETARY DAMAGES,
## INJUNCTIVE RELIEF, AND DEMAND FOR JURY TRIAL

~~Plaintiffs~~Plaintiff Ross Hecox ("Plaintiff Hecox"), individually and as next of friend ~~of~~for

his minor child~~,~~ R.E.H, and Plaintiff Reid Hecox ("Plaintiff R. Hecox") (collectively "Plaintiffs"),

for themselves and those similarly situated, by and through their undersigned counsel, based on

their reasonable investigation, and pursuant to Rules 17(c) and 23(b)(2) and (3) of the Federal

Rules of Civil Procedure, bring this suit as a class action seeking appropriate declaratory and injunctive relief, ~~and all allowable~~actual monetary and treble damages, ~~including reasonable~~and attorney's fees and costs, against and from DoorDash, Inc~~.~~... ("DoorDash"), for reasons set forth herein ~~(the "~~("First Amended Complaint").

Plaintiffs file this First Amended Complaint as a matter of course pursuant to Fed. R. Civ. P. 15(a). The First Amended Complaint asserts two claims under the Federal Racketeer Influenced Corrupt Organization statute, 18 U.S.C. § 1961, et seq. and modifies, clarifies, and expands on assertions in the Complaint, including scope of recoverable damages.

## TABLE OF CONTENTS

**NATURE OF THE ACTION**..................................................................................... **1**

**THE PARTIES**......................................................................................................... **12**

**JURISDICTION AND VENUE** ............................................................................ **14**

**COMMON FACTUAL ALLEGATIONS** .............................................................. **15**

**I.   FROM DOORDASH'S NOBLE BEGININGS TO ITS EXPLODING MARKET
      TO ITS UNSAVORY BUSINESS PRACTICES** ............................................ **15**
      A.   DoorDash's Noble Beginnings........................................................... 15

      B.   DoorDash's Growth During the Exploding On-Demand Deliver Market ..................... 16

      C.   DoorDash's Penchant for Unsavory Business Practices ................................. 19

**II.   HOW DOORDASH WORKS** ........................................................................ **22**
      A.   Signing Up to Use the DoorDash Platform ............................................ 23
            (1)   Signing up on Doordash.com .................................................. 24
            (2)   Signing Up on the DoorDash App .......................................... 40
      B.   Using DoorDash's Platform ........................................................... 50
            (1)   Placing Orders.................................................................... 50
            (2)   Payment Methods............................................................... 53
            (3)   Communicating Order Status through Text Messages and Emails ............. 54
      C.   DoorDash Markets Its Platform and Services to Consumers Through the Mail............ 56

      D.   The Functionality of DoorDash's Technology............................................ 57

**III.   THE DOORDASH "TERMS AND CONDITIONS"** .................................... **60**

**IV.   DOORDASH'S SIGN UP LANGUAGE LACKS SUFFICIENT INQUIRY
       NOTICE** ..................................................................................................... **65**

**V.    DOORDASH TARGETS MINORS AND KNOWS MINORS FREQUENTLY USE
       DOORDASH'S SERVICE** ........................................................................... **75**

**VI.   DOORDASH'S FRAUDULENT AND DECEPTIVE PRICING SCHEME** .......... **80**
      A.   DoorDash Charges a Deceptive and Misleading Delivery Fee........................... 80

B.  DoorDash Charges a Deceptive and Misleading Express or Priority Delivery Fee ....... 83

C.  DoorDash Charges a Deceptive and Misleading "Expanded Range" Delivery Fee ...... 86

D.  DoorDash Charges Consumers Hidden Marketing Fees .................................................. 92

E.  DoorDash Charges Consumers Hidden Commission Fees ............................................. 94

F.  DoorDash Uses False Advertising for Prices and Fees ................................................... 98

G.  DashPass Offers Illusory and Fraudulent Savings ........................................................ 100

H.  DoorDash Disclosures About its Fees are Deceptive .................................................... 104

I.  DoorDash's "Other Factors" in Assessing Delivery Fees is Price Discrimination ...... 115

VII. THE TRUTH ABOUT DOORDASH'S FRAUDULENT PRICING SCHEME .... 124

A.  Fraud and Deception in Registering to Use DoorDash .................................................. 125

B.  Fraud and Deception in Hidden Fees .............................................................................. 126

C.  Fraud and Deception in Advertising Prices .................................................................... 128

D.  Fraud and Deception in Describing the Nature of Services Provided ........................... 129

E.  Fraud and Deception in Disclosures ............................................................................... 130

F.  Fraud and Deception in Parceling Out Fees ................................................................... 131

G.  Impact of DoorDash's Fraud and Deception .................................................................. 133

VIII. COMMON FACTUAL ALLEGATIONS TO RICO COUNTS ........................... 135

A.  DoorDash is a Culpable Person ...................................................................................... 136

B.  DoorDash Engaged in Racketeering Activity Through the Predicate Acts of Mail and
Wire Fraud ...................................................................................................................... 136

C.  DoorDash Engaged in A Pattern of Racketeering Activities ......................................... 138

D.  DoorDash's Racketeering Activities Affect Stride Bank and/or the Dasher Direct
Program as RICO Enterprises ......................................................................................... 139

E.  Both the Enterprise and the Racketeering Activity Affect Interstate Commerce. ........ 145

F.  Plaintiffs Sustained an Injury Because of DoorDash's Actions ..................................... 145

G.  Plaintiffs' Claims Are Timely. ....................................................................................... 145

iv

**CLASS ACTION ALLEGATIONS** ................................................................................ **146**

**CAUSES OF ACTION AND CLAIMS FOR RELIEF** ....................................................... **153**

   **FIRST CLAIM FOR RELIEF** ................................................................................. **153**

   **SECOND CLAIM FOR RELIEF** ............................................................................. **156**

   **THIRD CLAIM FOR RELIEF** ................................................................................ **157**

   **FOURTH CLAIM FOR RELIEF** ............................................................................ **160**

   **FIFTH CLAIM FOR RELIEF** ................................................................................. **163**

   **SIXTH CLAIM FOR RELIEF** ................................................................................ **164**

   **SEVENTH CLAIM FOR RELIEF** ........................................................................... **166**

   **EIGHTH CLAIM FOR RELIEF** ............................................................................. **169**

   **NINTH CLAIM FOR RELIEF** ................................................................................ **171**

   **TENTH CLAIM FOR RELIEF** ............................................................................... **172**

   **ELEVENTH CLAIM FOR RELIEF** ......................................................................... **173**

   **PRAYER FOR RELIEF** ......................................................................................... **174**

## NATURE OF THE ACTION

1.      This case challenges certain fees that DoorDash imposes on consumers. DoorDash is "an online marketplace platform using web-based technology that connects contractors, restaurants and/or other businesses" ~~principally~~ to provide business-to-consumer deliveries ~~("DoorDash App").~~.[1] With an estimated 32 million users of its technology, DoorDash earns billions of dollars in annual revenue.[2] ~~But~~Yet, DoorDash generates its revenues not only through heavy-handed tactics that take advantage of struggling merchants and a significant immigrant driver workforce, but also through deceptive, misleading, and fraudulent practices that illegally deprive consumers of millions, if not billions, of dollars annually. This lawsuit details DoorDash's illegal pricing scheme and seeks to hold DoorDash accountable for its massive fraud on consumers, including ~~our~~one of the most vulnerable ~~segment~~segments of society, minor children.

2.      Despite its short ten-year existence, DoorDash's history is replete with predatory tactics toward the contractors, merchants, and consumers using its technology platform. For example, DoorDash retained part of the tips that consumers paid to the contracted drivers~~,~~ (called "Dashers~~," for their deliveries~~") despite DoorDash's representations that the Dashers received the tips~~.~~ in their entirety after each delivery. DoorDash was sued for its tip retention

---

[1] Attached hereto at Exhibit ("Ex.") 1, *Independent Contractor Agreement - United States, DoorDash Dashers*, DOORDASH (~~Jan. 2022~~Apr. 14, 2023), https://help.doordash.com/legal/document?~~type~~type=dx-ica&region=US&locale=en-US (citing recitals).

[2] Ex. 2, David Curry, *DoorDash Revenue and Usage Statistics (2023)*, BUSINESS OF APPS (~~Feb. 20~~May 2, 2023), https://www.businessofapps.com/data/doordash-statistics/.

practice.[3] While DoorDash, now, purportedly pays Dashers the entire tip amount, the company still holds its Dashers' daily compensation (including tips) on each order for up to a week, despite having the ability to pay them immediately. If the drivers want to receive their earned compensation daily, Dashers must pay DoorDash a "Fast Pay" fee to release ~~the~~those funds daily.[4] With reportedly ~~two~~six million Dashers performing deliveries each year,[5] DoorDash stands to make millions in interest by holding its drivers' compensation weekly and ~~then stands to make~~ millions more by charging drivers a Fast Pay fee to receive funds ~~those drivers~~they already earned.

       3.     Targeting immigrants to work as drivers,[6] DoorDash knows many Dashers are forced to pay the Fast Pay fee because they lack resources and need money desperately.

---

[3] *See* Ex. 3, *AG Racine Reaches $2.5 Million Agreement with DoorDash for Misrepresenting that Consumer Tips Would Go to Food Delivery Drivers*, OFFICE OF THE ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA (Nov. ~~24, 2020), https://oag.dc.gov/release/ag-racine-reaches-25-million-agreement-doordash#:~:text=In%20a%20November%202019%20lawsuit,DoorDash's%20payments%20to%20its%20workers.~~24, 2020), https://oag.dc.gov/release/ag-racine-reaches-25-million-agreement-doordash.

[4] ~~*See Independent Contractor Agreement - United States, DoorDash Dashers*, DOORDASH (Jan. 2022), https://help.doordash.com/legal/document?type=dx-ica&region=US&locale=en-US.~~ *See* Ex. 4, DoorDash Dasher Support, *How Dasher Pay Works*, DOORDASH, https://help.doordash.com/dashers/s/article/How-is-Dasher-pay-calculated?language=en_US (last visited May 3, 2023); Ex. 5, DoorDash Dasher Support, *What is Fast Pay?*, DOORDASH, https://help.doordash.com/dashers/s/article/What-is-Fastpay?language=en_US (last visited May 3, 2023).

[5] ~~*See* Tyler Philbrook, *DoorDash Statistics: Revenue, Usage Statistics & More*, THE RIDESHARE GUY (Mar. 15, 2023), https://therideshareguy.com/doordash-statistics/.~~ Ex. 6, Excerpts from DoorDash, Inc., Annual Report (Form 10-K), at 7 (Feb. 24, 2023).

[6] *See, e.g.*, Ex. 7, DoorDash, FACEBOOK (Sept. 6, 2022, 12:23 PM), ~~https://www.facebook.com/DoorDash/;~~https://www.facebook.com/DoorDash/posts/pfbid035wvdSt6aJZ9TJEEn15o7vBGF71x3DvFZFb2XdWLzCEx4yccKAPzL5hiT51Sfj49fl; Ex. 8, Kimiko de Freytas-Tamura, *Food delivery apps are booming, while their workers often struggle.*, N.Y. TIMES (Nov. 30, 2020), https://www.nytimes.com/2020/11/30/~~world~~world/food-delivery-apps-are-booming-while-their-workers-often-struggle.html; *see also* Ex. 9, Claudia Irizarry Aponte, *DoorDash Wanted to Teach Delivery Workers About Their Rights. It Backfired.*, THE CITY (July 31, 2022, 7:00 PM

DoorDash then leverages the drivers' desperation ~~(~~by implementing the weekly hold period and levying the "Fast Pay" fee~~)~~ to force the Dashers to participate in its DasherDirect ~~program~~Program. Under the DasherDirect ~~program~~Program, DoorDash pays ~~its~~participating drivers their compensation daily with "no fee," but ~~does so~~makes that payment through a direct deposit on a VISA debit card that Stride Bank underwrites.[7] Stride Bank then pools the Dashers' funds and "deposit[s] those funds at one or more FDIC insured banks" for investment purposes.[8] ~~DoorDash,~~Payfare, Inc. created a mobile application for the DasherDirect Program that allows Dashers to conduct digital banking with Stride Bank. The DasherDirect Program and/or Stride Bank are enterprises that in effect~~, controls~~ control most of ~~its drivers'~~the Dashers' funds for much longer than a week. Upon information and belief, DoorDash ~~then earns more money~~ receives fees under the DasherDirect ~~program on its share of fees generated~~Program from the drivers' invested ~~drivers'~~funds and their debit card usage ~~than~~and those fees exceed what DoorDash would earn ~~by~~ charging drivers only for Fast Pay fees.

4.      DoorDash engages in a similar pay scheme with restaurants. DoorDash ~~represents that~~says it is neither "a restaurant" nor in "the food preparation businesses,"[9] but ~~DoorDash~~it still takes food orders from consumers, collects ~~their~~consumers' payments, and

[7] *See* Ex. 10, DoorDash Dasher Support, *Introduction to DasherDirect*, DOORDASH, https://help.~~doordash~~doordash.com/dashers/s/article/Introduction-to-DasherDirect?language=en_US (last visited ~~Apr. 14~~May 3, 2023).

[8] *See* Ex. 11, DASHERDIRECT CARDHOLDER AGREEMENT ¶ I(1) (Mar. 16, 2023), https://payfare.~~github~~github.io/~~doordash~~doordash/en-us/assets/documents/dasherdirect-cardholder-agreement.pdf.

[9] *See* Ex. 1, *Independent Contractor Agreement – United States, DoorDash Dashers*, DOORDASH (~~Jan. 2022~~Apr. 14, 2023), https://help.doordash.com/legal/document?type=dx-ica&region=US&locale=en-US~~.~~ (citing recitals).

EST), https://www.thecity.nyc/queens/2022/7/31/~~2328449~~23284495/doordash-immigrant-groups-workers (noting that immigrant drivers accused DoorDash of stealing their money).

retains a portion of each consumer payment as a ~~hidden~~ "commission" on each order ~~. DoorDash then holds its restaurants' earnings on each order for a week unless the restaurants either (1) pay to receive their earned funds earlier,[10] or (2) enroll in a premium service with higher commissions to receive those funds daily~~ "without ~~charge."[11] DoorDash again stands to make millions in interest during the hold period; millions more in~~ever telling consumers about that hidden fee. DoorDash also includes fees ~~by charging restaurants to receive funds daily that they already earned;~~in promotional and ~~millions more from charging higher commissions that restaurants pay to receive their daily earnings "~~sponsored menu items advertised for sale on the platform without ~~charge."~~ever informing consumers about those fees. Because DoorDash's hidden ~~commissions~~fees (which include hidden commission, marketing, sponsored listing, and credit card transactions fees) reduce profit margins on food orders, restaurants must increase their prices.[12] ~~In effect,~~ DoorDash in effect earns millions, if not more, strong-arming drivers and merchants (and forcing them to capitulate to DoorDash's questionable billing tactics), while consumers bear the unsettling burden of the increased cost from the hidden fees.

5.    DoorDash's consumer-facing, predatory pricing practices are unsettling in several other respects. First, DoorDash charges consumers "city" or regulatory response fees, creating the illusion for consumers that local governments impose these fees. DoorDash engages in this

---

[10] ~~See DoorDash Merchant Support, *What is Merchant Daily Payouts?*, DOORDASH, https://help.doordash.com/merchants/s/article/Daily-Pay-FAQ?language=en_US (last visited Apr. 14, 2023).~~

[11] ~~See id.; see also Products and Pricing, DOORDASH FOR MERCHANTS, https://get.doordash.com/en-us/products (last visited Apr. 14, 2023).~~

[12] *See* Ex. 12, DoorDash Merchant Support, *Level Pickup Pricing*, DOORDASH, https://help.~~doordash~~doordash.com/~~merchants~~merchants/s/article/What-is-level-pickup-pricing?language=en_US (last visited ~~Apr. 14~~May 3, 2023~~.~~); Ex. 13, Sara DeForest, *Food Delivery and Pickup Commissions and Fees, Explained*, DOORDASH FOR MERCHANTS (May 2, 2023), https://get.doordash.com/en-us/blog/food-delivery-pricing.

deceptive practice in part to circumvent limitations on food commissions in certain areas. Cities have sued DoorDash for imposing these unauthorized fees.[13] Second, DoorDash disavows that it provides anyno delivery service whatsoever, but still charges consumers a range of delivery fees. Third, DoorDash disavows that it controls the manner and means of delivery routesdeliveries, but still charges consumers an "express" or "priority" fee for delivering "direct to you." DoorDash promises this "direct to you" service without ever informing Dashers (whowhom DoorDash knows may deliver for companies besides DoorDash) that the DoorDash consumers paid for a priority delivery that is advertised as going directly to them. As a result, these "express" delivery orders average around the same delivery time as standard orders. Finally, DoorDash charges consumers an "expanded range delivery" fee on orders "outside of [their] normal delivery area," but DoorDash never creates "normal delivery areas" for each consumer. Rather, DoorDash creates delivery areas around restaurants based on the restaurants' service level plan (meaning how much they pay DoorDash). And DoorDash willmay send certain consumers' orders (like low-cost McDonalds orders) to restaurant locations further from the consumer's home (bypassing closer locations), triggeringwhich may trigger the expanded range fee, and "justifyingjustify" increased "delivery" costs. Moreover, DoorDash disingenuously applies the expanded range fee on DashPass accounts, occasion as a likely method to subsidize

---

[13] See Mary Anne Pazanowski, *DoorDash Must Defend Chicago's Consumer Deception Lawsuit (1)*, BLOOMBERG LAW (Mar. 10, 2022, 9:40 AM, updated Mar. 10, 2022, 3:40 PM), https://news.bloomberglaw.com/litigation/doordash-must-defend-chicagos-consumer-deception-lawsuit; *See* Ex. 14, Craig Clough, *Chicago Accuses Grubhub, DoorDash Of Deceptive Practices*, LAW360 (Aug. 27, 2021, 6:03 PM EST), https://www.law360.com/consumerprotection/articles/1417060/chicago-accuses-grubhub-doordash-of-deceptive-practices; Ex. 15, Ashok Selvam, *As Chicago's Lawsuits Versus DoorDash and Grubhub Proceed, San Francisco May Settle*, EATER CHICAGO (July 28, 2022, 1:45 PM CST), https://chicago.eater.com/20222022/7/28/2327790823277908/chicago-doordash-grubhub-lawsuit-delivery-company-update-san-francsico-settlement.

lost revenues from discounted fees under the DashPass Program (which are consumer accounts that pay DoorDash a flat monthly fee ~~to receive~~for discounted delivery fees.~~ If a DashPass account and a standard account place the same order at~~ ). And, as tests indicate, DoorDash charges the ~~same time from the same restaurant to be delivered to the same home, DoorDash occasionally will charge the DashPass account (but not the standard account) an "~~expanded range fee.~~" Upon information and belief, DoorDash charges DashPass accounts the expanded range delivery fee to subsidize lost revenues from discounted fees under the DashPass program.~~ on iPhone users more often than Android users and charges iPhone users more for "delivering" (likely because studies reveal iPhone users earn more). These tactics are simply money grabs.

~~1.~~     ~~A critical part of~~ DoorDash's ~~deception is its~~ fees are deceptive, ~~misleading "explanations" of its fees in oddly placed informational tabs that are designed to dissuade consumers from seeking more details about those charges. The consumer can only find "more details" about the fees by piecing together DoorDash's statements in its legal terms,~~ and ~~other admissions buried in various places in its website. Each of DoorDash's illegal pricing practices not only violates a multitude of state and federal laws, but also deprives consumers of millions, if not billions, of dollars annually.~~

6.     otherwise fraudulent. DoorDash ~~retains all ill-gotten consumer payments from the delivery-related fees. These fees are unquestionably deceitful, deceptive, and misleading given DoorDash vehemently denies~~promises services that it ~~provides any delivery service, while~~does not provide, including charging consumers a premium amount for deliveries ~~it~~ that DoorDash does not perform. ~~Instead, DoorDash charges the~~DoorDash's "delivery" fees are designed to make the "service fee" ~~that~~ it charges to "operate" its technology appear smaller. After all, as even DoorDash concedes in obscure fine print, it "has no obligation to itemize its costs" under

the many different categories of fees that DoorDash advertises.[14] Rather, DoorDash uses this deceptive practice to trick consumers into believing Dashers receive the "delivery-related" fees when, in reality, each and every "delivery fee" is retained in total by DoorDash. If DoorDash ~~in fact~~instead bundled all of its delivery fees into one large service fee, that practice would raise questions in a consumer's mind ~~about~~ whether ~~the cost of~~ using DoorDash's platform is truly worth ~~it~~the cost. In other words, DoorDash utilizes a psychologically manipulative pricing structure ~~to~~that strategically ~~mislead~~misleads, deceives, and ~~deceive~~defrauds consumers into using the technology platform at a much higher, premium cost.

~~6.~~7.    Two critical components of DoorDash's fraud are its misleading "explanations" of fees and its false advertising on its app and on its website. DoorDash ~~further manipulates~~uses oddly placed informational tabs that are designed to dissuade consumers from seeking more details about the true nature of its charges through misleading and contradictory statements. The consumer can only find "more details" about DoorDash's fees by piecing together its statements in legal terms and other admissions buried in various places on its website. DoorDash also uses deceptive strikethrough pricing, partition pricing, drip pricing, price discrimination and dark patterns as part of a bait-and-switch advertising scheme to market food and delivery costs to consumers. DoorDash defrauds consumers through "estimated" delivery windows. The delivery windows advertised before an order is placed are usually ~~five to seven minutes~~far less than actual delivery windows ~~(~~, which are shown immediately after an order is placed~~)~~. The consistent difference between the advertised and real delivery windows suggests ~~that~~ DoorDash uses an algorithm to set shorter advertised delivery windows to mislead consumers into believing orders

---

[14] ~~See~~Ex. 16, *Consumer Terms and Conditions – United States (Including Puerto Rico)*, DOORDASH ¶ 12(a) (~~Feb. 3~~Apr. 28, 2023), https://help.doordash.com/legal/document?type=cx-terms-and-conditions&region=US&locale=en-US.

will be delivered sooner—another example of manipulation. . Indeed, DoorDash uses algorithms and "engineering" in virtually all aspects of its operations to maximize profits even at the sake of candor. DoorDash then uses the mail to send its advertisements with purported "discount offers" that solicit consumers to become victims of its fraudulent billing practices. Moreover, DoorDash uses e-mails and text messages to carry out its fraudulent scheme on unsuspecting consumers. DoorDash's use of the mail, text messages, and e-mail to further its fraud on consumers represents predicate acts for its racketeering activities. DoorDash then invests the money it has received from its fraud on consumers in the DasherDirect Program, which, in turn, generates even more money for DoorDash. In the end, DoorDash dupes naive consumers into paying more for using its platform and paying for services they never receive. DoorDash's pattern of illegal pricing practices not only violates federal, state, and common laws, but also deprives consumers of millions, if not billions, of dollars annually.

7.8.    Far worse, DoorDash directly targets minor children as part of its deceptive and deceitful scheme. DoorDash engages in advertising campaigns on television and in social media (like its Sesame Street campaign) that encourage minors to use its service. DoorDash does nothing to discourage the Play Store from advertising the DoorDash App as "E" for Everyone, or the Apple App Store from advertising it as "12+", or otherwise restrict minors from downloading the DoorDash App. Nor does DoorDash use any age verification methods to prohibitstop minors from usingregistering to use its technologyplatform, despite having the technological capabilities to do so. In fact, the DoorDash App has no parental controls whatsoever, making it so easy for a child to use the platform that a two-year old ordered thirty-one hamburgerscheeseburgers on the

~~app~~DoorDash.[15] And Dashers deliver to children at their high schools so frequently that some schools set up delivery tables outside for ~~student~~ orders, while others were forced to ban deliveries because ~~they~~the deliveries became disruptive and created potential security risks. As a result, ~~our most~~a vulnerable population, minor children, falls prey to DoorDash's predatory pricing practices when ordering from the on-demand service. But DoorDash does not care.

~~8.~~9.    DoorDash believes it is effectively bulletproof against consumer claims because of its Terms and Conditions—the foundation of its illegal pricing practices. DoorDash's Terms and Conditions transform recognized liability avoidance into illegal liability evasion. ~~The~~Its Terms and Conditions strip consumers of recognized protections~~,~~ by~~:~~ forcing ~~consumers~~them to waive their right to trial; requiring them to pursue claims ~~against DoorDash~~ in secret arbitration (which also deprives the public of the ability to learn about DoorDash's illegal practices); prohibiting ~~them~~consumers from exercising their right to proceed as a class; obligating consumers to indemnify DoorDash for liability; reducing the applicable statute of limitations ~~for applicable claims~~ from years to mere months; ~~obligating consumers to indemnify DoorDash for all liability;~~ and restricting consumers' right to ~~certain relief, including~~ injunctive relief that could prohibit DoorDash from continuing its illegal practices. Relying on the fact that hungry consumers will likely fail to notice, read, or understand ~~the~~its complex terms and conditions, DoorDash buries ~~its use~~some of its highly deceptive ~~strikethrough pricing and~~ bait~~-~~ and~~-~~switch ~~billing~~ practices in pages of legalese. With these terms of adhesion in place (coupled with the nominal cost of each consumer transaction~~,~~ and virtually no exposure from its drivers or

---

[15] Good Morning America, *2-year-old orders 31 cheeseburgers via DoorDash after taking mom's phone*, YOUTUBE (May 19, 2022), https://www.youtube.com/watch?v=Bk2vLDGJ2rw.

merchants given their own ~~similarly~~ restrictive contracts), DoorDash acts with impunity in its charging practices.

~~9.~~10.   DoorDash believes it has created the perfect predatory pricing scheme—one in which it ~~holds~~makes all the rules and keeps the money, while consumers, merchants, and drivers hold all the risk of higher prices and liability. In effect, DoorDash uses its Terms and Conditions as a shield and a sword to ~~carry out~~accomplish its deception. DoorDash uses its Terms and Conditions as a sword against consumers by subjecting them to fraudulent prices and fees for services it neither performs nor provides~~, because~~. In doing so, DoorDash mistakenly believes consumers tacitly agreed to aspects of its shady practices under ~~the terms~~its Terms and Conditions, thereby making them legally permissible. DoorDash then uses the same Terms and Conditions to shield ~~DoorDash~~itself from exposure through indemnification provisions, liability limitations and exculpatory agreements, forced acknowledgments, and ~~waiver~~waivers of rights. The results: DoorDash believes a consumer can only sue in secret arbitration, on an individual basis, with a six-month statute of limitations, and cannot use injunctive relief to stop DoorDash from continuing its devious practices ~~through injunctive relief.~~. But DoorDash's beliefs are ~~based~~premised on a fundamentally flawed position.

~~10.~~11.  DoorDash believes its Terms and Conditions represent an enforceable contract with consumers, but ~~that~~DoorDash is wrong for at least three reasons. First, DoorDash's purported contract lacks an offer, acceptance, sufficient consideration, ~~mutual assent,~~ and a meeting of the minds—basic ~~contract~~contractual elements. ~~Unlike with a clickwrap (or scroll wrap) agreement, consumers using the DoorDash platform never affirmatively acknowledge that their use of the platform creates a binding contract. And unlike with a sign-in-wrap agreement, DoorDash's sign-up language is not reasonably conspicuous. Even so, that language fails to~~

generate sufficient inquiry notice that consumers should read the Terms and Conditions and will be bound by them contractually when creating an account. Second, because DoorDash's Terms and Conditions represent a contract of adhesion, consumers must agree affirmatively to be bound by them.the Terms and Conditions because they represent a contract of adhesion that waives fundamental rights granted by the United States Constitution (jury trials and access to public courts) and the Federal Rules of Civil Procedure (class and collective actions). But here, DoorDash tries to havehas consumers manifest their assent to purportedly "agree" to contract by simply clicking a button whosethe primary purpose of which is not acceptingacceptance of the oppressive contract terms but performing the completely ; rather, the click represents performance of a separate action of simply signing up, namely creating an account to use the technology platform. Third, DoorDash's purported contract does not apply to minor children. Minors lack the capacity to contract, and DoorDash's Terms and Conditions disaffirm any contract with a minor. Absent an enforceable contract, DoorDash must answer for its fraudulent actions before this Court with respect to its delivery fee, priority delivery fee, regulatory fee, expanded range delivery fee, hidden marketing DashPass fee, and hidden marketing and commission feefees, which all increase the cost of the service fees DoorDash charge consumers.

11.12.  DoorDash engages in a fraudulent scheme to charge and collect misleading, premium, and hidden fees from consumers for deliveries that DoorDash does not perform and for food that DoorDash does not sell. This lawsuit seeks to end this dubious practice.This lawsuit seeks to end DoorDash's massive fraud on consumers. Plaintiffs, for themselves and a nationwide class of individuals, including minors, now sue DoorDash for its predatory pricing practices that cost consumers hundreds of millions (if not billions) of dollars each year. . In doing so, Plaintiffs seek the appropriate declaratory and injunctive relief and monetary damages of no

less than $1,000,000,000.00 (One Billion Dollars) ~~on behalf of various classes of~~for all consumers who fell prey to DoorDash's illegal pricing scheme~~.~~ over the past four years.

**THE PARTIES**

~~12.~~13.  Plaintiff Hecox is a citizen of the State of Maryland and a resident of Carroll County. He is the father of Plaintiffs R. ~~Hecox,~~E.H. and R.~~E.H~~ Hecox. Plaintiff Hecox is a divorced, single parent who must ensure that his children are fed when in his care, while also balancing his work responsibilities and shuttling his children to school and sporting activities. Like many parents, he relies on the on-demand food delivery market to help. Plaintiff Hecox is a consumer and user of DoorDash~~. He~~ and is a DashPass member. Plaintiff Hecox signed up for DoorDash and established an account in his own name; used the delivery service to place and receive orders; and was charged and paid a misleading, deceptive and/or fraudulent delivery fee, priority ~~or express~~ delivery fee, DashPass fee, promotional and/or sponsor listing marketing fee, food commission fee, regulatory fee, and/or expanded range delivery fee. ~~Plaintiff Hecox was also a DashPass member.~~ The vast majority, if not all, of Plaintiff Hecox's transactions with DoorDash occurred ~~within the State of~~in Maryland. When he signed up for DoorDash, he did not know of the Terms and Conditions.

~~13.~~14.  Plaintiff R. Hecox is a citizen of the State of Maryland and a resident of Carroll County. Plaintiff R. Hecox turned 18 years old in January 2023 ~~and he~~. He was a consumer and user of DoorDash~~.~~, but no longer uses the platform and disaffirms any prior use. Before reaching the age of majority, ~~he~~Plaintiff R. Hecox established a DoorDash account in his own name; used the food ordering platform to place and receive orders under his own account; and was charged and paid a misleading, deceptive and/or fraudulent delivery fee, priority ~~or express~~ delivery fee, promotional and/or sponsor listing marketing fee, food commission fee, regulatory fee, and/or

expanded range delivery fee. The vast majority, if not all, of Plaintiff R. Hecox's transactions with DoorDash occurred ~~within the State of~~in Maryland. When he signed up for DoorDash, he did not know of the Terms and Conditions.

~~14.~~15.  Plaintiff R.E.H. is a citizen of the State of Maryland, a resident of Carroll County and a minor under the age of 18. He was a consumer and user of DoorDash, ~~who~~but no longer uses the platform and disaffirms any prior use. Plaintiff R.E.H. established an account with DoorDash in his own name; used the DoorDash ~~platform~~Platform to place and receive orders; and was charged and paid a misleading, deceptive and/or fraudulent delivery fee, ~~expedited or express~~priority delivery fee, promotional and/or sponsor listing marketing fee, food commission fee, and/or an expanded range delivery fee. The vast majority, if not all, of Plaintiff R.E.H.'s transactions with DoorDash occurred in Maryland. When he signed up for DoorDash, he did not know of the Terms and Conditions.

~~15.~~16.  Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3) on behalf of themselves and all others similarly situated as defined below in paragraphs ~~100~~190 through ~~110~~202. As used herein, ~~the term~~ "Plaintiffs" refers to both the named Plaintiffs and to members of the proposed Class and Subclasses. Each Plaintiff has suffered a compensable injury.

~~16.~~17.  Defendant DoorDash is incorporated in the State of Delaware and has its principal place of business in the State of California and therefore, for diversity jurisdiction, is a citizen of both states. Defendant DoorDash conducts business in Maryland. DoorDash is a technology company that does not prepare or sell food and, thus, DoorDash, the DoorDash ~~platform~~Platform, and its associated technology, is not a necessity. DoorDash is a culpable

13

person under the Racketeer Influenced and Corrupt Organizations Act, codified as Title IX of the Organized Crime Control Act of 1970, 18 U.S.C. §§ 1961 to 1968 ("RICO").

## JURISDICTION AND VENUE

17.18.  This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 and 28 U.S.C. § 1332 because there are over 100 members of the proposed class, at least one member of the proposed class has different citizenship from the Defendant, and the total amount in controversy exceeds $5,000,000. This Court also has subject matter jurisdiction pursuant to 28 U.S.C.§ 1331 and 18 U.S.C. §§ 1964(a) and (c) because this action involves claims under RICO.

18.19.  DoorDash is subject to this Court's exercise of *in personam* jurisdiction because: (a) DoorDash: (a) transacts business or performs any character of work or service in the State; (b) DoorDash contracts to supply food services in the State; and (c) DoorDash has caused tortious injury in the State by an act or omission in the State. Moreover, pursuant to 18 U.S.C. § 1965(b), process may be served on DoorDash "in any judicial district of the United States" when required by the "ends of justice." And pursuant to 18 U.S.C. § 1965(d), process may be served on DoorDash "in any judicial district in which such person resides, is found, has an agent, or transacts his affairs."

19.20.  Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claimclaims occurred in the District of Maryland. Venue is also proper pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(c) because DoorDash is subject to the Court's personal jurisdiction regarding this action.

<u>COMMON FACTUAL ALLEGATIONS</u>

I.     ~~FROM~~ DOORDASH'S NOBLE BEGINNINGS ~~AND GROWTH~~TO ITS EXPLODING MARKET TO ITS UNSAVORY BUSINESS PRACTICES

A.     DoorDash's Noble Beginnings

~~20.~~21.  DoorDash began in 2012 as PaloAltoDelivery.com ("Palo Alto Delivery") when four Stanford University students established a website designed to provide delivery services for local restaurants to help them increase sales. Unlike ~~others~~other services, Palo Alto Delivery provided its own delivery force so restaurants could outsource deliveries to Palo Alto Delivery rather than develop a delivery arm themselves. Palo Alto Delivery's success quickly attracted investors. ~~The~~In 2013, the company rebranded as DoorDash ~~in 2013, shifting~~and shifted its focus to developing technology ~~that assists~~to assist business-to-consumer deliveries in the on-demand delivery market.

~~21.~~22.  "On demand delivery is the process of retailers, restaurants, manufacturers, grocery stores, etc. [. .,] being able to deliver orders quickly and with no advanced notice. On demand services have become particularly popular due to the popularization of the on-demand delivery app, as well as the expansion of eCommerce due to COVID-19."[16] The on-demand food delivery industry predominately impacts the country's most financially vulnerable populations. A nationwide research study conducted by Zion & Zion reveals the largest user markets for ~~reveals the largest user markets for~~ online delivery food services are the young and the poor.[17]

---

[16] Ex. 17, Zahava Dalin-Kaptzan, *On-Demand Delivery: 7 Fundamentals of Fast, Competitive Delivery*, BRINGG, https://www.bringg.com/blog/delivery/the-on-demand-delivery-experience/ (last visited May 3, 2023).

[17] ~~*See*~~Ex. 18, Aric Zion & Thomas Hollman, ~~*Usage and Demographics of*~~ *Food Delivery Apps*: *Usage and Demographic — Winners, Losers and Laggards*, ZION & ZION (2019), https://www.zionandzion.com/research/~~food~~food-delivery-apps-usage-and-demographics-winners-losers-and-laggards/.

23.      The on-demand delivery market represents a significant part of the gig economy. As one source explains, the "gig economy is a labor market that relies heavily on temporary and part-time positions filled by independent contractors and freelancers rather than full-time permanent employees. Gig workers gain flexibility and independence but little or no job security. Many employers save money by avoiding paying benefits such as health coverage and paid vacation time. . . . [T]he flexibility of working gigs can actually disrupt the work-life balance, sleep patterns, and activities of daily life. Flexibility in a gig economy often means that workers have to make themselves available any time gigs come up, regardless of their other needs, and must always be on the hunt for the next gig. Competition for gigs has increased, too. And unemployment insurance usually doesn't cover gig workers who can't find employment."[18] DoorDash plays a significant role in the gig economy by using Dashers to perform deliveries.

**B.      DoorDash's Growth During the Exploding On-Demand Deliver Market**

22.24.  Over the past ten years, the on-demand food delivery market enjoyed steady revenue increases before exploding in popularity during the pandemic starting in 2020. In 2018, the on-demand food delivery market represented a healthy $82 billion in gross revenues andbut is now projected to exceed $200 billion by 2025.[19] The growth in this market ishas been rapid and DoorDash experienced a similar rapid growth. But as explained herein, DoorDash's tremendous growth in the pursuit of more revenue occurred on the backs of restaurants, contractors, and especially consumers through a multitude of fraudulent business practices and strategies.

---

[18] Ex. 19, The Investopedia Team, *Gig Economy: Definition, Factors Behind It, Critique & Gig Work*, INVESTOPEDIA (Oct. 1, 2022), https://www.investopedia.com/terms/g/gig-economy.asp.

[19] *See*Ex. 20, *$9.6 Billion in Investments Spurring Aggressive Expansion of Food Delivery Companies,* FROST & SULLIVAN (Oct. 25, 2019), https://www.frost.com/news/press-releases/9-6-billion-in-investments-spurring-aggressive-expansion-of-food-delivery-companies/.

~~23.~~25.  ~~DoorDash has experienced a similar rapid growth.~~ By late 2018, DoorDash had overtaken Uber Eats as the country's number two delivery service and was closing fast on then-number one GrubHub. ~~According to one source~~[20] By September of 2019, DoorDash controlled thirty-five percent of the on-demand food delivery market in the United States ~~by September of 2019. The~~.[21] With the start of the pandemic in 2020 and the resulting economic crisis, DoorDash's deceptive business practices spurred its growth. By March 2022, the company had ~~a~~ more than fifty-nine percent of the monthly market ~~share in March 2022~~.[22] ~~And~~Less than a year later, by February 2023, DoorDash's monthly market share ~~rose from 59% in March 2022~~had climbed to 65~~% in February 2023, less than a year later.~~%, as the illustrations below reflect.[23]



[20] Ex. 21, Alison Griswold, *DoorDash has overtaken Uber Eats in US online food delivery*, QUARTZ (Feb. 14, 2019), https://qz.com/1549084/doordash-overtook-uber-eats-in-us-online-food-delivery-second-measure-finds.

[21] Ex. 22, Frank Holland & J.R. Reed, *DoorDash continues to lead in the food delivery wars*, CNBC (Nov. 25, 2019, 9:43 AM EST), https://www.cnbc.com/2019/11/21/doordash-continues-to-lead-in-the-food-delivery-wars.html.

[22] Ex. 23, Tom Kaiser, *U.S. Delivery Sales, DoorDash Share Still Growing*, FOOD ON DEMAND (Apr. 28, 2022), https://foodondemand.com/04282022/u-s-delivery-sales-doordash-share-still-growing/.

[23] Ex. 24, Janine Perri, *Which company is winning the restaurant delivery war?*, BLOOMBERG SECOND MEASURE (Apr. 14, 2023), https://secondmeasure.com/datapoints/food-delivery-services-grubhub-uber-eats-doordash-postmates/.



24.26.  In December 2020, DoorDash's initial public offering ~~was in December 2020, which~~ raised $3.37 billion and ~~in turn~~ gave DoorDash a valuation ~~that exceeded~~exceeding $70 billion.[24] The IPO made billionaires out of ~~the three~~ DoorDash founders, Tony Xu, Andy Fang, and Stanley Tang.

25.27.  During 2020 and 2021, ~~in~~at the height of the COVID-19 pandemic, ~~DoorDash~~DoorDash's revenue grew significantly. DoorDash had $2.9 billion revenue in 2020, which skyrocketed to $4.9 billion in 2021. DoorDash's trend of significantly higher year-over-year revenue and gross order value continued through 2022, reaching $6.6 billion.[25]

26.28.  In 2021, DoorDash had 25 million active users, most of them in the United States, an increase of twenty-five percent over 2020. DoorDash reported delivering 1.4 billion orders in

---

[24] Ex. 25, Erin Griffith, *DoorDash Soars in First Day of Trading*, N.Y. TIMES (~~Dec. 9, 2020, updated~~ Mar. 19, 2021), ~~https://www.nytimes.com/2020/12/09/technology/doordash-ipo-stock.html#:~:text=DoorDash%20stock%20rose%2086%20percent,and%20Chipotle%20Mexican%20Grill%20combined~~https://www.nytimes.com/2020/12/09/technology/doordash-ipo-stock.html?smid=url-share.

[25] Daniela Coppola, *Annual revenue of DoorDash from 2019 to 2022*, STATISTA (Mar. 22, 2023), ~~https://www.statista.com/statistics/1294498/doordash-annual-revenue/.#:~:text=In%202021%2C%20DoorDash%20generated%20revenues,2013%20in%20Palo%20Alto%2C%20California.~~ https://www.statista.com/statistics/1294498/doordash-annual-revenue/ (chart attached as Ex. 26).

2021, which grew to 1.7 billion orders in 2022.[26] As of 2022, DoorDash ~~has~~had about 450,000 active monthly merchants,[27] and ~~controls around fifty-seven percent~~about 25 million active monthly consumers using its platform. Now, with an estimated 32 million users of its technology,[28] DoorDash serves about 10% of the ~~on-demand food delivering market.[29]~~entire United States population.

### C.      DoorDash's Penchant for Unsavory Business Practices

29.     As DoorDash's market share grew so did its willingness to engage in unsavory business practices towards the drivers, merchants, and consumers who use the DoorDash Platform. Beyond the issues discussed previously herein (namely, DoorDash improperly retained tips; forced struggling gig drivers to pay fees to receive their own money; leveraged or extorted drivers to participate in programs designed to generate more revenue for DoorDash; and was sued by Chicago for marking-up menu items, violating the City's pandemic-related cap on food delivery fees, and misleading consumers on the nature of fees),[30] DoorDash's short history is full of more dubious conduct.

30.     Former or current Dashers and gig workers complain about DoorDash misleading the public about Dashers' earnings through social media marketing campaigns on TikTok.[31] In

---

[26] Ex. 27, Gennaro Cuofano, *DoorDash Orders*, FOURWEEKMBA (Feb. 20, 2023), https://~~fourweekmba~~fourweekmba.com/doordash-orders/.

[27] Ex. 28, Brian Dean, *How Many People Use DoorDash in 2023? [New Data]*, BACKLINKO (Mar. 27, 2023), https://backlinko.com/doordash-users.

[28] Ex. 2, David Curry, *DoorDash Revenue and Usage Statistics (2023)*, BUSINESS OF APPS (May 2, 2023), https://www.businessofapps.com/data/doordash-statistics/.

[29] ~~Brian Dean, *How Many People Use DoorDash in 2022? [New Data]*, BACKLINKO (June 29, 2021), https://backlinko.com/doordash-users.~~

[30] *Supra* ¶¶ 2, 3.

[31] *See* Driven Wyld, *DoorDash Driver EXPOSES Company for False Advertising! The Harsh Truth! UberEats Grubhub Instacart*, YOUTUBE (Apr. 13, 2023), https://youtu.be/cnam6bA3nc4.

other words, like its actions with consumers, DoorDash has a habit of inducing people to engage with its platform based on misrepresentations.

31.     Even after a $100 million settlement of a class action alleging that DoorDash misclassified its Dashers in Massachusetts and California as independent contractors rather than employees,[32] DoorDash continues to face suit in multiple jurisdictions under the Fair Labor Standards Act and state equivalents for misclassifying their drivers, including recently in the United States District Court for the Middle District of Florida, *Silva v. DoorDash*, No. 6:23-cv-00104. In these cases, DoorDash moved to compel arbitration. But when sued by nearly 6,000 current or former Dashers in a mass arbitration over the classification of its drivers, DoorDash sought to avoid its own contractual arbitration provision by litigating in court.[33] Regardless of the forum, in each case DoorDash still stressed that it is not a delivery company and does not control its drivers because of its independent contractor model.

32.     DoorDash has been sued for using the trade dress—names, logos, trademarks, and other intellectual property—of various restaurants without permission to create the appearance to consumers that its restaurant offerings are more robust.[34]

33.     DoorDash was sued for false advertising reportedly for falsely listing a mom-and-pop restaurant struggling during the pandemic as "closed" or "unavailable" on its platform. That

---

[32] Ex. 29, Informational website for the settlement of wage and hour claims of DoorDash California and Massachusetts Drivers, https://www.doordashclasssettlement.com/ (last visited May 3, 2023).

[33] *Abernathy v. DoorDash, Inc.*, 438 F. Supp. 3d 1062 (N.D. Cal. 2020).

[34] *Burger Antics v. DoorDash*, No. 18-cv-00133 (N.D. Ill.) (alleging that DoorDash was publicizing a relationship with the restaurant and delivering its food without permission).

restaurant contends in a class action that "DoorDash deceptively directed customers away from restaurants that refuse[d] to pay up to a 30% commission for each DoorDash delivery." [35]

34.     DoorDash has been sued because its Dashers have harmed people, including a Dasher who killed at least one person when the driver crashed driving for DoorDash while reading a DoorDash communication.[36] DoorDash still disputed liability for the Dashers' actions because the Dasher is an independent contractor.

35.     Of course, when confronted with its misdeeds DoorDash reverts to the standard corporate playbook of emphasizing its philanthropic efforts. In many respects these efforts are contrived and minimal compared to DoorDash's gross revenues. For example, when facing negative press over the strong-arm tactics that it used on restaurants during the pandemic, DoorDash developed an advertising campaign that highlighted its role helping restaurants survive during the pandemic, particularly restaurants owned by people of color.[37] While DoorDash likes to play up its "good citizen" image, its history is far less rosy.

36.     Frustrated with DoorDash's pricing approach, several states and municipalities have adopted legislation regulating how DoorDash charges restaurants. But DoorDash's questionable business practices with restaurants pale in comparison to DoorDash's actions

---

[35] Ex. 30, Nicholas Iovino, *DoorDash Can't Duck Restaurant's False Advertising Suit*, COURTHOUSE NEWS SERVICE (Jan. 19, 2021), https://www.courthousenews.com/doordash-cant-duck-restaurants-false-advertising-suit/.

[36] Ex. 31, Emilie Raguso, *Motorist who killed pedestrian was driving for DoorDash, lawsuit says*, BERKELEYSIDE (Aug. 31, 2021, 4:29 PM), https://www.berkeleyside.org/2021/08/31/motorist-killed-pedestrian-berkeley-doordash-lawsuit.

[37] *See* DoorDash, *SOUTHSIDE MAGNOLIA*, YOUTUBE (Oct. 26, 2020), https://www.youtube.com/watch?v=Q42SPkzI3Dw; s*ee also* DoorDash, *Soul of the City*, YOUTUBE (June 15, 2021), https://youtu.be/aCriukDwvI4.

towards consumers, like Plaintiffs. To that end, Congress has begun investigating DoorDash and others for their consumer pricing practices.[38]

## II.   HOW DOORDASH WORKS

27.37.   DoorDash is "an online marketplace platform using web-based technology that connects contractors, restaurants and/or other businesses, and consumers [ ]. [DoorDash]'s software permits registered users to place orders for food and/or other goods and services from various restaurants and businesses. Once such orders are made, [DoorDash's] software notifies [a network of independent] contractors that a Delivery Opportunity is available and the [DoorDash] software facilitates completion of the delivery."[39] *See illustration below.*In other words, DoorDash uses text messaging, and emails communications extensively as part of its delivery scheme. Each of the contractors, restaurants, and consumers receive such electronic communications. *See* illustration describing operations below.[40]

---

[38] Ex. 32, Cristiano Lima, *Democrats press Grubhub, DoorDash and Uber on their use of 'junk fees'*, WASH. POST (Feb. 21, 2023, 9:16 AM EST), https://www.washingtonpost.com/politics/2023/02/21/democrats-press-grubhub-doordash-uber-their-use-junk-fees/.

[39] Ex. 1, *Independent Contractor Agreement - United States, DoorDash Dashers*, DOORDASH (Jan. 2022Apr. 14, 2023), https://help.doordash.com/legal/document?type=dx-ica&region=US&locale=en-US (citing recitals).

[40] Ex. 33, Holly Jin et al., *Next-Generation Optimization for Dasher Dispatch at DoorDash*, DOORDASH ENGINEERING (Feb. 28, 2020), https://doordash.engineering/2020/02/28/next-generation-optimization-for-dasher-dispatch-at-doordash/.



A.



## A.     Signing Up to Use the DoorDash Platform

28.38.  Consumers, including minor children, who want to have food or other goods and services delivered anywhere—whether to their home, office, hotel, ballpark, or elementary, middle, or high school— can access DoorDash in either of two ways: (1) through its website,

www.doordash.com,www.doordash.com, or (2) through the DoorDash App, which is available either through the Apple App Store or Google Play. The registration process to create a DoorDash account on both its website and the DoorDash App (herein "DoorDash platform") presentcollectively the "DoorDash Platform") has slightly varied over the years in terms of what consumers see. But the DoorDash Platform presents a virtually identical user experience when registering to use the DoorDash technology. Regardless of when one registers while interacting with the platform, or the method one used to create their account, DoorDash always has placed a purported notice of an its intent to contract with consumers in a cluttered environment and/or in an inconspicuous manner. The DoorDash registration experience allows consumers to neither manifest an assent to contractor nor waive fundamental rights knowingly and intelligently.

      **(1)**     (1)    **Signing up on Doordash.com**

    29.39.  Logging onto www.doordash.com, a user sees a delivery address sign-in box in the center top of the home page and a "sign -in" tab for returning customers or "sign -up" tab for new customers in the upper right-hand corner of the page. Either the address box or sign-in/up tabs will allow a user to begin the process of accessing the platform. *See* illustration below.





~~30.~~40.   If the first-time user clicks on "sign ~~-~~up," a prompt appears~~. This sign-up prompt seeks~~ that is cluttered with visuals. While requesting basic personal information ~~like~~, DoorDash includes six large, gray boxes with writing in each indicating that the user should input the user's first and last name, an email address, a telephone number, and a password. These boxes take up

significant space. The sign-up prompt ~~also allows the user to~~includes four large, colorful tabs reading "sign up" or continue ~~the sign-up process through~~with Google, Facebook, or Apple. There are no prompts or fields requesting that the user verify his or her age. Nor does the website ~~have any language urging~~tell consumers to read the Terms and Condition or indicate that ~~signing up~~registering or otherwise using the website platform binds consumers or creates a contract that ~~waives~~incorporates waivers of important rights. After completing the requested information, a first-time user clicks on "sign up" and that user is now registered. But presently located above the large, red sign-up button (in smaller, less prominent font) and squeezed in between the large box requesting a password, is inconspicuous language that reads: "By tapping 'Sign Up' or 'Continue with Google, Facebook, or Apple,'" you agree to DoorDash's Terms and Conditions and Privacy Policy." Surrounding the registration process are graphics of food and restaurants and additional words that command attention. DoorDash has used various iterations of this registration form since 2019. *See* illustration below.





31.41.   Upon information and belief, as recently as several months ago in January 2023, and from time-to-time over the last four years, that same (less prominent) language was buried at the bottom of the sign-up prompt obscured by other large sign-upregistration icons for Google, Facebook, and/or Apple. *See* illustration below.



32.42.  If a first-time user scrolls down the home page without providing an address or signing-in or signing-up, that user can learn about becoming a Dasher, a partner restaurant, or downloading the DoorDash App. *See* illustration below.





33.43.  Scrolling down the home page further, the user can find restaurants. *See* illustration below.





34.44.  Clicking the "find restaurant" tab will take the user to a "~~Restaurant~~Restaurants near me" landing page. Upon information and belief, the website uses location information embedded in the user's computer or mobile device to identify nearby restaurants. The sign-in and sign-up buttons remain in the upper right-hand corner and ~~the~~ an "enter ~~a~~ delivery address" field is on the upper left-hand side. *See* illustration below.





~~35.~~45.  If ~~you click~~a user clicks on a specific restaurant, like Shake Shack for example, a new page loads forcing the user to enter ~~his/her/their~~an address for delivery. *See* illustration below.





36.46.   When you entera user enters an address, a new page will load informing the user whether the identified restaurant is within the restaurant's delivery area. If the address is outside the restaurant's delivery area, the user is given the option to change the address, change the order to pick-up or view other nearby restaurants.⁴¹ *See* illustration below.

_____

⁴¹ The addresses and other confidential information listed in all screenshots have been redacted for privacy.

pick-up or view other nearby restaurants.⁴² *See* illustration below.



    37.47.  Selecting "view other nearby restaurants" allows the user to pursue a variety of

locations by specific food type and other categories of organization in what is called the

DoorDash marketplace. *See* illustration below.

---

⁴² The addresses and other confidential information listed in all screenshots have been redacted for privacy.



~~You~~



~~38.~~48.  A user can then select a specific restaurant to view its menu and select a food item to add to the cart. *See* illustration below.





39.49.  Once the menu item is added, youa user can select "checkout" in the upper right-hand corner of the page. *See* illustration below.





40.50.  Selecting checkout takes ~~you~~a user to a page on which ~~you~~the user can add ~~your~~a payment method in the upper right-hand corner, or sign ~~-up~~~~or,~~ sign-in, or proceed with an email address in the center. Nowhere on this page is there any reference to Terms and Conditions or any notice that by continuing the user assents to a contract with DoorDash. *See* illustration below.





41.51.  When enteringa first-time user enters an email address for a first-time user, a

prompt appears instructing the individual to "sign-in" to an existing account or "sign –up" or

"create an account" to use DoorDash. The Terms and Conditions are not referenced on this page.

*See* illustration below.



52.     By clicking "create an account" or "sign -up," the first-time user is taken to a sign-up registration page (similar to like the sign-up prompt one sees when selecting sign-up on the home page after logging onto doordash.com). Indeed, this sign-up Upon information and belief, the above-described process has been substantially similar since 2019.

42.53.  This registration page seeks the same basic personal information, i.e., in the same format, i.e., large, gray boxes requesting the user's first and last name, an email address (which is already populated), a telephone number, and requests a password. The sign-up registration page also allows the user to continue creating an account the sign-up process through Google, Facebook, or Apple. Nowhere on the page is there any language that signing up registering to form an account on DoorDash creates a contract or waives rights. But the consumer's pending order is reflected to the right of the sign-up area (almost like a reminder to hurry up and complete the process). And above the red sign-up button, in smaller font, is language that reads, "By tapping 'Sign Up' or 'Continue with Google, Facebook, or Apple,' you agree to DoorDash's Terms and Conditions and Privacy Policy." Upon information and belief, over time, DoorDash

38

previously located this same language at ~~various places, including~~ the bottom of the page beneath the ~~various~~other large sign-up icons (like the illustration in paragraph ~~31~~41) until ~~it recently moved~~moving the location of the language. recently. Below, the registration tabs are fields to enter shipping and payment details related to the pending order. After filling in the requested information, ~~that~~a first-time user clicks on "sign up" and ~~that user is now registered.~~completes the registration process. There are no prompts or fields requesting ~~that~~age verification from the user ~~verify his or her or their age.~~. *See* illustration below.





**(2)      Signing Up on the DoorDash App**

~~43.~~54.  ~~You~~A user can access the DoorDash App by downloading it from the Play Store, Apple Store, or from DoorDash's website. Once the app is downloaded and opened, users on either the IOS/Apple or Android/Samsung mobile platforms ~~engage~~have engaged in ~~a~~ virtually identical registration ~~experience.~~experiences since 2019. The user is met with a screen cluttered by food graphics, advertisement slogans, and different (albeit large and colorful) registration tabs. In effect, a returning user can sign into the DoorDash App, and a first-time user is able to ~~sign-up for DoorDash~~create an account or continue as a guest. For IOS/Apple and Android/Samsung mobile platforms, ~~there is~~language on the app's initial landing screen in smaller font near the bottom of the page and obscured by much larger colorful icons ~~that~~reads, "By tapping 'Sign Up' or 'Continue with Google, Facebook, or Apple,' ~~you agree~~a user agrees to DoorDash's Terms and Conditions and Privacy Policy." ~~The~~Assuming consumers look at the bottom of the screen instead of pressing a tab, the words "Terms and Conditions and Privacy

Policy" appear in an even smaller font on the IOS/Apple platform. There is no language on this page urging consumers to read the Terms and Condition or warning them that ~~signing up or otherwise using~~creating an account on the DoorDash App binds consumers ~~or creates a contract that waives important~~contractually and subjects them to arbitration, waiving fundamental rights. ~~If you elect to sign-up or sign-in using Google, Facebook, or Apple, the user is redirected without further prompts.~~ *See* illustrations below.



**APPLE/IOS**                                    **ANDRIOD/SAMSUNG**

41

55.     Since 2019, if a returning user selects "Continue with Google, Facebook, or Apple" as an alternative method of signing-into DoorDash, that returning user will be connected to an existing DoorDash account through that user's account on Google, Facebook, or Apple. If a first-time user selects "Continue with Google, Facebook, or Apple" as an alternative method to sign up for DoorDash, that first-time user will receive a prompt allowing that user to sign up with an account on Google, Facebook, or Apple. The prompt includes language at the bottom that generally states that the first-time user "can review DoorDash's privacy policy and terms of service." The prompt does not inform the first-time user that he or she must "agree" to (let alone be "bound" by) DoorDash's "terms of service," which is a misnomer for its Terms and Conditions. *See* illustrations below using Google and Apple as alternative methods for registering on the DoorDash Platform.



**Android/Samsung          Apple/IOS**

Upon information and belief, the first-time user registering with Facebook will see a prompt similar to the illustrations above for alternative registration methods.

44.56.  If the user selects continue with email, a sign- as reflected in/sign- the illustrations at paragraph 54, a sign-in/sign up screen will appear. Toggling to the sign-up prompt, a user must entersign up, a user is presented with yet another cluttered registration screen. From time to time, the screen will include advertisements, like a colorful banner urging the user to sign up for a 40% discount. The screen also requests (consisting of his or herthe user's first and last name, an email address, a telephone number, and a password. The sign-up prompt also allows the user to continue the sign-up process through Google, Facebook, or Apple. After filling in the ) in large grey boxes with wording that describes the nature of the information requested information, a first-time user clicks on "sign up" and that user is now registered.. The registration prompt also includes large, colorful tabs that allow the user to proceed "by tapping" the red "sign up" button or tapping buttons to "continue with Google, Facebook, or Apple." There are no prompts or fields requesting that the user verify his or her age or even acknowledge that the user is over 18 years old. Nor does the app have any language urgingthat urges consumers to read the Terms and Conditions, or noting that signing upinforms consumers that registering or otherwise usingcreating an account on the DoorDash App binds consumers or creates a contractthem contractually and waives importantsubjects them to arbitration, waiving fundamental rights. But abovesandwiched between the large red sign-up button and the large grey password box is the same, less prominent language that reads, "By tapping 'Sign Up' or 'Continue with Google, Facebook, or Apple,'" you agree to DoorDash's Terms and Conditions and Privacy Policy." Upon information and belief, this same language used to be located at the bottom of the page beneath the various large sign-up icons (like *See* illustration in paragraph 31) until DoorDash moved the location of the language earlier in 2023. *See* illustrations below.





Upon information and belief, since 2019, DoorDash has located this same or similar notice language in different places previously, including at the bottom of the page beneath other large sign-up icons (as reflected by the illustration in paragraph 41). DoorDash moved the location of the language earlier this year.

45.57.  If the user continues as a guest, the user will be prompted to provide an address and then is allowed to browse restaurants, select menu options to be added to the cart, and then can proceed to checkout. Before continuing to check out, however, the app prompts the guest user to create an account with the same sign-up requirements as those launched from the initial screen when opening the DoorDash App and selecting sign –up. *See* illustrations below.





(3)    Signing-up on the



The DoorDash Platform ~~Present the Same Concerns~~

~~2.      As the above review reflects, DoorDash~~ does not ~~use a scroll-wrap or clickwrap agreement, which require a consumer to review the contract terms and/or click a box with language such as "I Agree" to become contractually bound before using the website. Of course, DoorDash insists on using a clickwrap agreement with its merchants. Kathy Zhu, DoorDash's former Senior Director and Associate General Counsel Commercial and Legal Operations, tasked with contracting, said DoorDash "knew we wanted a clickwrap contract" for DoorDash's merchant relationship "to be a lot more precise."⁴³ She equivocated on DoorDash's consumer contracts stating, "in the B-to-C world [business to consumer], it's usually ok legally speaking to deal with all of your customers more or less in the same way."⁴⁴ "Usually ok legally speaking, more or less" is hardly a ringing endorsement of enforceability from DoorDash's then chief "contract counsel." But her equivocation about enforceability is indeed apt.~~

---

~~⁴³ *How DoorDash Creates Self-Service Restaurant Partnership Contracts Using Clickwrap*, IRONCLAD (1:26-1:58), https://ironcladapp.com/customers/doordash/ (last visited Apr. 14, 2023).~~
~~⁴⁴ *Id.*~~

46.58.   DoorDash's wrap agreement presents several concerns. First, DoorDash located its notice language inconspicuously at the bottom of its sign-up page away from the sign-up button as reflected in the illustration in paragraph 31. That language remains in that same place for customers initially signing-up through Google, Apple, or Facebook as reflected in the illustrations in paragraphs 43 through 45. Rather than provide a notice next to each sign-up button or a prompt that informed consumers about the notice after clicking one of the sign-up buttons, DoorDash located the sign-up notice at the bottom of the sign-up page after consumers scrolled through the sign-up options. But DoorDash recently moved the location of that language closer to the sign-up button as reflected in those same paragraphs. Regardless of where the sign-up notice is located, the notice language is still deficient. The language is neither prominent, informs consumers they should read the daunting and intimidating include the Terms and Conditions, nor informs them that they will be "bound" contractually when creating a DoorDash account. As a result, at a minimum, the language does not generate sufficient inquiry notice about DoorDash's oppressive Terms and Conditions. Consumers, like Plaintiffs, therefore, never manifest their assent to DoorDash's Terms and Conditions as a category in the information menu located in the upper-left corner of the page. *See* illustrations below.

3.      DoorDash's approach to minimizing the sign-up process is intentional. As its former contract counsel Zhu noted in an interview, DoorDash's priority is "speed" and "efficiency."[45] She did not mention legal compliance. Instead of attempting to comply with the law, DoorDash created a "contracts playbook" with talking points and even "fallback positions"

---

[45] Lawtrades, *#6 - DoorDash Head of Commercial Kathy Zhu on Staying Nimble Despite Bandwidth Constraints*, Yᴏᴜᴛᴜʙᴇ (11:51) (Dec. 17, 2020), https://www.youtube.com/ watch?v=ZWXbc6HCBwg.

about the enforceability of their agreements.[46] Here, DoorDash achieves speed and efficiency by skipping steps in its sign-up process that would ensure users received a definitive offer, a clear mode of acceptance, supported by sufficient consideration and mutual assent.



And the DoorDash Platform buries the Terms and Conditions at the bottom of a lengthy list of shopping options. Even without selecting the "More" tab to reveal more restaurant options, a user must scroll through ten screens before the Terms and Conditions appear. Even then, DoorDash stealthily displays them in a much smaller font which is neither highlighted, underlined, nor presented in a different color. *See* illustrations below and on the following page.

---

[46] *Id.*





**B.     Using DoorDash's ~~Technology~~Platform**

**(1)     Placing Orders**

~~47.~~59.  After signing up, a consumer may place orders on DoorDash. Whether using the DoorDash ~~on its~~ website or on the DoorDash App, the user experience is virtually the same and has been that way since 2019. The intuitive nature of DoorDash's technology makes it easy to use.

~~48.~~60.  After launching the app or website, consumers are presented with categories of merchants and below that types of food in the DoorDash marketplace. By scrolling down the

50

page, a consumer can see restaurants and merchants organized under various categories such as

"~~nearby~~Nearby" or "~~wallet friendly~~Wallet Friendly" or "~~try something new~~Try Something

New." *See* illustration below.





49.61.  To place an order, a consumer need only select a restaurant, like Chick-fil-A, and

then browse its menu, scrolling down the page to view the various items and then ~~touching~~

~~on~~tapping the menu items and adding ~~it~~them to ~~your~~the cart. ~~You continue~~The consumer continues adding ~~items~~ to ~~your~~the cart until the ~~consumer~~order is ~~finished~~complete, at which point the consumer views the cart screen to see a populated list of ~~what is in the cart~~its contents. Scrolling to the bottom of the cart screen, the consumer can see a summary of charges which typically consist of a subtotal for food, a delivery fee, a service fee, and taxes. When completed, a consumer presses continue, which will take the consumer to a screen with delivery time options (which include express, standard, or scheduled). The delivery time window advertises ~~how long it will take~~the length of time for the order to reach the consumer. Scrolling further down the page, a consumer can review his or her contact information, instructions on delivery, and a summary of the order costs. *See* illustrations below.





62.    After selecting the delivery window, and confirming the contact information, a consumer can click the "next" button to proceed with ~~the order.~~ entering your payment method and eventually placing the order.

### (2)    Payment Methods

63.    As for payment methods, DoorDash reserves a section above the place order button for consumer payment methods. When a user clicks on that section, the DoorDash Platform reveals the various accepted payment methods. DoorDash takes virtually all forms of electronic payments. A consumer can add a credit card, Google or Apple Pay, Venmo, PayPal, gift cards, or debit cards. *See* illustrations below.



64.     As DoorDash knows, the wide range of payment methods makes it easy for minor children to place and pay for orders on DoorDash, given the proliferation of parent-loaded debit cards like Greenlight and the ability to use gift cards. The varying electronic payment methods do not impact the user experience on the DoorDash Platform. DoorDash maintains all consumer order information. The payment method (credit or debit card number) provides DoorDash with insight into the type of consumer placing an order. *See* illustrations at paragraph 63.

**(3)      Communicating Order Status through Text Messages and Emails**

~~50.~~65.   After selecting the time, clicking next, and entering the payment method, a consumer can click place the order to complete the order. Once done, the consumer receives a summary of the order (including the cost of the food, each line-item fee, estimated tax, and the Dasher's tip, which the consumer can select). Near the bottom of the screen above the "Place Order" button, a consumer can enter his or her payment methodology. As soon as the "Place Order" button is touched, the screen shows the real delivery time which is usually different from the advertised delivery time, and ~~you~~the user can again click to view all details of the order or add items to the order from another store. ~~DoorDash then sends a series of text messages~~

~~showing each stage of the order until it is delivered. Consumers, including minors, receive these~~

~~text messages although proper consent is not obtained.~~ *See* illustrations below.



### ~~C.~~     Payment Methods

As for payment methods,



<u>66.</u>     DoorDash ~~takes virtually all forms~~<u>then sends a series</u> of ~~electronic payments. A~~

~~consumer can add a credit card, Google~~<u>text messages and/</u>~~or Apple Pay, Venmo, PayPal, gift~~

~~cards, or debit cards. As~~<u>emails showing each stage of the order until it is delivered.</u>

**C.      DoorDash** ~~knows, the wide range of payment methods makes it easy for minor children~~Markets Its Platform and Services **to** ~~place and pay for orders on Consumers Through the Mail~~

67.      In promoting its platform, DoorDash ~~given the proliferation of parent loaded debit cards~~uses the United States Postal Service and other mail services to send solicitations to consumers, like ~~Greenlight, and the ability~~Plaintiffs, that provide discounts on DoorDash's service and advertisement about its offerings.[47] Plaintiff Hecox has received such mailings soliciting him to use ~~gift cards.~~DoorDash. *See* illustration on the following page.



~~51.~~68.  DoorDash uses the mail so frequently that some websites offer services to stop DoorDash's direct mail marketing.[48] *See* illustration below.

---

[47] Ex. 34, Gennaro Cuofano, *DoorDash GOV*, FOURWEEKMBA (Feb. 20, 2023), https://fourweekmba.com/doordash-gov/.

[48] Ex. 35, *How to Stop Mail from DoorDash*, PAPERKARMA, https://www.paperkarma.com/stop-junk-mail/doordash/ (last visited May 3, 2023).



4.      The varying electronic payments methods do not vary the user experience on the DoorDash platform. DoorDash maintains all consumer order information. The payment method (credit or debit card number) provides insight into the type of consumer placing an order.



C.D.    **The Functionality of DoorDash's Technology**

52.69.  DoorDash's operation reliestechnology operates on sophisticated engineering infor everything it does. In describing this work, DoorDash says it "is rapidly growing a logistics platform that enables millions of orders a day globally, and none of it would be possible without

our world-class engineering team."[49] DoorDash advertises its engineering as driving its "high impact projects that power our velocity, reliability, and innovation."[50] DoorDash even advises merchant restaurants how to perform "menu engineering" with respect to their prices.[51] Upon information and belief, DoorDash routinely advises restaurants and merchants to increase their prices for menu items available for delivery.

53.70.  The heart of DoorDash's engineering rests on proprietary algorithms. "At DoorDash, route optimization is a key component of our dispatch system, known internally as DeepRed. The routing algorithm design we chose—based on the ruin-and-recreate principle— helped us to scale to meet the increased demand . . . ."[52] DoorDash says,

> Route optimization is a computationally intensive process . . . . Solving this problem for last-mile logistics introduces additional complexity because a multitude of orders must be delivered same-day under a range of constraints, including varying delivery windows, vehicle capacity, speed, and Dasher, our name for delivery drivers, availability.[53]

"Fortunately, DoorDash's team was able to quickly replace its manual, ops-driven solution with a more automated one that could handle th[e] increased demand."[54] In other words, DoorDash's system is subject to manipulation given the varying inputs underlying the algorithms.

system is subject to its manipulation given the varying inputs underlying the algorithms.

---

[49] Ex. 36, DOORDASH ENGINEERING, https://doordash.engineering/ (last visited Apr. 14May 3, 2023).

[50] Ex. 37, Engineering Blog, DOORDASH ENGINEERING, https://doordash.engineering/blog/ (last visited Apr. 14May 3, 2023).

[51] Ex. 38, Sara DeForest, *How to Improve Your Restaurant Profit Margin*, DOORDASH FOR MERCHANTS (Feb. 23, 2023), https://get.doordash.com/en-us/blog/restaurant-profit-margin.

[52] Ex. 39, Ben Katz, *Scaling a routing algorithm using multithreading and ruin-and-recreate*, DOORDASH ENGINEERING (Nov. 30, 2021), https://doordash.engineering/2021/11/30/scaling-a-routing-algorithm-using-multithreading-and-ruin-and-recreate/.

[53] *Id.*

[54] *Id.*

54.71.  Hidden in ~~its website~~the frequently asked questions section of its website, DoorDash discloses "[t]here is not a standard delivery radius for merchants on DoorDash. The delivery radius is ***set by an algorithm*** based on how many Dashers are in your area and consumer demand. Plus and Premium members do get access to a larger delivery area than Basic, potentially reaching more customers."[55] In other words, DoorDash manipulates service areas based on algorithmic data.

55.72.  Despite its optimization efforts, DoorDash's "real-time delivery logistics system, the environment, behavior of Dashers ([its] term for delivery drivers), and consumer demand are highly volatile. Because small changes to the decision-making process of matching deliveries to Dashers can cause a cascade of different assignment decisions, it is difficult to determine the expected outcome of any algorithm iteration or product change. All of this makes it hard to determine the impact of any change via offline sizing or analysis."[56] In other words, DoorDash cannot promise anything with respect to how or when a Dasher will make a delivery.

56.73.  But DoorDash pays close attention to the "small changes to the decision-making process," especially for consumers. DoorDash closely studies consumer habits to determine the best ~~manner in which~~way to "sell" ~~them~~ (some might say exploit) them) on their habits. To this

---

[55] Ex. 40, *Frequently Asked Questions*, DOORDASH FOR MERCHANTS, at *What is the DoorDash delivery radius?*, https://get.doordash.com/en-us/faq (last visited ~~Apr. 14~~May 3, 2023) (emphasis added).

[56] Ex. 41, Sifeng Lin & Yixin Tang, *The 4 Principles DoorDash Used to Increase Its Logistics Experiment Capacity by 1000%*, DOORDASH ENGINEERING (Sept. 21, 2021), https://doordash.~~engineering~~engineering/2021/09/21/the-4-principles-doordash-used-to-increase-its-logistics-experiment-capacity-by-1000/.

end, DoorDash conducts consumer surveys[57] and even generates annual reports[58] providing detailed analysis insight into ~~key~~ consumer habits. Upon information and belief, DoorDash "engineers" its platform to optimize ~~speed, efficiency, and~~sales based on consumer habits even at the sake of ~~being transparent, accurate~~transparency, accuracy, or ~~legally compliant~~legal compliance.

### III.     THE DOORDASH "TERMS AND CONDITIONS"

74.     DoorDash's Terms and Conditions, dated April 28, 2023, are 27 standard pages of complex legalese. Since 2019, DoorDash has had more than a dozen different versions of its Terms and Conditions with each having numerous pages of complex legal concepts. For a multitude of factual and legal reasons, the Terms and Conditions are unenforceable. Even a cursory review of the current Terms and Conditions demonstrates their oppressive nature.

75.     As a threshold matter, paragraph 2 of the Terms and Conditions read,

If you access any of our websites located at https://www.doordash.com/ . . . install or use the DoorDash or Caviar mobile application, install or use any other technology supplied by DoorDash (collectively, the "Technology"), or access or use any information, function, feature, or service made available or enabled by DoorDash (collectively, the "Services," which includes the Technology), click or tap a button or take similar action to signify your affirmative acceptance of this Agreement, or complete the DoorDash account registration process, you, your heirs, assigns, and successors (collectively, "you" or "your") hereby represent and warrant that: (a) *you have read, understand, and agree to be bound by this Agreement and any*

---

[57] Ex. 42, Allison Van Duyne, *2022 Consumer Trends in the Restaurant Industry*, DOORDASH FOR MERCHANTS (May 23, 2022), https://get.doordash.com/en-us/blog/online-ordering-habits.

[58] Ex. 43, *2022 Restaurant Online Ordering Trends, DoorDash for Merchants*, DOORDASH FOR MERCHANTS (July 21, 2022), https://get.doordash.com/en-us/resources/restaurant-online-ordering-trends.

> *future amendments and additions to this Agreement* as published from time
> to time at https://www.doordash.com/terms/ or through the Technology. . .[59]

In other words, DoorDash only informs consumers in the Terms and Conditions that they should read them and that completing the registration process purportedly binds consumers to a contract of adhesion that waives and limits important rights. Upon information and belief, because it believes consumers have agreed to future amendments of the Terms and Conditions, DoorDash does not inform consumers when they change or amended them. Thus, under DoorDash's purported contract, consumers' initial registration on the platform represents their assent to any contract terms DoorDash chooses without any further notice to or agreement from the consumer.

76.     Paragraph 6 of the Terms and Conditions assert strategic acknowledgments, like:

> You acknowledge and agree that DoorDash is not a merchant, retailer,
> restaurant, grocer, pharmacy, chemist, delivery service, or food preparation
> business, and has no responsibility or liability for the acts or omissions of
> any Merchant or any Contractor. Merchants are the retailers of the products
> or services offered through the Services. DoorDash is not in the delivery
> business, does not provide delivery services, and is not a common carrier.
> DoorDash provides the Services to facilitate the transmission of orders by
> Users to Merchants, including orders for pickup or delivery by Contractors
> and/or Merchants.[60]

77.     The Terms and Conditions provide quasi-indemnification language in paragraph

7, stating, in relevant part, that:

> You are the sole authorized User of any account you create through the
> Services. You are solely and fully responsible for all activities that occur
> under your password or account. You agree that you shall monitor your
> account to prevent use by minors, and you will accept full responsibility for
> any unauthorized use of your password or your account.[61]

---

[59] *See* Ex. 16, *Consumer Terms and Conditions – United States (Including Puerto Rico)*, DOORDASH ¶ 2 (Apr. 28, 2023), https://help.doordash.com/legal/document?type=cx-terms-and-conditions&region=US&locale=en-US  (emphasis added).

[60] *Id.* ¶ 6(a).

[61] *Id.* ¶ 7.

Specific indemnification language is included in paragraph 18 of the Terms and Conditions in which DoorDash seeks consumers to indemnify DoorDash for all claims and expenses. These sections purport to hold the consumer liable for any damage caused by their use of DoorDash.

78.    In paragraph 12 of the Terms and Conditions, DoorDash mentions part of its false pricing scheme, including:

(a) **Prices & Charges.** You understand that: (i) the prices for menu or other items displayed through the Services may differ from the prices offered or published by Merchants for the same menu or other items and/or from prices available at third-party websites and that such prices may not be the lowest prices at which the menu or other items are sold and may change at any time without notice; (ii) DoorDash has no obligation to itemize its costs, profits, or margins when publishing such prices; and (iii) pricing may change at any time, in the discretion of DoorDash or the Merchant (depending on which party sets the given price). . . .

(b) **Strikethrough Pricing (United States Orders).** This Section 12(b) applies to United States Orders. DoorDash may use strikethrough pricing for certain items (for example, when presenting a discount or promotional price for items). DoorDash does not represent that the strikethrough price was the regular or former price of items for any particular period of time and the time period may vary widely depending on the items. DoorDash may also rely on Merchants or a third party to provide information about the regular or former price of items offered by those Merchants or a third party, and DoorDash's strikethrough price therefore may represent the price that DoorDash, a Merchant, or a third party offered the item for sale for some period of time. The strikethrough price may also be an introductory price that was offered for a short period of time. Unless otherwise specified, the strike-through price represents a non-member discount to the extent the Merchant has a membership program. . . .

These paragraphs are deceptive because, by adding the language "the time period may vary widely," DoorDash misleads consumers into believing pricing is a function of the point in time that a price is offered rather than being a function of DoorDash's engineered pricing model. Here, DoorDash concedes it may "set the given price" on its platform. But neither of these paragraphs nor any other provision in the Terms and Conditions disclose DoorDash will charge consumers different prices for the same items or service without any true standard or base price; that DoorDash will charge consumers more than an advertised strikethrough price and/or fee;

and that DoorDash will use strikethrough pricing when misrepresenting DashPass savings. Nor do these paragraphs, or any other provision in the Terms and Conditions, disclose that DoorDash uses deceptive partition pricing, drip pricing, price discrimination, and dark patterns as part of its bait-and-switch advertising scheme.

79.     Also, in paragraph 12 of the Terms and Conditions, DoorDash states,

(e) **Fees for Services.** DoorDash may change the fees that DoorDash charges you as we deem necessary or appropriate for our business, including but not limited to Delivery Fees, Service Fees, Small Order Fees, Expanded Range Fees, Regulatory Response Fees, and Surge Fees. DoorDash may offer different pricing to customers based on a variety of factors, including but not limited to geographic areas or usage. DoorDash may also charge you additional fees as required by law. Further, DoorDash may charge Merchants fees on orders that you place through the Services, including commissions and other fees, and may change those Merchant fees as we deem necessary or appropriate for our business or to comply with applicable law. DoorDash may charge you a Service Fee for the convenience of ordering through the DoorDash Platform.[62]

Neither this paragraph nor any other paragraph in the Terms and Conditions discloses DoorDash's false advertising scheme relating to fees and food costs, including but not limited to DoorDash's decision to charge delivery fees unrelated to delivery, distance, or time and based on undisclosed "other factors" that consumers never know; that DoorDash misleads consumers into believing they are charged delivery fees and other fees (besides taxes) "as required by law"; and that DoorDash charges consumers for hidden marketing fees and commissions, misleading consumers into believing that merchants pay these costs.

80.     In paragraph 13 of the Terms and Conditions, DoorDash addresses its DashPass scheme, noting "DashPass Benefits include reduced fees for United States Orders" only while DashPass is "$0 delivery fees for Australia Orders and New Zealand Orders."[63] The Terms and Conditions also note that "Service Fees and other fees may apply. [DoorDash] reserve[s] the

---

[62] *Id.* ¶ 12(e).

[63] *Id.* ¶ 13(a).

right to add and modify fees that may apply to your DashPass orders."[64] Finally, the Terms and Conditions note,

> AT THE TIME OF RENEWAL, DOORDASH WILL AUTOMATICALLY CHARGE THE THEN-CURRENT DASHPASS FEE AND ANY APPLICABLE TAXES TO AN ELIGIBLE PAYMENT METHOD THAT WE HAVE ON FILE FOR YOU. If your payment details change, your card provider may provide us with updated payment details. We may use these new details or details from other payment methods on file in order to help prevent any interruption to your DashPass subscription. This includes our right to charge any payment method on file if your initial form of preferred payment fails.[65]

In other words, DoorDash suggests that it can charge U.S. consumers whatever fees it would like under the DashPass and that DoorDash will continue to charge consumers for DashPass on any payment method available until and unless the consumer cancels the DashPass subscription. Indeed, after Plaintiff Hecox terminated his debit card, DoorDash unilaterally changed his payment methodology to continue charging him for DashPass.

81.     Paragraph 14 of the Terms and Conditions (which has twelve subparts) is a forum selection provision that purports to require that all claims arising out of the Terms and Conditions be subject to arbitration; that purports to waive a jury trial; that purports to ban public injunctive relief; and that purports to ban class action lawsuits.

82.     The Terms and Conditions also incorporate an attempted limitation of liability, that purportedly caps DoorDash's liability at "the greater of amounts actually paid by and/or due from you to DoorDash in the six (6) month period immediately preceding the event giving rise to such claim" and to exclude "any indirect, punitive, special, exemplary, incidental, consequential or other damages of any type or kind . . . .").[66]

---

[64] *Id.*

[65] *Id.*

[66] *Id.* ¶ 21(a).

83.      Since 2019, DoorDash's Terms and Conditions have been a contract of adhesion. The Terms and Conditions are a form or standardized contract that is prepared and offered by DoorDash for its benefit. DoorDash created its Terms and Conditions with disproportionate bargaining power over consumers, like Plaintiffs, who could not, cannot, and did not negotiate any terms, let alone understand them. Rather, DoorDash presents its Terms and Conditions on a take-it-or-leave-it basis. Under this approach, consumers only obtain DoorDash's services by acquiescing to the purported form contract.

84.      Moreover, regardless of when they were in use, DoorDash's Terms and Conditions are unreadable for most consumers. The terms rely on technical legal jargon that lay consumers cannot comprehend. The Terms and Conditions score poorly under the Flesch Reading Ease and Flesch-Kincaid Grade Level testing standards. For example, the language in paragraph 2 of the most recent Terms and Conditions, using a Flesch Kincaid Calculator of Readability, is rated "college" level. The Flesch Kincaid Readability Calculator rates paragraph 6 of the Terms and Conditions as "college graduate – very difficult to read." DoorDash knows or should know that an overwhelming majority of consumers who read the Terms and Conditions cannot comprehend their significance.

85.      Consumers, like Plaintiffs, do not assent to DoorDash's Terms and Conditions by continuing to use the platform. And DoorDash's Terms and Conditions are procedurally and substantively unconscionable.

## III.IV.   DOORDASH'S ~~HISTORY OF UNSAVORY BUSINESS PRACTICES~~SIGN UP LANGUAGE LACKS SUFFICIENT INQUIRY NOTICE

~~5.      When confronted with its misdeeds, DoorDash reverts to the corporate playbook of emphasizing philanthropic efforts. In many respects, these efforts are contrived. For example, when confronted with negative press over the strong-arm tactics DoorDash used on restaurants~~

during the pandemic, DoorDash naturally developed an advertising campaign that highlighted its role helping restaurants survive during the pandemic, particularly restaurants owned by people of color.[67] While DoorDash likes to play up its "good citizen" image, its history is far less rosy.

6.     DoorDash's history is replete with unsavory practices towards the drivers, merchants, and consumers who use DoorDash's technology. First, DoorDash improperly retained Dashers' tips.[68] The tipping policy also resulted in a class action against the company, *Arkin v. DoorDash, Inc.*, No. 1:2019-cv-04357 (E.D.N.Y. 2021). Ultimately, DoorDash changed the policy and CEO Xu tweeted "The new model will ensure that Dashers' earnings will increase by the exact amount of customer tips on every order."[69]

7.     DoorDash also earned money holding its Dashers' and restaurants' compensation for a week,[70] forcing them to pay fees to receive their compensation daily.[71] DoorDash then required its Dashers and restaurants to participate in programs designed to generate more income for DoorDash if its Dashers and restaurants want their earned compensation daily without a fee.[72] Frustrated with DoorDash's approach, several states and municipalities have adopted legislation to regulate how DoorDash charges restaurants. DoorDash's fee structure has long been controversial – so much so that, in 2021, the City of Chicago sued DoorDash claiming that DoorDash was marking up menu items and violating the City's pandemic-related cap on food

---

[67] *See* DoorDash, *SOUTHSIDE MAGNOLIA*, YOUTUBE (Oct. 26, 2020), https://www.youtube.com/watch?v=Q42SPkzI3Dw; s*ee also* DoorDash, *Soul of the City*, YOUTUBE (June 15, 2021), https://youtu.be/aCriukDwyI4.

[68] *Supra* ¶ 2.

[69] Andy Newman, *DoorDash Changes Tipping Model After Uproar From Customers*, N.Y. TIMES (July 24, 2019), https://www.nytimes.com/2019/07/24/nyregion/doordash-tip-policy.html.

[70] *Supra* ¶ 2.

[71] *Supra* ¶ 2.

[72] *Supra* ¶ 2, 3.

delivery fees. Chicago also alleged that the imposition of a $1.50 "Chicago Fee" was an unlawful attempt to circumvent the City's delivery fee cap and confused consumers on which entity levied and collected that fee.

8.        DoorDash's litigation history is far more extensive than the Chicago case. DoorDash has been sued in multiple jurisdictions for alleged violations of the Fair Labor Standards Act and various state equivalents, including recently in a case filed in the United States District Court for the Middle District of Florida, *Silva v. DoorDash*, No. 6:23-cv-00104. In such cases, DoorDash, to protect its contractor model, stresses it is not a delivery company. DoorDash also has been subject to litigation for using the trade dress—names, logos, trademarks, and other intellectual property—of various restaurants without permission. *See Burger Antics v. DoorDash*, No. 18-cv-00133 (N.D. Ill) (alleging that DoorDash was publicizing a relationship with the restaurant and delivering its food without permission). DoorDash has been sued because its Dashers have injured people, including killing at least one person, while driving for DoorDash and reading a DoorDash communication.[73] These unsavory business practices, however, pale in comparison with DoorDash's actions towards consumers, like Plaintiffs.

86.        DOORDASH'S At all relevant times, DoorDash's registration process preys on consumers' natural urge for instant gratification.[74] In doing so, the DoorDash Platform fails to provide actual or constructive notice that consumers enter a binding legal contract under the DoorDash Terms and Conditions (which includes an arbitration agreement) when they create a

___

[73] Emilie Raguso, *Motorist who killed pedestrian was driving for DoorDash, lawsuit says*, BERKELEYSIDE (Aug. 31, 2021), https://www.berkeleyside.org/2021/08/31/motorist-killed-pedestrian-berkeley-doordash-lawsuit.

[74] Ex. 44, Courtney E. Ackerman, *What is Instant Gratification? (Definition & Examples)*, POSITIVEPSYCHOLOGY.COM (June 19, 2018), https://positivepsychology.com/instant-gratification/.

DoorDash account. Since 2019, DoorDash has used a wrap agreement that provides inadequate notice about the ramifications of registering to use DoorDash. In various iterations, DoorDash has provided a notice that merely states by tapping or by clicking "Sign Up" or by tapping or clicking "Continue with Google, Facebook, or Apple," the user "agrees to DoorDash's Terms and Conditions and Privacy Policy." All variations of this notice fail to create a contract with consumers for a multitude of reasons.

87.     As a threshold matter, the notice appears in a cluttered environment regardless of when the notice is presented in the registration process. In some places surrounding the notice, DoorDash includes items in your cart (like in paragraph 51), and food graphics and large grey boxes seeking registration information with writing in the boxes (as reflected below). In all places, there are large, colorful tabs with more instructions on what a consumer should do, like "continue with email" or "sign up" or continue with Google, Facebook, or Apple or as a guest. On other pages, DoorDash includes advertisement banners offering significant discounts on "signing up," like 40% off on a consumer's first order. To this extent, DoorDash uses the registration process as an opportunity to market, sell, and rush consumers into registering rather than allowing them to develop an opportunity to discover terms and then knowingly, intelligently, and affirmatively assent to them. *See* illustrations below.



88.     DoorDash adds visual clutter when consumers, like Plaintiffs, create an account to distract them from focusing on the small notice language that is either buried at the bottom of the registration screen or sandwiched between competing text in the middle of the screen. DoorDash then diverts consumers' attention to a large red "sign up" tab because, as an industry expert notes, "[f]or the food delivery business, red color is probably the best choice, as it prompts users to do *the desired impulsive action* – tapping the "Get" button. White captions are easy-to-read as they are big contrast with the red color background."[75] As the illustrations in paragraph 87 demonstrate, DoorDash employs this manipulative approach, using a large red "sign-up" tab with white colored letters. Consequently, consumers take the impulsive action of registering without seeing any notice, which makes the prominence and content of the notice much more important.

---

[75] Ex. 45, Anastasia Sidoryk, *App Overview: DoorDash on the App Store & Google Play Store*, App Growth Blog (June 2, 2020), https://splitmetrics.com/blog/app-overview-doordash/ (emphasis added).

89.     Beyond being placed in a cluttered environment designed to make consumers act impulsively, the notice is inconspicuous. The notice is not prominent in color or size relative to other text and prompts on the screen, making it naturally more difficult to see easily and more likely to overlook. And the location of the notice language renders it inconspicuous. Upon information and belief, since 2019, DoorDash has located its notice language at various places, including the bottom of its registration page away from and/or beneath the red sign-up button, as reflected in the illustration in paragraph 41. That language remains in that same place today for consumers initially registering with Google, Apple, or Facebook as reflected on the illustrations in paragraphs 54 through 57. Consumers likely never even see that notice because their attention is drawn to, and they impulsively act on, the large colorful registration tabs before arriving at the small, inconspicuously located language at the bottom of the screen.

90.     DoorDash's registration notice is also poorly worded. As a threshold matter, the notice fails to create a definitive offer by informing consumers that DoorDash is providing its technology only if consumers agree to be bound contractually. And DoorDash does not provide clear instructions on a consumer's acceptance by explaining the act of "registering" to create an account will "bind" them to oppressive Terms and Conditions. Hardly unambiguous, consumers face three implications when seeing DoorDash's sign up notice. First, the notice implies that DoorDash is making them a contractual offer to use its technology. Second, clicking the "sign up" tab means they are registering to create an account. Third and finally, clicking the sign up tab serves as acceptance and consideration to be bound by a contract. These compound implications do not allow consumers to achieve a meeting of the minds or waive fundamental rights knowingly and intelligently. Nor does the notice advise consumers to read DoorDash's

oppressive Terms and Conditions, as part of ensuring that their registration allows them to manifest assent to contract and waive a right to jury knowingly and intelligently.

91.     Moreover, DoorDash has consistently included a visible line with the word "or" that separates the various registration methodologies. This separation line casts confusion over the entire sign-up structure for consumers, particularly whether the notice applies to all registration methods or the ones above or below the line with the notice. Exacerbating this issue, as reflected in the left illustration on the following page with the cut-off "Continue with Apple" tab, the registration process does not always fit on one screen. *See* illustrations of sample registration pages on the following page.



92.     Of course, DoorDash has known its registration language was deficient because it changed the language recently. Upon information and belief, DoorDash changed the language in or around April 2023. When toggling to sign up, the language now reads, "[b]y registering, you confirm you have read and agree to the Terms and Conditions and Privacy Policy." But even

with this change, the new notice remains deficient for reasons that include, but are not limited to: (1) its size and color disparity lacks prominence; (2) it is not located conspicuously relative to each of the sign up methods; (3) it does not have a button that reads "register" leaving consumers to interpret whether sign-up and "registering" are the same; (4) it does not mention the impact of "registering" on Google, Facebook, or Apple; (5) it still has the dividing line with the word "or" separating registration methods; and (6) it does not inform consumers they will be "bound" by the Terms and Conditions (which creates a legal obligation), and waives a right to jury. Illustrations on the following page reflect the change in the notice language.



**Notice on Mar. 31, 2023          Notice on Apr. 19, 2023**

93.     Other evidence indicates the company knows its consumer wrap agreement is deficient. With its contract for drivers and its merchants, DoorDash insists on using a clickwrap agreement to manifest assent to contract because their enforceability is more definitive. With respect to its contracted drivers, Victor Shao, Director, New Verticals for DoorDash, provided sworn testimony in April 2022 in a class action, stating:

Although the sign up process has varied slightly over time, the following description represents the process. Prospective Dashers undergo a multi-step process in signing up for a Dasher account. On the first sign up screen, prospective Dashers must enter their email address, or, depending on when the Dasher signed up, their email address, phone number and zip code. The first sign up screen notifies the Dasher that they must check a box and/or press a button to continue with the sign up process, and it also states that by doing so: "I agree to the **Independent Contractor Agreement** and have read the **Dasher Privacy Policy**."[76]

. . .

Before creating accounts and agreeing to the [Independent Contractor Agreement], Plaintiffs could click on the hyperlink and scroll through the ICA at their leisure, on their own terms, and to seek the input of an attorney or trusted advisor if they so choose. They could have also chosen to refrain from creating an account. If they elected to proceed, however, they had to first indicate their acceptance of the ICA. Plaintiff Flores had to manifest his consent to the ICA by checking a box and clicking "Sign Up" on the sign up screen . . . .[77]

94.      For its merchant relationships, Kathy Zhu, DoorDash's former Senior Director and Associate General Counsel Commercial and Legal Operations, was tasked with commercial contracting. In a client testimonial found at Ironclad.com,[78] Ms. Zhu said, DoorDash "knew we wanted a clickwrap contract" for DoorDash's merchant relationship "to be a lot more precise."[79] She equivocated on DoorDash's consumer contracts stating, "in the B-to-C [business to consumer] world, it's usually ok legally speaking to deal with all of your customers more or less in the same way."[80] "Usually ok legally speaking . . . more or less" is hardly a ringing

---

[76] Ex. 46, Decl. of Victor Shao in Support of Def.'s Mot. to Compel Arb., Strike Class Allegations, and Stay Proceedings at ¶ 5, *Mullo v. DoorDash, Inc.*, No. 1:22-CV-02430 (S.D.N.Y. Apr. 8, 2022), ECF No. 12 (emphasis in original).

[77] *Id.* ¶ 11 (emphasis in original).

[78] Ironclad is "a Contract Lifecyle Management (CLM) platform that helps business and legal teams manage every aspect of the contracting process." Ex. 47, IRONCLAD, https://ironcladapp. com/about-us/ (last visited May 3, 2023).

[79] *How DoorDash Creates Self-Service Restaurant Partnership Contracts Using Clickwrap*, IRONCLAD (1:26-1:58), https://ironcladapp.com/customers/doordash/ (last visited May 3, 2023).

[80] *Id.*

endorsement from DoorDash's then "contract counsel" about the enforceability of its wrap
agreement for consumers. But her equivocation on enforceability is indeed appropriate.

95.     DoorDash's approach to minimizing the registration process is intentional. As
Zhu noted in a separate interview, DoorDash's priority is "speed" and "efficiency."[81] She did not
mention legal compliance. Rather than prioritize complying with the law, DoorDash created a
"contracts playbook" with talking points and even "fallback positions" about the enforceability
of their agreements.[82] That same approach is deployed here.

96.     DoorDash achieves speed and efficiency in its consumer registration process by
skipping necessary steps to ensure users receive a definitive offer, a clear mode of acceptance,
supported by sufficient consideration, and a mutual meeting of the minds. DoorDash skipped
these steps to divert consumers' attention from the oppressive Terms and Conditions, which
could hinder the registration process if a consumer saw, read, and/or understood the complex
legal language. Instead, DoorDash engineered a registration process that allows consumers to
access and use its platform quickly in the name of speed and efficiency and at the sake of mutual
assent.

97.     While DoorDash's registration process has evolved over the years with different
notices, located in different places, with different distractions (like advertisements, graphics, and
pending orders in carts), the process is and always has been deficient. The registration process
does not create an environment in which consumers, like Plaintiffs, see a conspicuous notice, and

---

[81] Lawtrades, *#6 - DoorDash Head of Commercial Kathy Zhu on Staying Nimble Despite Bandwidth Constraints*, YOUTUBE (11:51) (Dec. 17, 2020), https://www.youtube.com/watch?v=ZWXbc6HCBwg.

[82] *Id.*

receive an unambiguous and definitive offer to contract that allows them to assent to the terms

and waive fundamental rights, like a right to a jury, knowingly and intelligently.

## V.      DOORDASH TARGETS MINORS AND KNOWS MINORS FREQUENTLY USE DOORDASH'S SERVICE

98.      In its Terms and Conditions, DoorDash says that any consumer who uses its

technology "represent[s] and warrant[s]" that the user is "of legal age in the jurisdiction in which

you reside to form a binding contract with DoorDash."[83] DoorDash's unconscionable terms

purport to hold parents responsible for minors who use parents' account.[84] DoorDash does

nothing to prevent minors from accessing its technology. DoorDash has the technology to verify

consumers' ages—it verifies age for alcohol purchases. But DoorDash does not use that

technology when consumers sign up to use its platform, despite knowing that a significant

percentage of its 32 million users are minor children. Millions of minors have registered and

used DoorDash. *See* illustration below of DoorDash's alcohol policy.

---

[83] Ex. 16, *Consumer Terms and Conditions – United States (Including Puerto Rico)*, DOORDASH ¶ 2 (Apr. 28, 2023), https://help.doordash.com/legal/document?type=cx-terms-and-conditions&region=US&locale=en-US.

[84] *Id.* ¶ 7.



99.      In the Apple Store, DoorDash allowed its app to be rated for ages twelve and up.

*See* illustration below.



100.     In the Google store, there is no age limit for the app. DoorDash allowed its app to

be rated E for everyone. *See* illustration below.



101.     DoorDash does not require any age verification to register to use its platform, despite having and using age verification technology for some orders on the platform. Nor does DoorDash offer any parental controls on its platform. Nor does DoorDash require a credit card for transactions, which would limit minors from ordering. Instead, DoorDash allows debit cards, preloaded debit cards (like Greenlight cards), and even gift cards, all of which are payment methods minors use frequently. None of these facts surprise DoorDash. Indeed, during a podcast, Jonathan Levin, Dean of the Stanford Graduate School of Business, told Tony Xu, a DoorDash co-founder and its Chief Executive Officer, that Levin's 13-year-old son wanted to trade his Nike and Amazon birthday gift cards for DoorDash gift cards.[85] And DoorDash knows that if a parent has ever lent their credit card to their child for a single online purchase, the credit card information is saved to the minor's mobile/online pay account, making it accessible for a minor who establishes their own DoorDash account with basic information and a cellular telephone and/or an email address.

---

[85] Stanford Graduate School of Business, *Tony Xu, MBA '13, Cofounder and CEO, DoorDash*, YOUTUBE (starting at 30 second mark) (Feb. 12, 2021), https://www.youtube.com/watch?v= 5TidMV_ux_4.

102.     DoorDash also advertises to minors, including a Sesame Street-themed television ad campaign that aired during the 2021 Super Bowl. *See* illustration below.[86]



DoorDash reportedly paid $5.5 million for its Sesame Street commercial, while committing to contribute no more than $1 million to Sesame Workshop. It cannot be argued seriously, therefore, that a Sesame Street-themed advertising campaign served a charitable purpose. The campaign was designed to attract children.

103.     In its Privacy Policy, moreover, DoorDash tacitly admits children under 18 use its delivery app. DoorDash says, "[o]ur Services are not intended for children under 16 years of age, and we do not knowingly collect personal information from children under the age of 16."[87] At a minimum, the statement implies that DoorDash's services are intended for 16 and 17 year olds, none of whom have reached the age of majority or possess the capacity to contract.

104.     DoorDash cannot credibly contend that it does not know minor children use its service. Kids have cellular phones, which are necessary to use DoorDash. According to a

---

[86] Funny Commercials, *DoorDash Super Bowl Commercial 2021 Daveed Diggs Sesame Street*, YOUTUBE (Feb. 7, 2021), https://youtu.be/RWViEadCvuM.

[87] Ex. 48, *Privacy Policy – United States, DoorDash – General Privacy Policy*, DOORDASH ¶ 7(a) (Jan. 3, 2023), https://help.doordash.com/legal/document?type=cx-privacy-policy&region=US&locale=en-US.

Stanford Medicine study, "nearly all children had phones by age 15 years."[88] And it is well known that DoorDash deliveries (and those of other web-based services) are disrupting schools across the country—particularly high schools—raising security concerns and creating administrative nightmares. Dashers even talk about these problem deliveries in chat rooms.[89] One article compared DoorDash's penetration into schools to the cult-classic movie, *Fast Times at Ridgemont High*.[90] But this is no laughing matter. Many school districts have had to address DoorDash deliveries with some banning the delivers and a few allowing them, including school districts in New Jersey, Massachusetts, Kansas, California, and Maryland.[91] Despite having

---

[88] Ex. 49, Erin Digitale, *Age that kids acquire mobile phones not linked to well-being, says Stanford Medicine Study*, STANFORD MEDICINE NEWS CENTER (Nov. 21, 2022), https://med. stanford.edu/news/all-news/2022/11/children-mobile-phone-age.html.

[89] Ex. 50, *Why are (some) schools telling students that they cannot order food deliveries through DoorDash, GrubHub or UberEats, to be delivered to their schools?*, QUORA (June 6, 2019), https://www.quora.com/Why-are-some-schools-telling-students-that-they-cannot-order-food-deliveries-through-DoorDash-GrubHub-or-UberEats-to-be-delivered-to-their-schools.

[90] Ex. 51, Mustafa Gatollari, *High School Students DoorDash Lunch to School, Get Sent to Admin's Office in Viral TikTok*, DISTRACTIFY (Jan. 30, 2023, 12:06 PM EST), https://www.distractify.com/p/students-doordash-food-to-school.

[91] Ex. 52, Beccah Hendrickson, *South Jersey students ordering food to high school causing security issues, district says*, 6ABC (Feb. 1, 2022), https://6abc.com/west-deptford-school-district-food-delivery-safety-doordash-uber-eats/11530002/; Ex. 53, Brittany Polito, *Pittsfield School Policy Panel Considers Student DoorDash Ban*, IBERKSHIRES.COM (Mar. 3, 2023, 12:29 PM), https://www.iberkshires.com/story/71088/Pittsfield-School-Policy-Panel-Considers-Student-DoorDash-Ban.html; Ex. 54, Katie Kausch, *Students can get DoorDash deliveries. Just follow the security rules, N.J. school says.*, NJ.COM (Feb. 16, 2023, 1:11 AM), https://www.nj.com/gloucester-county/2022/02/students-can-get-doordash-deliveries-just-follow-the-security-rules-nj-school-says.html; Ex. 55, Audrey Menzies, *Principal, students contemplate Doordash deliveries to the school*, KC PIPER NEWS (Sept. 9, 2019), https://www.kcpipernews.com/18459/feature/principal-and-students-contemplate-doordash-deliveries-to-the-school/; Ex. 56, Jonathan Sarabia, *Parents debate over the safety of delivering food to students in school*, KION NEWS CHANNEL 5/46 (Nov. 30, 2021, 11:52 AM), https://kion546.com/news/monterey-county/2021/11/30/parents-debate-over-the-safety-of-delivering-food-to-students-in-school/; Ex. 57, Elaine S. Povich, *Students, bored by cafeteria fare, love food delivery services; schools don't.*, WASH. POST (June 9, 2019, 8:30 AM), https://www.washingtonpost.com/health/students-bored-by-cafeteria-fare-love-food-delivery-services-schools-dont/2019/06/07/2568d12c-8617-11e9-98c1-e945ae5db8fb_story.html.

technology to handle almost two billion orders every year (including orders for alcohol), DoorDash does absolutely nothing to verify the age of its users when they register. It cannot seriously be disputed that DoorDash intends for minors to use its platform.

## IV.VI.    DOORDASH'S FRAUDULENT ~~AND DECEPTIVE PRICING SCHEME~~AND DECEPTIVE PRICING SCHEME

57.105.        Plaintiffs, and ~~other~~similarly situated consumers, are victims of DoorDash's deceptive, misleading, and fraudulent pricing scheme. DoorDash's fraud is far reaching, implicating almost every fee, price, or cost that DoorDash advertises and collects from consumers, like Plaintiffs.

### A.    DoorDash Charges a Deceptive and Misleading Delivery Fee

58.106.        DoorDash asserts that it "is not in the delivery business, does not provide delivery services, and is not a common carrier."[92] While disavowing it performs or provides deliveries, DoorDash ~~still~~nonetheless charges a "Delivery Fee" on most orders. ~~DoorDash explains~~DoorDash's explanations of the delivery ~~in different places~~fees are inconsistent and depend on where they are placed. The information icon ~~next to~~accompanying the Delivery Fee merely states, "Delivery fee varies for each restaurant based on your location and other factors." In its webpage under customer support, DoorDash ~~defines~~says the Delivery ~~fee as, "[t]his fee~~ Fee "is charged on delivery orders and helps DoorDash cover costs associated with getting your order directly to you and can vary depending on the merchant location, and other factors, such as demand. Delivery fees currently can vary starting at $0." ~~DoorDash then explains DashPass~~

---

[92] Ex. 16, *Consumer Terms and Conditions – United States (Including Puerto Rico)*, DOORDASH ¶ 6(a) (Apr. 28, 2023), https://help.doordash.com/legal/document?type=cx-terms-and-conditions&region=US&locale=en-US.

savings.⁹³ None of these statements ~~affirmatively inform~~tell the consumer that DoorDash keeps

the Delivery Fee in total, and that the fee is simply a ~~cost~~revenue source unrelated to ~~operate its~~

~~platform. The illustration below highlights certain~~delivery of the consumer's specific order. *See*

illustrations on the following page highlighting aspects of ~~DoorDash's~~the Delivery Fee.



---

⁹³ Ex. 58, DoorDash Customer Support, *What fees do I pay?*, DOORDASH, https://help.doordash.com/consumers/s/article/What-fees-do-I-pay?language=en_US (last visited May 3, 2023).

DoorDash misleads consumers, like Plaintiffs, into believing



59.107.        As the Delivery Fee is based on their illustration in paragraph 106

demonstrates, DoorDash's explanations of the Delivery Fee emphasize the location of consumers

and the restaurants' location. DoorDash further deceives consumers, like Plaintiffs, into

believing the Delivery Fee alsorestaurants and claim the fee "helps cover the cost associated with

getting your order directly to you." DoorDash's emphasis on delivery Emphasizing the distance

(whether the consumer's or merchant's location)of the trip and "getting the order" to the

consumer creates the logical impression that the Delivery Fee is related to "deliveries." Thus,

DoorDash creates the impression that hardworking Dashers who perform the "deliveries" will

receive the "Delivery" Fee. But that logical impression is not true. DoorDash keeps all delivery

fees and manipulates the Delivery Fee at its whim, even charging $0 for some deliveries to entice

consumers to continue using the platform. Upon information, and belief, the Delivery Fee is part

of an engineered pricing structure that fluidly moves around the costs for fees are related to the

cost of DoorDash providing DoorDash'sits technology through different categories of advertised

~~fees that DoorDash identifies in a manner to trick consumers into believing they are paying for work performed by others and for discounts that either never truly materialize or stand contrary to representations. The Delivery Fee is nothing more than a deceitful sales gimmick and part of a fraudulent bait- and-switch pricing model. The true goal of the "Delivery" Fee appears to be selling monthly "DashPass" accounts because consumers pay DoorDash a flat monthly rate even if consumers do not place a single order..~~

**B.     DoorDash Charges a Deceptive and Misleading Express or Priority Delivery Fee**

~~60.~~108.          "Express" delivery on DoorDash purportedly represents a ~~speed~~ speedy-delivery option that costs consumers, like Plaintiffs, $2.99 for orders to be delivered directly to them. Unlike with its other fees, DoorDash provides no written description of what "Express" ~~Delivery Fee~~delivery or "direct to you" means. This lack of explanation is intentional insomuch as DoorDash knows it cannot make an affirmative representation on delivery times~~.~~ given the vagaries of the delivery process. So, DoorDash does the next best thing, it ~~leaves~~creates the ~~impression~~misimpression that ordering "Express" means consumers will receive their orders faster. To that end, DoorDash advertises "Express" delivery as having shorter delivery time windows—always setting that time frame as five to ten minutes shorter than a standard time window—and it includes the phrase "direct to you" under the charge. Then DoorDash ~~identifies~~reclassifies the "Express" delivery as a "~~Priority Fee~~priority fee" when itemizing its charges during checkout. ~~The~~Upon information and belief, DoorDash switches its nomenclature for the fee at this juncture so that it can preserve certain arguments, like the "express" fee is not about speed but rather a consumer's position in DoorDash's engineered delivery system. Unsuspecting consumers are duped by this practice. One Dasher in a chatroom reacted to the express fee saying, "Holy crap DD is shady AF." *See* illustration below ~~includes~~representing a

compilation of screenshots from DoorDash's App, its contractor agreement, and ~~chatrooms reflecting~~chatroom discussions addressing the ~~discussion above.~~"Express Delivery Fee."





~~61.~~109._____As the ~~above~~-illustration in paragraph 108 reflects, there is only one reasonable ~~view~~interpretation of the Express Delivery Fee ~~exists~~: if a consumer pays the fee, DoorDash will ensure that consumer will get their food quicker. ~~But~~Despite that ~~is not true.~~being the only justifiable interpretation, it is false because DoorDash has no ability to provide ~~the~~ express or faster service it sells ~~for priority deliveries "direct to" consumers, like Plaintiffs~~.

84

According to DoorDash, the company neither provides deliveries nor controls the manner or means in which deliveries occur (as DoorDash has represented in its independent contractor agreement with its drivers and in defense of litigation against them). Upon information and belief, DoorDash does not even tell its drivers when a consumer places an Express Delivery order or otherwise informs them that the order is a priority. In internet chatrooms, even drivers discuss the misleading nature of the "Express" fee for deliveries direct to you.[94] Nothing prevents a Dasher from stacking an Express order with other orders for DoorDash or for anotherany other delivery company—taking more time rather than less, and certainly not delivering "direct to you." And the five-to-ten-minutes-shorter time windows DoorDash advertises for its express service as five to ten minutes shorter are demonstrably false. Once an order is placed, within seconds or sooner, DoorDash reveals the previously concealed true delivery time window from its dispatch system, which. The real delivery window is typically longer than the advertised "Express" window and even the advertised standard delivery window in many cases. DoorDash has information that could inform consumers that the consumer the advertise windows are wrongorder will not be any more "express" than a standard order, but DoorDash does not provide consumers withconceals that information. until after the order has been placed. Upon information and belief, in furtheranceas part of its fraud, DoorDash sets its advertised delivery windows for all orders to appear shorter than true market conditions to avoid losing potential sales. Consumers literally pay for nothing when selecting the option for Express Delivery, rendering irrelevant. Because DoorDash cannot provide what consumers purchased, it is not relevant whether DoorDash's actuallyDoorDash in fact provided a fasteran express

---

[94] Doug H., *Is Express Delivery on DoorDash worth it? Here's what it really does,* RIDESHARING DRIVER (Aug. 10, 2022), https://www.ridesharingdriver.com/doordash-express-delivery/.

delivery ~~service~~ that was consistent with or better than the advertised express delivery window (on any ~~isolated,~~ individual ~~order.~~, isolated basis).

**C.     DoorDash Charges a Deceptive and Misleading "Expanded Range" Delivery Fee**

110.    DoorDash charges consumers, like Plaintiffs, a fee to make "expanded range deliveries." DoorDash defines "expanded range delivery" to consumers as ~~one in which~~occurring when the "restaurant is outside of your normal delivery area." ~~But~~*See* illustration below.



111.    Contrary to DoorDash's representations in the above disclosure, consumers do not have a "normal delivery" area. Unlike its representation to consumers, DoorDash tells ~~its~~ merchants and contractors something far different. ~~In advertising materials to merchants, DoorDash defines the "~~ about delivery ~~area" or "delivery radius" as a function of how much money a restaurant is willing to pay.~~areas. In various hard-to-find places on its website, DoorDash says, "[e]ach store on DoorDash has a circular delivery area extending out from their store. Any consumer within that delivery area will be able to see and order from that store.

DoorDash defines the delivery area for each individual store based on their partnership structure on DoorDash."[95] ~~In other words, one~~*See* illustration on the following page.



~~62.~~112.         As the above illustration reflects, DoorDash defined its delivery areas based on its merchant's partnership, not any consumer's location as DoorDash represented to consumers. In other words, a "delivery area" or "delivery radius" is a function of how much money a restaurant pays DoorDash. But DoorDash qualifies this position some in other places on its website, stating "[t]here is not a standard delivery radius for merchants on DoorDash. The delivery radius is **set by an algorithm** based on how many Dashers are in your area and consumer demand. Plus and Premium members do get access to a larger delivery area than

---

[95] *See, e.g.,* Ex. 40, *Frequently Asked Questions*, DOORDASH FOR MERCHANTS, at *What is the DoorDash delivery radius?*, https://get.doordash.com/en-us/faq (last visited May 3, 2023); DoorDash Dasher Support, *What is a "Delivery Radius" or a "Delivery Area" on DoorDash?*, DOORDASH, https://help.doordash.com/dashers/s/article/What-is-a-Delivery-Radius-or-a-Delivery-Area-on-DoorDash?language=en_US (last visited Apr. 14, 2023).

Basic, potentially reaching more customers."[96] In other words, DoorDash manipulates delivery areas based on its Dashers locations, consumer demand and merchants' partnership with DoorDash. Again, this definition of delivery area contradicts DoorDash's representation to consumers when explaining the Extended Range Delivery fee as based on consumer location. But this definition makes clear delivery areas arise from merchant payments to DoorDash. For example, one chain restaurant, like a Chick-fil-a, might be located closer to a consumer's home, but DoorDash could assign deliveries to that home to a different Chick-fil-a further away if that restaurant pays DoorDash more money under its partnership structure for a larger delivery area.

DoorDash then ~~charges~~may charge consumers more for ~~Delivery Fees~~delivery fees and~~/~~or for ~~out of~~ expanded range deliveries, despite closer delivery options being available. This scenario occurs because the consumer has no normal delivery area. Rather, DoorDash employs the Expanded Range Fee at its whim, irrespective of the "consumer's location" or any "normal delivery area" for the consumer. *See* ~~the below~~ illustration below of how the Expanded Range Delivery Fee works.



---

[96] Ex. 40, *Frequently Asked Questions*, DOORDASH FOR MERCHANTS, at *What is the DoorDash delivery radius?*, https://get.doordash.com/en-us/faq (last visited May 3, 2023) (emphasis added).

~~The illustration below reflects a test on the DoorDash platform under which DoorDash will apply the Expanded Range Fee to a DashPass account while not applying that fee to a standard account when placing the same order at the same time to the same restaurant for delivery to the same home.~~



63.113.    If the Expanded Range Fee is premised on a set geographic delivery area for a consumer as DoorDash represents, that fee would be applied ~~to both accounts~~ equally. ~~But to consumers similarly located. In a test on the~~ DoorDash ~~likely applies~~Platform, however, DoorDash applied the Expanded Range Fee to ~~a~~ DashPass ~~accounts on occasions~~account, but not to ~~recoup some discounts offered under~~a standard account when each account placed the same order at the same time to the same restaurant for delivery to the same home. The illustrations on the next page demonstrate that ~~program~~the Expanded Range Fee is a money grab that DoorDash employs *sua sponte*.



**DashPass Account**          **Standard Account**

9.	As the above test case reveals, when ordering from a DashPass Account and a Standard Account with the same order from the same restaurant at the same time to be delivered to the same location, DoorDash makes numerous misrepresentations. DoorDash falsely tells the DashPass account holder that the delivery fee of $2.99 is reduced to zero when in fact the Delivery Fee is only $0.49 as reflected on the standard account. DoorDash reduces the service fee on the DashPass which lowers the taxes, but DoorDash then assesses an Expanded Range Fee

on the DashPass account to recoup part of the discount. DoorDash falsely represents that the DashPass holder saved $4.22 on this order when they really saved only $0.73.

10.    Under another test of the DoorDash platform, when ordering from the same restaurant at the same time with the same menu item cost delivered to the same location, DoorDash applied the Expanded Range Fee to a standard account but not the DashPass account. DoorDash unilaterally decides to apply the Expanded Range Fee despite that fee supposedly being tied to a consumer's normal delivery area. As our test reveals, the delivery area has nothing to do with it. And DoorDash charged the standard account ($7.99) more than twice the amount of the advertised delivery cost ($3.99) to the DashPass account for the same order at the same time to the same place. Contrary to its representations, DoorDash simply makes up charges at its whim because consumers truly do not know the standard amount since DoorDash misrepresents all its charges. *See* illustration below.



Standard Account                    DashPass Account

114.    Upon information and belief, since Plaintiffs filed suit, DoorDash changed the way it refers to delivery areas or delivery radius. In resource materials for Dashers describing the delivery area, DoorDash now says, "[e]ach merchant on DoorDash has a dynamic delivery area where customers within that range will be able to discover and order from that store. There is no

91

standard numeric delivery radius for merchants on DoorDash. The delivery radius a merchant has access to is dynamic and influenced by a variety of factors, including Partnership Plans."[97] In other words, the delivery area is now a nebulous concept that will fluidly or dynamically change based on a variety of undisclosed factors at DoorDash's whim. However, this change does not cure DoorDash's false representation that the Expanded Range Delivery Fee is based on a consumer's "normal" delivery area given no "normal" area exists. *See* illustration below.



### D.   DoorDash Charges Consumers Hidden Marketing Fees

---

[97] *See generally* Ex. 59, DoorDash Dasher Support, *What is a "Delivery Radius" or a "Delivery Area" on DoorDash?*, DOORDASH, https://help.doordash.com/dashers/s/article/What-is-a-Delivery-Radius-or-a-Delivery-Area-on-DoorDash?language=en_US (last visited May 3, 2023); Ex. 40, *Frequently Asked Questions*, DOORDASH FOR MERCHANTS, at *What is the DoorDash delivery radius?*, https://get.doordash.com/en-us/faq (last visited May 3, 2023).

64.115.        DoorDash advertises menu item promotions that include hidden fees DoorDashthat it charges consumers without disclosing them ("Marketing Fees"). In describing this scheme, DoorDash explains to merchant restaurants (but not to consumers like Plaintiffs):) that:

> Menu item promotions are promotions that help you attract customers by using menu items in a couple of different ways to attract orders. Customers will discover your restaurant in the Offers Hub which helps surface the most relevant offers that they are most likely to choose. You can also choose to target this promotion to certain customers only based on certain factors. . . .
>
> Customers who qualify for the promotions will see them in the Offers Hub either based on the spend threshold or the items they have selected in their cart.
>
> **You'll pay for the item** or discount offered to the customer **as well as a $0.99 marketing fee** to power our Offers Hub and marketing efforts to deliver the best customers that will order from you and return as well.[98]

Unfortunately for consumers, the "You'll pay" islanguage truly references the consumer, not the restaurant, since this undisclosed fee is included in the menu price that is only charged to and paid by consumers. Indeed, DoorDash studies consumer habits relentlessly based on the billions of data pieces it receives from orders, learns which items are "most relevant" and "most likely [for consumers] to choose," and then adds a hidden Marketing Fee. Consumers then pay for DoorDash's undisclosed $0.99 Marketing Fee on promotional items without ever knowing thethat hidden charge was included as part of a "promotion." DoorDash applies this fee in the same manner and in the same amount. to different promotions. *See* illustration below.[99]

---

[98] Ex. 60, DoorDash Merchant Support, *Menu Item Promotions - Merchant Promotion Overview*, DOORDASH, https://help.doordash.com/merchants/s/article/Menu-Item-Promotions-Merchant-Promotion-Overview?language=en_US (last visited Apr. 14May 3, 2023) (emphasis added).

[99] *Id.*

**Menu Item Promotion Structures**

| | |
|---|---|
| Item Promos (Free over $X) | Marketing fee + item offered |
| Buy One Get One | Marketing fee + item offered |
| Buy Item Get x% or $Off | Marketing fee + discount |

E.

**Menu Item Promotion Structures**

| | |
|---|---|
| Item Promos (Free over $X) | Marketing fee + item offered |
| Buy One Get One | Marketing fee + item offered |
| Buy Item Get x% or $Off | Marketing fee + discount |

### E.      DoorDash Charges Consumers Hidden Commission Fees

11.      Embedded in every order that consumers place on DoorDash are undisclosed "commissions," which are truly nothing more than another hidden delivery fee that consumers pay. These commissions range from 20% to 29% on delivery orders and from 8% to 10% on pickup orders (collectively "Commission Fee"). *See* illustration below.



116.    DoorDash explains to restaurants (but not consumers) that, "[w]hen [a restaurant] list[s] [its] business on DoorDash, [it] pay[s] a percentage of the order subtotal — known as a "commission rate" — for each order processed through our platform."[100] These commissions range from 20% to 29% on delivery orders and from 8% to 10% on pickup orders (collectively "Commission Fee") before Plaintiffs filed suit. *See* illustration below.

---

[100] Ex. 40, *Frequently Asked Questions*, DOORDASH FOR MERCHANTS, at *What do commissions and fees cover?*, https://get.doordash.com/en-us/faq (last visited Apr. 14, 2023).May 3, 2023); *see also* Ex. 13, Sara DeForest, *Food Delivery and Pickup Commissions and Fees, Explained*, DOORDASH FOR MERCHANTS (May 2, 2023), https://get.doordash.com/en-us/blog/food-delivery-pricing.



65.117.        The commission rate allegedly covers a range of contrived delivery and other costs, including undisclosed credit card processing surcharges ~~paid on consumer transactions~~ at a rate of 2.9% plus $0.30 per consumer transaction.[101] *See* illustration ~~below.~~on the following page.

_____
[101] *Id.* Upon information and belief, DoorDash has since changed its commission rate structure in terms of the percentage charged at different thresholds.





12.    Regardless of how ~~DoorDash frames the issue,~~ DoorDash ~~charges a Commission Fee on each order that~~ spins it, consumers pay ~~and~~ the "Hidden Commission Fees." DoorDash includes the commission fee in the menu item price, and charges consumers for that fee on each order. When consumers pay that fee, DoorDash collects and retains ~~the payment~~ their money without ever informing ~~the consumer, including payments for~~ consumers the fee was included,

which includes credit card surcharges in violation of. The disclosure of surcharge is required under 12 C.F.R. § 1026.9(d). This approach represents the essence)(1). The Hidden Commission Fee is the epitome of deception and fraud.

F.    DoorDash Makes Misleading and Manipulative Statements about , injuring both consumers and restaurants. Because restaurants view the Hidden Commission Fee as potential lost consumer revenues, restaurants increase their menu prices, which cause consumers to pay more. But DoorDash obscures the fact that menu prices on its Fees

118.    DoorDash's explains its platform for deliveries are often significantly higher than prices available when ordering directly from the restaurant. Consumers, therefore, are truly the only party harmed by Hidden Commission Fees, while DoorDash benefits as these fees in a manner that furthers its deception, omitting material facts about its billing practices. Firstincrease prices.

F.    DoorDash Uses False Advertising for Prices and Fees

119.    DoorDash lures consumers, like Plaintiffs, into its predatory pricing practices with illusory advertisements promoting discounts on food costs and fees. For example, the DoorDash Platform deceptively offers consumers deals such as 20% off up to $5, without disclosing the consumer must meet a minimum order threshold to receive the advertised discount. When a consumer does not meet the minimum dollar amount, DoorDash does not apply the discount and never informs the consumer that the discount will not be applied. The consumer can only learn about the qualifiers on DoorDash's advertisements by searching the platform further.

120.    The illustration below demonstrates the 20% off up to $5 advertisement scheme. After clicking on the advertised sale for 20% off up to $5, the consumer is taken to the restaurant

page, which has a sales banner that highlights a different advertisement. This advertisement encourages the consumer to spend even more money without ever revealing the terms of the initial discount offer. The consumer must scroll across that banner to find the initial advertised offer for 20% off up to $5. And only after locating that advertisement does the consumer learn DoorDash has a $15 minimum-spend requirement for its 20% off up to $5 advertisement. *See* illustration below.



121.    DoorDash also lures consumers, like Plaintiffs, with advertised discounts on fees. These discounts, however, are deceptive and illusory. DoorDash routinely advertises zero-dollar delivery on the marketplace page (as reflected in the illustration on the left on the following page), without identifying that a minimum spend is associated with the offer and that expanded range fees may apply (as reflected in the illustration on the right on the following page).



122.    Under its scheme, DoorDash's advertisements entice consumers to make their purchases based on a misleading price—the "bait" in the bait-and-switch. The advertisement is deceptive because DoorDash tricks consumers into placing orders without realizing they will not qualify for the advertised discount. By using the advertisement as the bait for the transaction, DoorDash deprives consumers of important information about the true cost of their service. This interferes with a consumer's ability to comparison-shop among restaurants, compare the total cost of using one delivery service versus another, and weigh the costs and benefits of ordering from DoorDash versus ordering directly from the restaurant.

**G.    DashPass Offers Illusory and Fraudulent Savings**

123.    The DashPass is not spared from DoorDash's fraud and deception. DashPass is a subscription service that DoorDash sells on either a monthly or annual basis under which consumers are supposed to realize $0 delivery fees and other savings. For example, DoorDash advertises on Google Ads that consumers will receive "unlimited $0 deliveries" as a DashPass member. *See* illustrations on the next page.





124.    But like its other misleading advertisements, DoorDash's advertised DashPass savings is equally deceiving. Consumers, like Plaintiff Hecox, only learn after searching the DoorDash website further that its advertised "Unlimited $0 Delivery Fee" for a DashPass

membership has some sort of minimum spend requirement, as reflected in the following illustration below.



125.    Indeed, there is always a minimum-spend requirement associated with DashPass offers, as DoorDash explains in an obscure customer support section of its website. DashPass is "a subscription service that offers unlimited deliveries from thousands of eligible restaurants with $0 delivery fee on orders over $12. . . . If you are a DashPass subscriber but your order does not meet the minimum basket subtotal, your DashPass benefits will not apply."[102] Thus, any advertisement that does not mention the minimum spend is per se misleading.

126.    While DoorDash publicly advertises DashPass savings on thousands of restaurants, it does not advertise that many restaurants do not participate in the program. Again, hidden in the customer support section of its website, DoorDash reveals "to make sure your order is eligible, look for the green DashPass icon underneath the merchant's name. . . ."[103] In most cases, DashPass holders presume discounts apply on all orders given how DoorDash advertises the savings misleadingly. Thus, DoorDash twice deceives DashPass holders through DoorDash's

---

[102] Ex. 61, DoorDash Customer Support, *DashPass*, DOORDASH, https://help.doordash.com/ consumers/s/article/What-is-DashPass?language=en_US (last visited May 3, 2023).

[103] *Id.*

advertisements: (1) when they incur delivery fees for orders under the minimum spend and (2) when they incur fees on orders placed with non-participating merchants.

127.   Equally misleading are DoorDash's advertisements that "DashPass subscribers save an average of $4-5 per eligible order."[104] DoorDash sells DashPass for "$9.99/month with the monthly plan or $96/year ($8/month) with the Annual Plan." But these purported savings are falsely represented and, upon information and belief, are in fact engineered.

128.   As reflected in the test discussed in paragraph 113, DoorDash's DashPass embodies many elements of DoorDash's predatory pricing practices. Under this test, DoorDash applied the Expanded Range Fee to a DashPass account but not to a standard account despite each account placing the same order at the same time to the same restaurant for delivery to the same home. Upon information and belief, DoorDash on occasion applies the Expanded Range Fee to DashPass accounts to recoup or offset some of the purported discounts provided under that program. Upon further information and belief, DoorDash "engineers" DashPass savings by charging other fees and changing minimum spend thresholds *sua sponte* to ensure that program remains profitable. DoorDash then drives consumers to spend more on DashPass by advertising false savings. For example, under the aforementioned test, DoorDash falsely tells the DashPass account holder that the delivery fee of $2.99 is zero when in fact the Delivery Fee charged to a consumer is only $0.49, as reflected on the standard account. DoorDash discounts the service fee on the DashPass which lowers the taxes, but DoorDash then assesses an Expanded Range Fee on the DashPass account to recoup part of that discount. DoorDash then falsely represents that the DashPass holder saved $4.22 on this order when that holder really saved only $0.73 on the exact same order from a standard account. The unsuspecting consumer believes they saved almost half

---

[104] *Id.*

the value ($4.22) of a monthly DashPass ($9.99) in one order. But, of course, that representation is false. DoorDash's promotion of the DashPass is a significant part of its fraudulent sales gimmick scheme to reduce illicit delivery fees *See* illustrations below.

 

**DashPass Account**          **Standard Account**

129.    For any of the above reasons and for all of them, DoorDash misrepresents DashPass savings. Upon information and belief, DoorDash "engineers" fee reductions under DashPass as a profit center achieved at certain consumer minimum spend thresholds, allowing for true savings only at higher consumer spend thresholds. The DashPass account holder never realizes the benefit of the bargain with DoorDash's manipulation. Moreover, the DashPass account holder like Plaintiff Hecox never assented to the Terms and Conditions when registering to become a DashPass member.

**H.     DoorDash Disclosures About its Fees are Deceptive**

130.    DoorDash makes disclosures on its platform, in its Terms and Conditions, and in various locations throughout its website, particularly in the hard-to-find support search function.

As a threshold matter, the DoorDash Platform's disclosures are neither clear nor conspicuous. In making disclosures on its platform, DoorDash uses small icons with a lower-case "i" enclosed in a circle to provide curt explanations of certain fees, but only if a consumer touches the clicks on that icon to access it. The disclosures "explain" fees and pricing in a manner that omits or misleads material facts about DoorDash's billing practices in furtherance of its deception. These explanations conceal and/or misrepresent not only the true nature of the fees charged, but also the identity of who or what entity receives them. DoorDash also provides these disclosures in various other places with contradictory explanations.

66. 131.    For example, paragraph 112 discusses DoorDash's misleading description of the Expanded Range Fee, and paragraph 108 discusses DoorDash's misleading description of the Delivery Fee. In those informational icons, DoorDash misleads consumers, like Plaintiffs, about delivery areas and costs related to deliveries. But DoorDash places slightly different information about its pricingprices and fees where consumers would not likely look forare unlikely to see or seek them, i.e., on its merchant restaurant's menu page. On that merchant's page, hidden near the top, underneath the restaurant's logo and, obscured by the bolded restaurant name, and above larger bolded icons for pickup and delivery options, DoorDash places an informational icon for pricingthat address DoorDash's prices and fees in small greygray font. WhenIf a consumer clicksclicked on that icon, DoorDash provides various explanations of its charges, including whichall fees all "go to DoorDash and help cover the costs of operating the DoorDash platformPlatform." By strategically locating this pricing and fee icon in the same place where hungry consumers are ordering food and where menu items prominently display pricing information under them already, DoorDash limits the likelihood consumers will ever see this information. Instead, consumers are more likely to see the icons next to

associatedthe itemized fees during the checkout process, which merely statesand the icons for delivery fees that, "Delivery fee varies for each restaurant based on your location and other factors."Fees and Expanded Range Delivery Fees focus on those fees being related to deliveries. There is no mention here about DoorDash retaining the fee. Thus,fees or the location and contentfees being part of the informational tabs deceive consumers.cost to operate the platform. Thus, DoorDash's disclosures are deceptive in terms of both location and substance. *See* illustrationillustrations below.



      13.     All delivery, marketing, and commission fees that DoorDash directly or indirectly charges consumers, like Plaintiffs, are misleading, deceptive, and fraudulent. DoorDash creates these misleading and hidden fees because DoorDash knows that consumers will stop using its platform as the fees to use the platform that do directly to DoorDash increases.[105] And DoorDash, encourages (even creating the ability for) restaurants to increase menu prices for

---

[105] *The impacts of price controls*, DOORDASH (Apr. 8, 2021), https://doordash.news/company/the-impacts-of-price-controls/amp/.

~~delivery items because that means more money for DoorDash, without consumers realizing that DoorDash is responsible for the increased costs.[106]~~

132.   ~~DoorDash creates the misperception that Dashers receive delivery fees for the delivery services they perform when DoorDash retains the fees. Instead, DoorDash offers~~<u>With respect to substance, DoorDash's delivery disclosures create two misleading impressions. First, the delivery-related fees relate to delivery work performed by Dashers. Second, Dashers receive the delivery fees for performing deliveries. Neither impression is true. Instead, DoorDash collects and retains all delivery related fees, which are nothing more than a partitioned service fee.</u>

~~67.~~<u>133.</u>   <u>Taking delivery related fees for itself, DoorDash only gives</u> Dashers a "delivery offer~~," which.~~<u>." A delivery offer</u> is a predetermined compensation package for each order that is separate and apart <u>from,</u> and not identified on<u>,</u> any consumer order. ~~The~~<u>Upon information and belief, the</u> offer is directed to a specific Dasher who can accept or reject the offer, ~~but the~~<u>although</u> rejection comes with consequences as it may interfere with future delivery offers. Dasher compensation <u>in the delivery offers</u> principally consists of a base pay, which DoorDash creates and advertises as ranging from $2 to $10 per trip,[107] but appears to average around $3 per trip. DoorDash may also give a Dasher promotional pay for an order and the driver might receive a tip ~~from consumers~~.[108] ~~None of these forms of payment~~<u>Neither the promotional pay nor the tip</u> is <u>a</u> guaranteed ~~to be~~ part of a delivery offer. While DoorDash will reveal to

---

[106] ~~*Frequently Asked Questions*, DOORDASH FOR MERCHANTS, https://get.doordash.com/en-us/faq (last visited Apr. 14, 2023).~~

[107] <u>Ex. 4,</u> DoorDash Dasher Support, *How Dasher Pay Works*, DOORDASH, https://help.~~doordash~~<u>doordash</u>.com/~~dashers~~<u>dashers</u>/s/article/How-is-Dasher-pay-calculated?language=en_US (last visited ~~Apr. 14~~<u>May 3</u>, 2023).

[108] *Id.*

Dashers the promotional pay included ~~in its offer~~ before they accept ~~that~~an offer, upon information and belief, DoorDash ~~will~~may conceal ~~from Dashers whether~~or alter or change the consumer ~~tipped~~tip on an order ~~until after the delivery is complete.~~. DoorDash ~~conceals the tip so Dashers are more~~ likely takes these actions as manipulative attempts to urge Dashers to accept the payment offer.[109] One of the most critical issues ~~for~~facing Dashers is the lack of a consumer tip. The tip represents a significant portion of Dasher's compensation, making the difference between a profitable or losing job.[110] But Dashers frequently receive no or little tip because DoorDash misleads naïve consumers into believing Dashers (not DoorDash) receive the range of delivery related fees for deliveries that the Dashers (not DoorDash) perform. These misleading impressions—caused in part by misleading "disclosures"—create a tension between consumers and Dashers over the costs that consumer pay for deliveries. DoorDash is solely responsible for creating this tension. But Dashers have little recourse for DoorDash's actions given ~~they~~Dashers waive crucial rights under their DoorDash independent contractor agreement. And DoorDash mistakenly believes ~~consumers are similarly constrained by DoorDash's~~that its Terms and Conditions~~.~~ similarly constrain consumers.

### ~~V.      THE DOORDASH "TERMS AND CONDITIONS"~~

~~14.     DoorDash does not require consumers, like Plaintiffs, to affirmatively acknowledge the Terms and Conditions because DoorDash knows that reading those terms (which, if enforceable, represent an unconscionable, contract of adhesion) would cause consumers to reconsider using the platform.~~

---

[109] ~~For people using DoorDash and reading this complaint, please tip the Dashers. Tipping is how they truly make their money.~~

[110] For people using on-demand delivery services, please tip the drivers. Tipping is how they truly make most of their money.

15. As a threshold matter, in paragraph 2, the Terms and Conditions read,

> If you access any of our websites located at https://www.doordash.com/ . . . install or use the DoorDash or Caviar mobile application, install or use any other technology supplied by DoorDash (collectively, the "Technology"), or access or use any information, function, feature, or service made available or enabled by DoorDash (collectively, the "Services," which includes the Technology), click or tap a button or take similar action to signify your affirmative acceptance of this Agreement, or complete the DoorDash account registration process, you, your heirs, assigns, and successors (collectively, "you" or "your") hereby represent and warrant that: (a) you have read, understand, and agree to be bound by this Agreement and any future amendments and additions to this Agreement as published from time to time at https://www.doordash.com/terms/ or through the Technology. . .[111]

In other words, DoorDash only informs consumers in the Terms and Conditions that signing-up to use DoorDash will contractually bind the consumer to various terms and forces them to make certain acknowledgements the impact of which waives and limits important rights. DoorDash does not even inform consumers when its Terms and Conditions change because DoorDash believes consumers already agreed to future amendments of the Terms and Conditions. Upon information and belief, DoorDash recently changed its terms and conditions to account for issues raised in prior lawsuits about its deceptive billing practices.

16. To avoid liability for illegal acts, the Terms and Conditions assert strategic acknowledgments, such as,

> You acknowledge and agree that DoorDash is not a merchant, retailer, restaurant, grocer, pharmacy, chemist, delivery service, or food preparation business, and has no responsibility or liability for the acts or omissions of any Merchant or any Contractor. Merchants are the retailers of the products or services offered through the Services. DoorDash is not in the delivery business, does not provide delivery services, and is not a common carrier. DoorDash provides the Services to facilitate the transmission of orders by

---

[111] *See Consumer Terms and Conditions – United States (Including Puerto Rico)*, DOORDASH ¶ 2 (Feb. 3, 2023), https://help.doordash.com/legal/document?type=cx-terms-and-conditions&region=US&locale=en-US.

Users to Merchants, including orders for pickup or delivery by Contractors and/or Merchants.[112]

17.     The Terms and Conditions provide quasi-indemnification language, stating:

You are the sole authorized User of any account you create through the Services. You are solely and fully responsible for all activities that occur under your password or account. You agree that you shall monitor your account to prevent use by minors, and you will accept full responsibility for any unauthorized use of your password or your account.[113]

Specific indemnification language is included in paragraph 18 of the Terms and Conditions in which DoorDash seeks consumers to indemnify DoorDash for all claims and expenses.

18.     Paragraph 14 of the Terms and Conditions (which has twelve subparts) is a forum selection provision that purports to require that all claims arising out of the terms and conditions be subject to arbitration; that purports to waive a jury trial; that purports to ban public injunctive relief; and that purports to ban class action lawsuits.

19.     The Terms and Conditions also incorporate an attempted Limitation of Liability, that purportedly caps DoorDash's liability at "the greater of amounts actually paid by and/or due from you to DoorDash in the six (6) month period immediately preceding the event giving rise to such claim" and to exclude "any indirect, punitive, special, exemplary, incidental, consequential or other damages of any type or kind . . . .").[114]

20.     DoorDash's Terms and Conditions are a contract of adhesion. The Terms and Conditions are a form or standardized contract that is entirely prepared and offered by DoorDash and entirely for its benefit. DoorDash created its Terms and Conditions with disproportionate bargaining power over consumers, like Plaintiffs, who could not, cannot, and did not negotiate

---

[112] *Id.* ¶ 6(a).

[113] *Id.* ¶ 7.

[114] *Id.* ¶ 21.

any terms let alone understand them. Rather, DoorDash presents its Terms and Conditions on a take-it-or-leave-it basis. Under this approach, consumers only obtain DoorDash's services by acquiescing to the form contract.

## VI.   DOORDASH TARGETS MINORS AND KNOWS MINORS FREQUENTLY USE DOORDASH'S SERVICE

21.   In its Terms and Conditions, DoorDash says that any consumer who uses its technology "represents and warrants" that s/he is "of legal age in the jurisdiction in which you reside to form a binding contract with DoorDash."[115] DoorDash's terms purport to hold parents responsible for minors who use their parents' account.[116] While disavowing any contract with minors, DoorDash does nothing to prevent minors from accessing its technology. Certainly, DoorDash has the technology to verify consumers' age as it presently does for alcohol sales. But DoorDash simply refuses to employ that technology when consumers sign-up to use its platform, despite knowing that a significant percentage of its 32 million users are minor children. Likely, millions of minors use the DoorDash platform. *See* illustration of DoorDash's alcohol use policy.



---

[115] *Id.* ¶ 2.

[116] *Id.*

22.   In the Apple Store, DoorDash allowed its app to be rated for ages twelve and up. *See* illustration below.



23.   In the Google store, there is no age limit for the app. DoorDash allowed its app to be rated E for everyone. *See* illustration below.



24.   DoorDash does not require any age verification to register to use its platform, despite having and using age verification technology in the sales process for alcohol. Nor does DoorDash use any parental control on either its app or its website. Nor does DoorDash require a credit card for transactions, which would limit minors from ordering. Instead, DoorDash allows debit cards, preloaded debit cards (like Greenlight cards), and even gift cards, all of which are payment methods that minors use frequently. Indeed, during a podcast, Jonathan Levin, Dean of Stanford Graduate School of Business, told Tony Xu, a DoorDash co-founder and its Chief Executive Officer, that Levin's 13-year-old son wanted to trade his Nike and Amazon birthday

gift cards for DoorDash gift cards.[117] And DoorDash knows that if a parent has ever given a credit card to a child for any online purchase, that information is saved on the minor's mobile/online pay account, making it accessible for any minor who establishes their own DoorDash account with basic information and a cellular telephone and/or an email address.

25.    DoorDash also advertises to minors, including a Sesame Street-themed television ad campaign that aired during the 2021 Super Bowl. *See* illustration below.[118]



DoorDash reportedly paid $5.5 million for its Sesame Street commercial and only committed to contributing up to $1 million to Sesame Workshop. It cannot seriously be argued, therefore, that a Sesame Street-themed advertising campaign is not a campaign directed at children.

26.    In its Privacy Policy, DoorDash tacitly admits children under 18 use its delivery app. DoorDash says, "[o]ur Services are not intended for children under 16 years of age, and we do not knowingly collect personal information from children under the age of 16."[119] At a

---

[117] Stanford Graduate School of Business, *Tony Xu, MBA '13, Cofounder and CEO, DoorDash*, YOUTUBE (starting at 30 second mark) (Feb. 12, 2021), https://www.youtube.com/watch?v=5TidMV_ux_4.

[118] Funny Commercials, *DoorDash Super Bowl Commercial 2021 Daveed Diggs Sesame Street*, YOUTUBE (Feb. 7, 2021), https://youtu.be/RWViEadCvuM.

[119] *Consumer Terms and Conditions—United States (Including Puerto Rico)*, DOORDASH (Feb. 3, 2023), https://help.doordash.com/legal/document?type=cx-terms-and-conditions&region=US&locale=en-US.

minimum, the statement implies that DoorDash's services are intended for 16 and 17 year olds who have not reached the age of majority or possess the capacity to contract.

27.    DoorDash cannot credibly contend it does not know minor children use its service. Kids commonly have cellular phones, which is truly all that is necessary to use DoorDash. According to a Stanford Medicine study, "nearly all children had phones by age 15 years."[120] Tellingly, DoorDash deliveries (and those of other web-based services) are becoming disruptive at schools—particularly high schools—across the country, raising security concerns and administrative nightmares. Many school districts have addressed DoorDash deliveries in schools with some banning and some allowing such deliveries, including school districts in New Jersey, Massachusetts, Kansas, California, and Maryland to name a few.[121] Dashers even talk

---

[120] Erin Digitale, *Age that kids acquire mobile phones not linked to well-being, says Stanford Medicine Study*, STANFORD MEDICINE NEWS CENTER (Nov. 21, 2022), https://med.stanford.edu/news/all-news/2022/11/children-mobile-phone-age.html.

[121] Beccah Hendrickson, *South Jersey students ordering food to high school causing security issues, district says*, 6ABC (Feb. 1, 2022), https://6abc.com/west-deptford-school-district-food-delivery-safety-doordash-uber-eats/11530002/; Brittany Polito, *Pittsfield School Policy Panel Considers Student DoorDash Ban*, IBERKSHIRES.COM (Mar. 3, 2023, 12:29 PM), https://www.iberkshires.com/story/71088/Pittsfield-School-Policy-Panel-Considers-Student-DoorDash-Ban.html; Katie Kausch, *Students can get DoorDash deliveries. Just follow the security rules, N.J. school says.*, NJ.COM (Feb. 3, 2022, 9:44 AM, updated Feb. 16, 2023, 1:11 AM), https://www.nj.com/gloucester-county/2022/02/students-can-get-doordash-deliveries-just-follow-the-security-rules-nj-school-says.html; Audrey Menzies, *Principal, students contemplate Doordash deliveries to the school*, KC PIPER NEWS (Sept. 9, 2019), https://www.kcpipernews.com/18459/feature/principal-and-students-contemplate-doordash-deliveries-to-the-school/; Jonathan Sarabia, *Parents debate over the safety of delivering food to students in school*, KION NEWS CHANNEL 5/46 (Nov. 30, 2021, 11:52 AM), https://kion546.com/news/monterey-county/2021/11/30/parents-debate-over-the-safety-of-delivering-food-to-students-in-school/; Elaine S. Povich, *Students, bored by cafeteria fare, love food delivery services; schools don't.*, WASH. POST (June 9, 2019, 8:30 AM), https://www.washingtonpost.com/health/students-bored-by-cafeteria-fare-love-food-delivery-services-schools-dont/2019/06/07/2568d12c-8617-11e9-98c1-e945ae5db8fb_story.html.

about these problem deliveries in chat rooms.[122] One article compared DoorDash's penetration

into schools to the cult-classic movie, Fast Times at Ridgemont High.[123] But this is no laughing

matter. With each such delivery, another child falls victim to DoorDash's illegal practices.

Despite having technology to handle almost two billion orders annually (including orders for

alcohol), DoorDash does absolutely nothing to verify the age of its users.

### I.   DoorDash's "Other Factors" in Assessing Delivery Fees is Price Discrimination

134.    One source defines "price discrimination" as "a selling strategy that charges

customers different prices for the same product or service based on what the seller thinks they

can get the customer to agree to. In pure price discrimination, the seller charges each customer

the maximum price they will pay. In more common forms of price discrimination, the seller

places customers in groups based on certain attributes and charges each group a different

price."[124] Upon information and belief, DoorDash charges different customers different fees for

the same orders based on discriminatory reasons.

135.    As mentioned above, DoorDash states in its informational icon that its "Delivery

fee varies for each restaurant based on your location and ***other factors***."[125] DoorDash expands on

this description slightly in its webpage under customer support, stating the Delivery Fee "is

charged on delivery orders and helps DoorDash cover costs associated with getting your order

---

[122] *Why are (some) schools telling students that they cannot order food deliveries through DoorDash, GrubHub or UberEats, to be delivered to their schools?*, QUORA (June 6, 2019), https://www.quora.com/Why-are-some-schools-telling-students-that-they-cannot-order-food-deliveries-through-DoorDash-GrubHub-or-UberEats-to-be-delivered-to-their-schools.

[123] Mustafa Gatollari, *High School Students DoorDash Lunch to School, Get Sent to Admin's Office in Viral TikTok*, DISTRACTIFY (Jan. 30, 2023, 12:06 PM EST), https://www.distractify.com/p/students-doordash-food-to-school.

[124] Ex. 62, Alexandra Twin, *What Is Price Discrimination, and How Does It Work?*, INVESTOPEDIA (June 13, 2022), https://www.investopedia.com/terms/p/price_discrimination.asp.

[125] *Supra* ¶ 106 (emphasis added).

directly to you and can vary depending on the merchant location, and ***other factors***, such as demand."[126] In searching for further explanation of the mysterious, non-descript "other factors," DoorDash does not disclose that its charges more delivery fees for any reason other than demand—and demand should not be a delivery issue for a company that does not perform deliveries. Since DoorDash does not disclose precisely what "other factors" influence the Delivery Fee, Plaintiffs' reasonable investigation into DoorDash's predatory practices included tests on the DoorDash Platform's pricing system to determine what other factors might exist.

136.    The pricing tests tried to create a neutral environment to assess how DoorDash charged consumers for fees. In doing so, the test used different accounts to place the same order from the same restaurant at the same time to be delivered to the same address. The restaurant menu prices are set prices at a given time for a given location so no difference should exist there. And DoorDash's service fee is a set percentage of the food subtotal equaling either 15% or a $3 minimum, whichever is greater, so there should be no difference between the menu costs, service costs, and associated taxes when ordering for the same restaurant at the same time. In theory, "different account" types could influence a consumer's price if a standard account and DashPass (pre-paid "saving") account placed the same orders, given that DoorDash manipulates its fees for DashPass orders, as discussed in paragraphs 123 to 129. Consequently, the tests accounted for different account types. To create a truly neutral environment, the test also accounted for device types including desktop computers; IOS based products like iPhones, iPads, and Macbooks; and Android systems like Samsung mobile devices. And while the physical location of the device

---

[126] Ex. 58, DoorDash Customer Support, *What fees do I pay?*, DOORDASH, https://help.doordash.com/consumers/s/article/What-fees-do-I-pay?language=en_US (last visited May 3, 2023).

placing an order should have no influence on the price of a virtual order, the test still accounted for the actual location of the device placing the order. The test results were alarming.

137.    The first test involved Android User 1 and Apple User 1, who placed orders for deliveries to the same residence (Address 1) under their respective standard DoorDash accounts. The users placed their orders on the DoorDash App from different physical locations—Apple User 1 was located at Address 1, while Android User 1 was located about 15 miles away. The orders included the same menu items from the same restaurant and were placed at the same time, with the same delivery speed (standard), and included the same tip. Under this test, iPhone User 1 incurred a ninety-nine cent Expanded Range Fee, while the Android User 1 did not. *See* illustrations of the test results on the following page.



**iPhone User 1**                    **Android User 1**

138.    Under the second test, Android User 1 (while located at Address 2) and iPhone User 1 (while located 15 miles away) placed identical orders at the same time to be delivered to the same address (Address 2). Because the restaurant thought the orders were duplicative, the receipts below reflect slightly different times for when the restaurant entered the orders into its

system. But again, the DoorDash Platform charged the iPhone user a dollar more than the Android user for the same delivery. *See* illustrations below.



**iPhone User 1**                    **Android User 1**

139.    Under the third test, Android User 1 and iPhone User 1 again placed the same orders with all the same criteria to be delivered to Address 1 but, this time, the users placed the orders while physically located in the same place (Address 1). The location made no difference. Again, iPhone User 1 was charged more for the order. But here, DoorDash charged iPhone User 1 an extra dollar for the Delivery Fee and included a ninety-nine cent Expanded Range Delivery Fee, making the iPhone order almost 8% higher than the Android order. *See* illustrations below.



**iPhone User 1**                    **Android User 1**

140.    Under the fourth test, Android User 1 and iPhone User 2 were located at Address 2 and placed the exact same orders under their respective standard accounts at the same time to Panera Bread. Although the users placed their orders while located in the same physical location (Address 2) for delivery to the same place (Address 2), the DoorDash Platform sent iPhone User 2's order to a Panera Bread located closer to Address 2 (within 5.3 miles) and sent Android User 1's order to a Panera Bread located further from Address 2 (within 8 miles). The cost of the menu item was higher at the location for the iPhone user. Proving that distance has no material bearing on delivery fees, the DoorDash Platform charged iPhone User 2 five dollars more than Android User 1 for Delivery Fees, despite iPhone User 2's order being placed at a location closer to the actual delivery address. In the end, the iPhone user paid almost 32% more for that same order than the Android user. *See* illustrations below.



**Android User 1**                                          **iPhone User 2**

141.    Under the fifth test, Android User 1 and iPhone User 3 were located at Address 2 when placing the exact same orders at the same time under their respective standard accounts to be delivered to Address 2. DoorDash charged iPhone User 3 a "discounted" delivery price of $7.99, while displaying a strikethrough price of $8.99. However, the actual delivery fee was much less. DoorDash charged Android User 1 only $5.99 for the same delivery of the same order at the same time from the same restaurant, making both the strikethrough delivery price false and greatly inflating the iPhone user delivery price (by more than 8% higher). *See* illustrations on the next page demonstrating the results of this test.



**iPhone User 3**                    **Android User 1**

142.    Under the sixth test, to demonstrate that a user's standard account does not impact the increased fee charges, Android User 1 logged off his standard account on his Android device and logged in under the standard account for "iPhone User 2" on the same Android device used by Android User 1 (hereinafter "Special Android 1"). Then, while located in the same physical place (Address 2), Special Android 1 and iPhone User 3 placed identical orders at the same time to be delivered to Address 2. Again, DoorDash charged the iPhone user more than the Android order. Thus, unlike with test 5, the standard account for iPhone User 2 realized a savings when ordering on an Android device in test 6. The iPhone user paid almost 12% more for the same order from the same place at the same time. *See* illustrations on the following page that demonstrate the results of this test.

 

**iPhone User 3**                    **Special Android 1**

143.    Under the seventh test, four different orders were placed simultaneously. Android User 1 (standard account), PC User 1 (standard account), iPhone User 1 (DashPass account) and Android User 2 (DashPass account), placed the same order at the same time from the same restaurant with the same delivery speed and same tip to be delivered to the same Address 1. PC User 1 and iPhone User 1 were located at the same address (Address 1), while the other devices were within 15 miles of that address when placing the orders. DoorDash charged four different prices for the same orders from the same place at the same time. The DashPass accounts received discounts on delivery and service fees, making those orders cheaper. For those orders, however, the Android User 2 DashPass account received a greater discount than the iPhone User 1 DashPass account. And for the other orders, the Android User 1 standard account paid less than the PC User 1 standard account, which DoorDash charged an Expanded Range Delivery Fee.

Notably, the savings represented to both DashPass members were false based on the delivery fees charged to Android User 1 for the same order. *See* illustrations below.



PC User 1 Standard



Android User 1 Standard



iPhone User 1 DashPass



Android User 2 DashPass

144.     As the above tests demonstrate, and upon information and belief and subject to further investigation and discovery, DoorDash routinely charges iPhone users more than Android users for reasons wholly unrelated to delivery and service costs. DoorDash likely charges iPhone users more because studies suggest that iPhone users make more money than Android users.[127] DoorDash likely takes the same approach when ordering from a PC. While these actions may represent violations of the Sherman Antitrust Act, Clayton Antitrust Act, and Robinson-Patman Act, DoorDash's discriminatory pricing practices truly demonstrate the fraudulent nature of its fees. Under its predatory pricing scheme, DoorDash engineers its fees to reach certain revenue goals without regard to the nature of the fee that DoorDash charges consumers or how they are represented to consumers. These charging practices are abhorrent.

## V.VII.    THE TRUTH ABOUT DOORDASH'S FRAUDULENT PRICING SCHEME

145.     DoorDash is committing a massive fraud. DoorDash is committing a massive fraud. DoorDash's predatory pricing practices charges fees arbitrarily and capriciously in violation of numerous federal, state, and common law, including Section 5 of the Federal Trade Commission Act, 15 U.S. Code § 45. Despite this fact, DoorDash says its "mission [is] to grow and empower local economies," but DoorDash's predatory tactics achieve the opposite results. Merchants earn less revenue and endure more competition in sales; consumers pay more for food costs; and drivers are left searching for profitable gigs that are few and far between. To that end some drivers even contend DoorDash hires individuals to promote fictitious gigs with unrealistic payments on TikTok and other social media platforms to influence Dashers to drive for the

---

[127] Ex. 63, Bartosz Szczygieł, *iPhone vs Android Users: Key Differences*, NETGURU (Dec. 13, 2022), https://www.netguru.com/blog/iphone-vs-android-users-differences.

company.[128] And for those who do drive, DoorDash's misrepresentations create conflicts between consumers and drivers over tips and delivery fees. And DoorDash's misrepresentations cause animosity between consumers and local establishments over increased prices. Thus, DoorDash's claim that it grows and empowers local economies is as fabricated and fraudulent as its pricing practices.

68.146.    DoorDash presents its predatory pricing scheme to consumers like Plaintiffs in a uniform manner. Regardless of the device used (Android or Apple) or the platform accessed (app or website), each consumer signs up with DoorDash in the same basic manner and is exposed to the same deficient language about the impact of signing up. In this respect, DoorDash treats all consumers the same, failing to provide them with a definitive offer with sufficient consideration or with proper inquiry notice or otherwise allowing them to manifest assent to contract when registering to use the DoorDash platform. Each consumer, like each Plaintiff,mobile app or website), each consumer interacts with DoorDash in the same manner and is subjected to the same fraudulent scheme that DoorDash advances with the same deceitful representations. InDoorDash's fraud occurs every day, in every transaction with every consumer in many ways. While the end,range of damages for consumers, like Plaintiffs, are injured in the same way by incurring monetary damages. This damage will be calculated based on charges reflected in may vary, DoorDash's records will provide that information uniformly.

**A.    Under its fraudulent scheme, DoorDash misrepresents that it is collecting delivery fees for Dashers for their delivery services when in fact DoorDash is collecting fees for itself that have nothing to do with deliveries. In making these**

---

[128] *See* Driven Wyld, *Doordash Driver EXPOSES Company for False Advertising! The Harsh Truth! UberEats Grubhub Instacart*, YOUTUBE (Apr. 13, 2023), https://www.youtube.com/watch?v=cnam6bA3nc4.

~~misrepresentation, DoorDash makes a wide range of others about charges for the speed and distance of deliveries. And then~~ **Fraud and Deception in Registering to Use DoorDash**

147. Consumers register with DoorDash in the same basic manner and are exposed to the same deficient language during the registration process. In this respect, DoorDash treats all consumers the same: DoorDash distracts each consumer from seeing and reading the Terms and Conditions by employing a cluttered registration process focused on speed and efficiency rather than disclosure and compliance. As a result, DoorDash fails to provide consumers with a definitive offer, with sufficient consideration, or with proper inquiry notice or otherwise to allow them to manifest their assent to a contract when registering to use the DoorDash Platform.

148. Adding to its deception, DoorDash uses its Terms and Conditions to force unaware consumers into strategic acknowledgements, while concealing the details of its dubious conduct in incomprehensible legalese. Without providing true inquiry notice, avoiding clickwrap agreements it uses with merchants and drivers and using manipulative registration tactics, DoorDash knows consumers are unlikely to see any misleading partial "disclosures." As a result, DoorDash includes misleading statements in its Terms and Conditions to preserve arguments about the nature of its deceptive and fraudulent conduct. But even if the average consumer could find the misleading, partial "disclosures," that reasonable consumer could not understand them, or piece together DoorDash's entire scheme. These disclosures, like the rest of the terms, are legally complex and dense, spanning over 27 standard, single-spaced pages. DoorDash's purported "contractual" Terms and Conditions are truly nothing more than an instrumentality of, or a part of the means for, accomplishing the fraud perpetuated on consumers.

**B.      Fraud and Deception in Hidden Fees**

69.149.       DoorDash hides Marketing and Commission Fees in menu items that consumers unwittingly pay and DoorDash collects. The Commission Fee includes surcharges not only on credit card transactions, but also on debit and pre-paid debit card transactions in violation of applicable laws. ~~DoorDash's predatory practices in effect steals consumers' hard-earned money and their precious choice to make informed decisions when using technology to order in the on-demand delivery market~~DoorDash falsely advertises items as discounted when they are secretly marked up with hidden fees. The impact of these hidden fees is significant. Restaurants increase their prices on consumers, who then must pay more for DoorDash's service fee because it is a percentage of food costs. Consumers bear the expense of this perverse economic model.

~~28.       Adding to its deception, without providing any true inquiry notice, and avoiding clickwrap agreements used with merchants and drivers, DoorDash allows consumers to register in a manner that draws no meaningful attention to its Terms and Conditions. DoorDash then uses its Terms and Conditions to try to force unknowing consumers into strategic acknowledgements, while DoorDash "discloses" bits and pieces of its fraudulent conduct. DoorDash buries these feigned "disclosures" in pages of complex legalese, knowing consumers are unlikely to see them, to preserve the argument that no fraud exists given these limited, eclectic, inconspicuous "disclosures." DoorDash knows that even if a lay consumer could find the misleading, partial disclosures, consumers could not understand them, or piece the entire scheme together. To that end, DoorDash sates:~~

~~(a) **Prices & Charges.** You understand that: (i) the prices for menu or other items displayed through the Services may differ from the prices offered or published by Merchants for the same menu or other items and/or from prices available at third-party websites and that such prices may not be the lowest prices at which the menu or other items are sold and may change at any time without notice; (ii) DoorDash has no obligation to itemize its costs, profits, or margins when~~

~~publishing such prices; and (iii) pricing may change at any time, in the discretion of DoorDash or the Merchant (depending on which party sets the given price). . . .~~

~~(b) **Strikethrough Pricing (United States Orders).** This Section 12(b) applies to United States Orders. DoorDash may use strikethrough pricing for certain items (for example, when presenting a discount or promotional price for items). DoorDash does not represent that the strikethrough price was the regular or former price of items for any particular period of time and the time period may vary widely depending on the items. DoorDash may also rely on Merchants or a third party to provide information about the regular or former price of items offered by those Merchants or a third party, and DoorDash's strikethrough price therefore may represent the price that DoorDash, a Merchant, or a third party offered the item for sale for some period of time. The strikethrough price may also be an introductory price that was offered for a short period of time. Unless otherwise specified, the strikethrough price represents a non-member discount to the extent the Merchant has a membership program. . . .~~

~~(e) **Fees for Services.** DoorDash may change the fees that DoorDash charges you as we deem necessary or appropriate for our business, including but not limited to Delivery Fees, Service Fees, Small Order Fees, Expanded Range Fees, Regulatory Response Fees, and Surge Fees. DoorDash may offer different pricing to customers based on a variety of factors, including but not limited to geographic areas or usage. DoorDash may also charge you additional fees as required by law. Further, DoorDash may charge Merchants fees on orders that you place through the Services, including commissions and other fees, and may change those Merchant fees as we deem necessary or appropriate for our business or to comply with applicable law. DoorDash may charge you a Service Fee for the convenience of ordering through the DoorDash platform.[129]~~

~~DoorDash's purported "contractual" Terms and Conditions are truly nothing more than an~~

~~instrumentality of, or a part of the means for, accomplishing the fraud perpetuated on consumers.~~

### C.      Fraud and Deception in Advertising Prices

150.    Relying on its Terms and Conditions in part ~~and to~~ to shield it from exposure

~~bless its dubious approach,~~ DoorDash engages in ~~deceit~~deceitful advertising. DoorDash uses

strikethrough pricing (where an original price is struck and replaced with a lower price~~) when~~

---

~~[129] *See Consumer Terms and Conditions – United States (Including Puerto Rico)*, DOORDASH ¶ 12(e) (Feb. 3, 2023), https://help.doordash.com/legal/document?type=cx-terms-and-conditions&region=US&locale=en-US.~~

advertising both menu items ); partition pricing (separating a single price to make it look smaller); drip pricing (revealing more costs as the sale process proceeds); price discrimination (charging consumers different prices for the same service); and its fees. This approach is effectively a dark patterns (having consumers become invested in their purchase through manipulation) as part of a bait-and-switch sales gimmick becauseadvertising scheme to market food and delivery costs to consumers, including its sale of DashPass. Like a game of three-card monte, DoorDash moves the costs from one category of feefees to another andso consumers never truly know the standard pricing. Forgoing and never truly realize the benefit of the advertised deal.

### D.    Fraud and Deception in Describing the Nature of Services Provided

151.    DoorDash makes various misrepresentations in connection with the services provided and fees and costs charged. DoorDash intentionally misrepresents the speed of deliveries, selling a faster delivery directly to you without any true ability to ensure what it is selling can be provided. DoorDash misrepresents that the merchant's location or distance increases DoorDash's costs, when Dashers incur the travel expenses and DoorDash has already charged merchants for delivery fees relating to the Dashers' services. In applying these fees, DoorDash creates confusion over who is providing the delivery service although it only provides technology over its platform. DoorDash similarly misrepresents Dashers receive fees associated with the delivery services that DoorDash collects and keeps in total—fees that have nothing to do with actual deliveries. Each of these misrepresentations is an integral part of an intentional scheme to manipulate and trick consumers, deceiving them into paying their hard-earned money.

152.    DoorDash engages in a modern-day bait-and-switch. With respect to the "bait," DoorDash advertises low, or no cost delivery fees or promotional or discounted menu items to

consumers. But DoorDash does not intend to provide any true discount. Instead, consumers, like Plaintiffs, endure the "switch" where DoorDash charges them a bevy of fees for marketing, food commissions, DashPass, and a range of contrived delivery services. DoorDash levies these fees to reach its desired per-job compensation level without ever truly providing the advertised bait. DoorDash then engages in a series of other manipulative practices to conceal and complete its deceptive and fraudulent actions.

### E.      Fraud and Deception in Disclosures

153.    DoorDash hides certain concessions from consumers instead of providing prominent, informational tabs with ~~full~~complete, consistent, and ~~appropriate~~candid disclosures, ~~DoorDash hides from consumers its concession that "DoorDash~~ . Where strikethrough pricing is used on its platform, DoorDash does not include a disclosure stating, it "does not represent that the strikethrough price was the regular or former price of items for any particular period of time"[130] and that its menu pricing "may not be the lowest prices at which the menu or other items are sold and may change at any time without notice."[131] ~~Instead, DoorDash's promotes~~DoorDash, instead, uses "informational" tabs with contradictory and misleading explanations that dissuade the consumer from searching further. And then DoorDash advertises delivery windows that mislead hungry consumers, who have all the attendant physical and psychological symptoms (including impacted decision making) that accompany hunger, into believing that DoorDash will ~~delivery~~deliver in a time that DoorDash already knows it cannot meet. With these artifices ~~in place~~deployed, DoorDash unilaterally applies ~~to orders~~the Delivery

---

[130] Ex. 16, *Consumer Terms and Conditions – United States (Including Puerto Rico)*, DOORDASH ¶ 12(b) (Apr. 28, 2023), https://help.doordash.com/legal/document?type=cx-terms-and-conditions&region=US&locale=en-US.

[131] *Id.* ¶ 12(a).

Fee, and Expanded Range Fee, to orders and allows consumers to purchase the Express option

for yet another fee, leaving the impression drivers are making deliveries further and faster and

incurring charges along the way. But these fungible fees have nothing to do with delivery

drivers. DoorDash invented them and retains them in total. Similarly, DoorDash also retains a

Marketing Fee that DoorDash hides in promotional items and a Commission Fee that DoorDash

hides in all menu items without ever informing consumers that they are paying these fees. In the

end, DoorDash even charges consumers for using their credit cards and debit cards without ever

telling them.

**F.      Fraud and Deception in Parceling Out Fees**

154.    All DoorDash's fees—Delivery Fee, Extended Range Fee, Marketing Fee,

Commission Fee, Regulatory Fee, DashPass Fee, and Express Fee—are untethered from real,

distinct elements of DoorDash's service. Consumers do not receive any actual convenience or

distinct benefit when paying for these fees separately because they represent a single amenity,

namely the cost of technology service that DoorDash provides. DoorDash's choice to charge

consumers numerous categories of separate fees for its service, rather than one, all-inclusive fee

disclosed upfront, is an integral part of its deceptive sales strategy both nationwide and in

Maryland. And under this strategy, DoorDash misleadingly and fraudulently advertises to

consumers, like Plaintiffs, that DashPass offers certain benefits that it does not truly provide.

155.    Arbitrarily parceling out the full charge wards off sticker shock and misleads

consumers regarding the true price of DoorDash's service. To that end, DoorDash engages in

partition pricing (dividing the full price of services into parts) and drip pricing (promoting only a

portion of a service cost upfront, revealing the rest only as consumers navigate and complete the

buying process). And when DoorDash advertises its costs for fees, services, and even food, it

uses deceptive strikethrough pricing. DoorDash then charges consumers different amounts for the same order involving the same services, delivered to the same address, which represents price discrimination. DoorDash's employment of all these dubious pricing methodologies supported by partial and misleading disclosures, operate to defraud consumers. The Federal Trade Commission has recognized many of these methodologies (in the manner DoorDash employs them), as misleading. And consumer watchdogs warn against some of these practices because separating prices "can lower customers' perceptions of total cost" and "makes continued search costlier and more complicated."[132]

156.    Upon information and belief, each of these dubious fees is part of a fraudulently engineered pricing scheme that fluidly achieves predetermined revenue goals for orders. DoorDash manipulates its fees, like its Delivery Fee, at its whim, advertising $0 for some deliveries to entice consumers to continue using the platform while it simultaneously raising fees in other areas. And DoorDash employs discounts on these fees to sell monthly "DashPass" accounts, beneficial to the company because consumers pay DoorDash a flat monthly rate even when they do not place a single order. Alternatively, DashPass consumers must buy more to realize true savings. Either way, DoorDash wins because it determines (or "engineers") the cost of each order and then engineers the best manner to get consumers to pay it. Unsuspecting consumers have no benchmark against which to measure whether they truly receive a discount because DoorDash never tells the truth about what represents the base "fee" for any order. Imagine walking into a grocery store and seeing the price of eggs change each time a different person examines them. Or worse, imagine if a grocery store clerk simply made up a price or told you an additional fee applied after you loaded your cart with eggs, unloaded them onto the belt,

---

[132] David Adam Friedman, *Regulating Drip Pricing*, 31 Stan. L. & Pol'y Rev. 51, 59 (2020).

and began paying for them. Or perhaps the worst, imagine if the grocery store clerk charged you more for those eggs because you had an iPhone or looked like you could pay more. These seemingly far-fetched scenarios occur in real-life when consumers use the DoorDash Platform.

**G.      Impact of DoorDash's Fraud and Deception**

157.    All delivery, marketing, and commission fees that DoorDash directly or indirectly charges consumers, like Plaintiffs, are misleading, deceptive, and fraudulent. DoorDash creates its misleading and hidden fees because it knows consumers will use its platform less as fees that go directly to DoorDash increase.[133] As a result, DoorDash, encourages (even creates the ability for) restaurants to increase menu prices for delivery items because that means more money for DoorDash, without consumers ever realizing that DoorDash is responsible for the increased costs.[134] And then DoorDash slowly drips the additional fees and costs associated with using its platform until the end of the order, revealing more of the true cost at checkout when consumers feel invested. This approach increases the likelihood consumers will complete the transaction despite incurring additional fees. Experts in the design of e-commerce user interfaces describe this tactic as a "dark pattern [that] exploits the sunk cost fallacy cognitive bias: users are likely to feel so invested in the process that they justify the additional charges by completing the purchase to not waste their effort."[135] This approach represents the essence of psychological manipulation.

---

[133] Ex. 64, *The impacts of price controls*, DOORDASH (Apr. 8, 2021), https://doordash.news/company/the-impacts-of-price-controls/amp/.

[134] Ex. 13, Sara DeForest, *Food Delivery and Pickup Commissions and Fees, Explained*, DOORDASH FOR MERCHANTS (May 2, 2023), https://get.doordash.com/en-us/blog/food-delivery-pricing.

[135] Ex. 65, Arunesh Mathur et al., *Dark Patterns at Scale: Findings from a Crawl of 11K Shopping Websites*, Proc. ACM Hum.-Comput. Interact. 81, 13 (2019).

70.158.	In the end, consumers, like Plaintiffs, are injured in the same way by incurring monetary damages, which can be calculated based on information from DoorDash's records. DoorDash's predatory practices in effect steal consumers' hard-earned money and their precious ability to make informed decisions when using technology to order in the on-demand delivery market. DoorDash's deceit generates billions in annual revenue using tactics that manipulate, trick, deceive, and/or induce consumers, like Plaintiffs, into using DoorDash not only at a much higher and premium price, but also without receiving the true benefit of their bargain. In other words, consumers hold the risk and fund the cost of DoorDash's fraudulent game of ""Catch Me If You Can."." Plaintiffs now sue to recover their damages from DoorDash's predatory pricing practices.

71.159.	This case raises twofour fundamental questions: (1) whether DoorDash's wrap agreement creates aan enforceable contract between DoorDash and consumers, including the consumers' waiver of important rights without ever expressly acknowledging such waiver;[136] and; (2) if itsthe wrap agreement can create a contract between DoorDash and consumers, whether, such a contract is effectiveforms against minor consumers. who lack a capacity to contract; (3) even if the wrap agreement can create a contract between DoorDash and consumers, whether the arbitration agreement is supported by adequate, separate consideration; and (4) even if the wrap agreement can create a contract between DoorDash and consumers, whether the DoorDash Platform allows consumers to knowingly and voluntarily waive their right to a jury trial. These fundamental questions are asserted on behalf of a potential class of millions of consumers nationwide, and tens, if not hundreds, of thousands in Maryland alone. Each

---

[136] Plaintiffs submit it cannot. *See generally Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014) (describing browsewrap agreements as those that allow users to continue to use a website without ever visiting the page that hosts the browsewrap agreement).

individual of these individuals fell victim to DoorDash's common, fraudulent, and deceptive scheme of assessing fees it charges without providing without ever assenting to a contract based on a clear offer, acceptance, and consideration—basic contractcontractual elements (including sufficient notice) )—that would make the Terms and Conditions create a binding contract.

### VIII.    COMMON FACTUAL ALLEGATIONS TO RICO COUNTS

160.    Plaintiffs reassert, reallege, and incorporate herein by reference the allegations set out in paragraphs 1 through 159 in support of their RICO count.

161.    In 1970, Congress passed RICO as part of a comprehensive legislative package aimed at combating the influence of organized crime on interstate commerce,[137] from infiltrating legitimate businesses.[138] When it enacted RICO to address criminal activity, Congress included a civil remedy provision that allows private parties to sue for injuries to their "business or property" caused "by reason of" a defendant's violation of RICO.[139]

162.    DoorDash's massive fraud on consumers implicates two of the four types of activities that RICO outlaws. First, DoorDash's conduct implicates § 1962(a), which prohibits a person from investing in an enterprise any income that is derived from a pattern of racketeering activity.[140] Second, DoorDash's conduct implicates § 1962(c), which prohibits a person from

---

[137] S. Rep. No. 91-617, at 76 (1969) (stating that RICO's purpose was "the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce").

[138] Jed S. Rakoff & Howard W. Goldstein, RICO Civil and Criminal Law and Strategy, § 1.01, at 1-4 (2000 ed.) (quoting S. Rep. 91-617, at 76 (1969)).

[139] 18 U.S.C. § 1964(c).

[140] 18 U.S.C. § 1962(a).

conducting the affairs of an enterprise through a pattern of racketeering.[141] Below, we address each of DoorDash's multiple violations of RICO.

### A.    DoorDash is a Culpable Person

163.    DoorDash is a culpable person as defined under RICO and recognized in law.[142] DoorDash intended to engage in fraudulent conduct with actual knowledge that its conduct violated applicable law as evidenced by its deceptive and misleading statements and attempts to conceal the true nature of its fraudulent scheme. Indeed, over the past several years, at a minimum, consumers, merchants, drivers, and even municipalities have sued DoorDash because of its illegal, fraudulent activities. As a culpable "person," DoorDash both invested income from racketeering activity into an enterprise and/or conducted the affairs of a distinct "enterprise" through a "pattern" of "racketeering" in a way that proximately caused Plaintiffs injuries.

### B.    DoorDash Engaged in Racketeering Activity Through the Predicate Acts of Mail and Wire Fraud

164.    In implementing its predatory pricing practices against consumers, like Plaintiffs, DoorDash engaged in mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343 (collectively "DoorDash's Predicate Acts"). DoorDash's mail and wire fraud represent the predicate acts underlying its racketeering activities.

165.    **Particularities of Mail Fraud.** DoorDash uses a persistent course of conduct over numerous years in which it sends advertisements through the mail to consumers, like Plaintiff Hecox, at his place of residence. In those advertisements, DoorDash not only promotes its predatory pricing practices, but entices consumers, like Plaintiff Hecox, to use the DoorDash

---

[141] *Id.* § 1962(c).

[142] *Id.* § 1961(3) (defining a culpable "person" as an "individual or entity capable of holding a legal or beneficial interest in property").

platform with misleading discount offers. Plaintiff Hecox has received these mail solicitations, and those solicitations helped induce him to place orders with DoorDash. The mail solicitations helped further DoorDash's fraudulent pricing scheme.

166.   **Particularities of Wire Fraud.** In completing its fraud on consumers, like Plaintiffs, DoorDash uses text-messages and e-mail communications between Plaintiffs, DoorDash, merchants, and Dashers, throughout the pendency of the order. These communications occurred at the time and date each Plaintiff placed an order and went to each of them at the specified delivery location. The content of these communications confirmed orders, updated consumers on the status of orders placed with merchant restaurants, informed consumers on the delivery status, explained delays or other problems, and confirmed when delivery occurred. On occasions, consumers like Plaintiffs, also received communications from Dashers about the status of the consumers' orders. Plaintiffs ordered from DoorDash on numerous occasions over the years. DoorDash possesses records of each order, which contain the specific time, place, and content of the wire communication, which Plaintiffs will obtain during discovery.

167.   DoorDash's Predicate Acts are part of its complex fraudulent scheme to defraud consumers through a series of solicitations, misrepresentations, and deceiving advertisements and predatory pricing practices. DoorDash knew that it engaged in illegal activities, as evidenced by its scheme to use oppressive Terms and Conditions—which DoorDash knew most consumers would not see and could not comprehend even if consumers took the time to locate and read them. These Terms and Conditions strategically disclosed some, albeit incomplete, aspects of DoorDash's misconduct in a transparent attempt to negate the *mens rea* for its fraud. And the Terms and Conditions also obtained strategic acknowledgments from consumers that positioned

DoorDash to make the inane claim that its users consent to being defrauded through deceptive pricing practices.

**C.      DoorDash Engaged in A Pattern of Racketeering Activities**

168.    DoorDash engaged in numerous racketeering activities over the last four years.[143] DoorDash's Predicate Acts are related and continuous and, thus, form a "pattern of racketeering." DoorDash's Predicate Acts harm consumers like Plaintiffs.

169.    **Related Acts.** DoorDash's Predicate Acts are related or interrelated because they have the same or similar: (a) purposes, (b) results, (c) participants, (d) victims, (e) methods of commission, or (f) other distinguishing characteristics, including:

170.    *Similar Purpose.* DoorDash's Predicate Acts had the same purpose of defrauding consumers, like Plaintiffs.

171.    *Similar Results.* DoorDash's fraud on consumers, like Plaintiffs, had the same results, insomuch as the company intended to gain and gained money illicitly.

172.    *Similar Participants.* DoorDash's predatory practices involved the same cast of characters, namely DoorDash employees, contract drivers, merchants, and unwary consumers.

173.    *Similar Victims.* DoorDash uniformly injured consumers, like Plaintiffs, by depriving them of their monetary property, making each of them a victim of DoorDash's predatory, fraudulent pricing scheme.

174.    *Similar Methods of Commission.* DoorDash defrauded each consumer, like each Plaintiff, through the DoorDash Platform, which implemented the same fraudulent activities in a uniform manner.

---

[143] *Id.* § 1961(5).

175.    *Similar Distinguishing Characteristics*. Every step of DoorDash scheme, including its solicitation and advertisement in the mail and the text message and emails, prominently displayed the DoorDash logo or name.

176.    **Continuous Acts.** DoorDash's Predicate Acts are continuous and involve both closed-ended and open-ended schemes. First, DoorDash uses a closed-ended scheme under which DoorDash engaged in fraud repeatedly and extensively in number and duration of times when using mail solicitations and advertisements, and when accepting and completing each individual consumer order, like Plaintiffs' orders, through their, computers, mobile devices, and/or emails. These racketeering activities represent a series of related predicate acts over a substantial period—more than several months or a year for Plaintiffs. Second, DoorDash uses an open-ended scheme under which DoorDash has engaged in extensive fraudulent activities for years and continues to engage in such conduct until and unless injunctive relief can end such practices. The threat of these predatory pricing practices continues to rely on the mail to solicit victims of the fraud and uses text and emails to bring the fraud to completion. In other words, DoorDash illegal conduct has lasted years, and the threat will continue indefinitely without judicial intervention.

**D.    DoorDash's Racketeering Activities Affect Stride Bank and/or the Dasher Direct Program as RICO Enterprises**

177.    In 2022, the DoorDash Marketplace Gov[144] generated over $53 billion,[145] benefiting extensively from DoorDash's predatory pricing practices which dramatically increased the cost of food and delivery services. In 2022, DoorDash made almost $6.6 billion in

---

[144] DoorDash defines its "Marketplace GOV" as the total dollar value of Marketplace orders completed in its local logistics platform, including taxes, tips, and any applicable consumer fees, including membership fees related to DashPass.

[145] Ex. 6, Excerpts from DoorDash, Inc., Annual Report (Form 10-K), at 61-62 (Feb. 24, 2023).

revenues, while Dashers made over $13 billion in revenue.[146] Upon information and belief, DoorDash has long viewed Dashers' earnings as an additional revenue source that DoorDash could exploit. After all, many Dashers are unbanked and new to this country, and DoorDash controls the jobs that the Dashers receive and the amount of money that they make.

178.    In or around December 2020, DoorDash launched the Dasher Direct Program.[147] In a press release announcing the program, DoorDash noted:

> With Dashers' needs top of mind, we're excited to launch DasherDirect – DoorDash's first financial platform for Dashers, featuring a Business Prepaid Visa Card and mobile banking app. With no-fee daily deposits, convenient mobile banking functionality, and cash-back rewards, the DasherDirect platform empowers Dashers with more flexibility and control over their earnings.
>
> DasherDirect is powered by our partners at Payfare and issued by Stride Bank. Through the DasherDirect app, Dashers can check their account balance, pay bills, transfer money, set savings goals and find no fee ATMs on the go – without worrying about overdraft fees or minimum account balance requirements.[148]

On its website under "Introduction to DasherDirect," DoorDash explains, "Payfare is a company that DoorDash partnered with to provide DasherDirect. Payfare provides the mobile app technology and the DasherDirect card is issued by Stride Bank, member FDIC."[149] With respect to its operation, DoorDash pays the Dasher through a direct deposit on a VISA debit card that Stride Bank underwrites.[150] "With DasherDirect, the earnings from [Dasher's] deliveries are deposited instantly at the end of every dash -- for no-fee -- so [Dashers] can access [their] cash

---

[146] *Id.*

[147] Ex. 66, Brandon Silverman et al., *DasherDirect- A Financial Platform Designed for Dashers*, DOORDASH (Dec. 14, 2020), https://doordash.news/dasher/dasherdirect-a-financial-platform-designed-for-dashers/amp/.

[148] *Id.*

[149] Ex. 10, DoorDash Dasher Support, *Introduction to DasherDirect*, DOORDASH, https://help.doordash.com/dashers/s/article/Introduction-to-DasherDirect?language=en_US (last visited May 3, 2023).

[150] *Id.*

when [they] need it." The key lure of the DasherDirect Program is that DoorDash does not charge Dashers a fee to receive their earnings daily.

179.   Despite having the ability to pay them immediately, DoorDash pays Dashers weekly from the revenues of its racketeering activities. If Dashers want to receive their earned compensation daily, they must pay DoorDash a "Fast Pay" fee of $1.99 per transaction (meaning per day) to release their funds each day.[151] With six million Dashers performing deliveries each year,[152] DoorDash stands to make millions in interest holding its drivers' compensation weekly and millions more charging drivers a daily Fast Pay fee. But the DasherDirect Program gives DoorDash the ability to make even more money from the Dashers' billions in annual revenue.

180.   Like many in the gig economy, Dashers face the conundrum of how to bridge the gap between when they get paid and when they need their money. This gap creates desperation. DoorDash leverages this desperation by holding Dasher's compensation for up to a week and then levying the "Fast Pay" fee. DoorDash provides "relief" by offering the no-fee daily deposit under the DasherDirect Program. The results: most Dashers participate in the program to such an extent that some Dashers do not even know the Fast Pay fee exists. Upon information and belief, DoorDash now automatically enrolls Dashers into the DasherDirect Program or sends them the materials to enroll at the outset of their engagement.

181.   Upon further information and belief, the DasherDirect Program generates revenues from both the Dashers' debit card transactions and the pooled Dashers' funds in which

---

[151] *See* Ex. 4, DoorDash Dasher Support, *How Dasher Pay Works*, DOORDASH, https://help.doordash.com/dashers/s/article/How-is-Dasher-pay-calculated?language=en_US (last visited May 3, 2023); Ex. 5, DoorDash Dasher Support, *What is Fast Pay?*, DOORDASH, https://help.doordash.com/dashers/s/article/What-is-Fastpay?language=en_US (last visited May 3, 2023).

[152] Ex. 6, Excerpts from DoorDash, Inc., Annual Report (Form 10-K), at 7 (Feb. 24, 2023).

Stride Bank invests. Upon information and belief, DoorDash, Payfare, and Stride Bank share fees generated from the DasherDirect Program.

182.    Lost in DoorDash's potential to make millions, if not more, from shared fees under the DasherDirect Program is an undeniable fact. The DasherDirect Program is financed entirely by the funds DoorDash fraudulently procured from consumers, like Plaintiffs. DoorDash pays Dashers with these illicit funds, holds those funds for Dashers participating in the DasherDirect Program, and then invests those funds with Stride Bank under the DasherDirect Program. Even if the illicit funds are invested with Stride Bank for a legitimate purpose and even if the program provides beneficial services, the byproduct of the investment income remains tainted by the fact that DoorDash derives the funds from its continuous, fraudulently scheme executed with solicitations through the mail, text message, and email communications—DoorDash's pattern of racketeering activities. In other words, Stride Bank, Payfare, and/or the DasherDirect Program are RICO enterprises that DoorDash has infiltrated with its continuous pattern of racketeering activities—activities that include the predicates of mail and wire fraud. *See* illustration below demonstrating DoorDash RICO scheme.



183.     RICO defines an enterprise as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity."[153] Here, four RICO enterprises exist.

184.     **The Stride Bank, Payfare, and DoorDash Enterprises**. Stride Bank, Payfare, and DoorDash are each independent, corporate enterprises under 18 U.S.C. §1962(a). DoorDash utilized the illicit funds derived from its pattern of racketeering activities to invest in the DasherDirect Program. That investment generated additional income. DoorDash also targeted

_____
[153] 18 U.S.C. § 1961(4).

Stride Bank and Payfare under the DasherDirect Program, providing them with an infusion of illicit funds derived from DoorDash's racketeering scheme.

185.    **The DasherDirect Enterprise.** Under 18 U.S.C. § 1964(c), Stride Bank, DoorDash, and Payfare created the DasherDirect Program through an association in fact (the "Dasher Association"). The Dasher Association created the DasherDirect Program to allow Dashers to conduct digital banking with Stride Bank, which provides private-label banking services that in effect serve as a FDIC insured financial institution conduit. Payfare created and manages the mobile application for Dashers to conduct digital banking under the DasherDirect Program. And DoorDash sits at the top of the Dasher Association.

186.    DoorDash managed the affairs and/or operations of the DasherDirect Program. DoorDash recruited and hired Dashers; advertised the DasherDirect Program on the DoorDash website, including agreements between Stride Bank and Payfare with Dashers; created the program's participation policies and rules; provided Dashers with the tools to participate in and register for the program; and steered and manipulated Dashers' participation in the program through heavy-handed and fraudulent conduct identified herein. DoorDash's heavy-handed and fraudulent conduct as part of its management of the DasherDirect Program includes, but is not limited to holding Dashers' compensation for up to a week; implementing a Fast Pay for non-participating Dashers; creating rules that prohibited both participating in Fast Pay and the DasherDirect Program; managing the Dashers' funds for purposes of allocating those funds to Stride Bank by each individual Dashers' name who participate in the program; and using its pattern of racketeering activities to control and limit Dasher compensation, creating more leverage to direct or otherwise manipulate Dashers' participation in the DasherDirect Program. The Dasher Association's common purpose under the program was generating fees, either

through debit card transactions or pooled investments, from the billions of dollars that Dashers make annually.

**E.      Both the Enterprise and the Racketeering Activity Affect Interstate Commerce.**

187.    Both the activity of the enterprises—the DoorDash, Stride Bank, Payfare, and DasherDirect Enterprises—and the predicate acts of mail and wire fraud underlying DoorDash's racketeering affect interstate commerce. DoorDash, Stride Bank, Payfare, and the DasherDirect Program each involve the sale, acquisition, purchase, and/or investment of goods, services, and monetary property, including the extension of credit, across state lines.

**F.      Plaintiffs Sustained an Injury Because of DoorDash's Actions**

188.    Each Plaintiff is a person as defined under RICO.[154] Plaintiffs sustained an injury to their property, including their money and other things of value such as their extension of credit, because of DoorDash's fraudulent, predatory pricing practices and scheme in violation of RICO 18 U.S.C. §§ 1962(a), (c). Specifically, Plaintiffs sustained an injury because of DoorDash's racketeering activities insomuch as these acts defrauded Plaintiffs causing them a monetary injury in violation of 18 U.S.C. § 1962(c). DoorDash then used the illicit funds fraudulently procured from Plaintiffs to invest in the DasherDirect Program, injuring Plaintiffs further in violation of 18 U.S.C. § 1962(a).[155] Under both situations, DoorDash was the factual and proximate cause of Plaintiffs' injuries. But for DoorDash's actions that deprived Plaintiffs of their property through mail and wire fraud, Plaintiffs would not have been injured.

**G.      Plaintiffs' Claims Are Timely.**

---

[154] 18 U.S.C. § 1961(3).

[155] A plaintiff need not allege injury from the use or investment of racketeering proceeds. *Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260, 264 n.2 (4th Cir. 2001); *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 836-40 (4th Cir. 1990).

189.    Within the last four years, each Plaintiff incurred an injury due to DoorDash's wire and mail fraud.

## CLASS ACTION ALLEGATIONS

190.    Plaintiffs reassert, reallege, and incorporate herein by reference the allegations set out in paragraphs 1 through 189 by reference.

191.    Plaintiffs bring this action on their own behalf and as a class action on behalf of the similarly situated class members as defined herein. This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3). The class consists of tens or hundreds of thousands, if not millions, of DoorDash users who were inappropriately and illegally charged fees as part of the DoorDash scheme.

~~72.~~192.             Plaintiffs seek to recover these damages for themselves and a class of similarly situated individuals who paid the following: (1) any and all delivery fees of any kind to DoorDash as DoorDash's records will establish; (2) hidden marketing fees on promotional items as DoorDash's records similarly will establish; and/or (3) any and all hidden commissions or commission fees that DoorDash included in or took from menu items advertised to and paid by consumers using the DoorDash ~~platform~~Platform, which also will be reflected in DoorDash's records.

## CLASS ACTION ALLEGATIONS

29.    Plaintiffs bring this action on their own behalf and as a class action on behalf of the similarly situated class members as defined herein. This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3). The class consists of tens or hundreds of thousands, if not millions, of DoorDash users who were inappropriately and illegally charged fees as part of the DoorDash scheme.

73.193.        Specifically, Plaintiffs bring this suit on behalf of the following Class: All persons in the United States who, within the relevant statute of limitations periods, established a DoorDash account and placed an order using either the DoorDash appApp or the website DoorDash.com and who paid a "Delivery Fee," an "Express (or Priority) Delivery Fee," and/or an "Extended Range Delivery Fee" and/or who purchased a promotional menu item that included a hidden "Marketing Fee" and/or who purchased a menu item that included a hidden "Commission Fee" and/or who paid any combination of these fees ("the Nationwide Class").

74.194.        Plaintiff Hecox, individually and/or as next of friend for his minor child R.E.H. who is a party to this case, and Plaintiff R. Hecox who just reached age of majority, also bring this suit on behalf of the following Subclasses:

a.        All parents and/or guardians in the United States who, within the relevant statute of limitations periods, established a DoorDash account and whose minor child or children placed an order from that account using either the DoorDash appApp or the website DoorDash.com and who paid a "Delivery Fee," an "Express Delivery Fee" and/or an "Extended Range Delivery Fee" and/or who purchased a promotional menu item that included a hidden "Marketing Fee" and/or who purchased a menu item that included a hidden "Commission Fee" and/or who paid any combination of these fees (the "Nationwide Parents Class").

b.        All minors in the United States who, within the relevant statute of limitations periods, established a DoorDash account and who placed an order from that account using either the DoorDash appApp or the website DoorDash.com and who paid a "Delivery Fee," an "Express Delivery Fee" and/or an "Extended Range Delivery Fee" and/or who purchased a promotional menu item that included a hidden "Marketing Fee" and/or who purchased a menu item that included a hidden "Commission Fee" and/or who paid any combination of these fees (the "Nationwide Minor Class").

c.        All persons resident in the State of Maryland who, within the relevant statute of limitations periods, established a DoorDash account and placed an order using either the DoorDash appApp or the website DoorDash.com and who paid a "Delivery Fee," an "Express Delivery Fee" and/or an "Extended Range Delivery Fee" and/or who purchased a promotional menu item that included a hidden "Marketing Fee" and/or who purchased a menu item that included a hidden

147

"Commission Fee" and/or who paid any combination of these fees (the "Maryland Class").

d.      All parents and/or guardians resident in the State of Maryland who, within the relevant statute of limitations periods, established a DoorDash account and whose minor child or children placed an order from that account using either the DoorDash ~~app~~App or the website DoorDash.com and who paid a "Delivery Fee," an "Express Delivery Fee" and/or an "Extended Range Delivery Fee" and/or who purchased a promotional menu item that included a hidden "Marketing Fee" and/or who purchased a menu item that included a hidden "Commission Fee" and/or who paid any combination of these fees (the "Maryland Parents Class").

e.      All minors resident in the State of Maryland who, within the relevant statute of limitations periods, established a DoorDash account and who place an order from that account using either the DoorDash ~~app~~App or the website DoorDash.com and who paid a "Delivery Fee," an "Express Delivery Fee" and/or an "Extended Range Delivery Fee" and/or who purchased a promotional menu item that included a hidden "Marketing Fee" and/or who purchased a menu item that included a hidden "Commission Fee" and/or who paid any combination of these fees (the "Maryland Minor Class").

~~75.~~195.         DoorDash subjected Plaintiffs (including the Nationwide Class, Nationwide Parents Class, Nationwide Minor Class, Maryland Class, Maryland Parents Class, Maryland Minor Class) (collectively "Plaintiffs") to the same wrongdoing and harmed them in the same manner. Plaintiffs seek to enforce the same rights and remedies pursuant to the same legal theories including: declaratory relief, injunctive relief, fraud (intentional misrepresentation or deceit), negligent misrepresentation, and a violation of the Maryland Consumer Protection Act [Md. §13-301 Unfair or deceptive trade practices].

~~76.~~196.         Numerosity: The proposed Class and Subclasses are so numerous that joinder of all members is impracticable. While the precise number and identities of class members are unknown at this time, targeted discovery will provide the information.

~~77.~~197.         Typicality: The claims of Plaintiffs are typical of the claims of the Class and Subclasses because the claims arise from the same event or practice or course of conduct. Plaintiffs are advancing legal theories applicable to the Class and Subclasses. And~~,~~ Plaintiffs'

measure of damages is the same as the measure of damages applicable to the Class and Subclasses.

78.198.    Adequacy: Plaintiffs and their counsel will fairly and adequately represent and protect the interest of the Class and Subclasses. Plaintiffs' counsel have considerable and substantial experience in prosecuting and defending complex litigation, including class actions. Plaintiffs and Plaintiffs' counsel intend to vigorously pursue this litigation on behalf of themselves and the Class and Subclasses and have the financial resources to do so. Neither Plaintiffs nor Plaintiffs' counsel have any interests adverse to the interests of the Class and Subclasses.

79.199.    Superiority of Class Action: Plaintiffs have suffered the same harm because of DoorDash's unlawful conduct, and the same claims and defenses are at issue for all Plaintiffs. A class action is superior to other methods for the fair and efficient adjudication of the controversy. Joinder of individual members of the Class and Subclasses is impractical, inefficient, and unduly burdensome on the individual members. By employing a class action vehicle, a single court can adjudicate the issues resulting in both judicial economy and the fair and equitable handling of all class claims. And a class action conserves the parties' resources and protects the rights of the Class and Subclasses. Were these claims to be adjudicated individually, as a practical matter, the individual adjudications would be dispositive of the interests of other members not parties to the adjudication and could substantially impair and impede the ability of the other members of the Class and Subclasses to protect their interests.

80.200.    Common Questions of Law and Fact Predominate: To further satisfy the requirements of Fed. R. Civ. P. 23, there are questions of law and fact common to Plaintiffs' claims and the claims of the Class and Subclasses that predominate over any question of law or

fact that relates to any individual member of the Class or Subclasses. Common questions of law and fact include, without limitation, at least:

- Whether DoorDash properly and appropriately informed Plaintiffs about the Terms and Conditions when they signed up for the DoorDash service, including:

    o Whether DoorDash made a definitive offer supported by consideration.

    o Whether by signing up for DoorDash a consumer had the requisite intent or assent to contract with DoorDash that, among other things, purported to require the arbitration of any disputes and to impose a limit on the type and amount of damages that could be recovered.

    o If a contract was formed, whether the arbitration clause is severable from the rest of the contract and whether it is supported by sufficient consideration.

    o If a contract is formed, whether the arbitration agreement is a contract of adhesion.

    o If a contract was formed, whether minor Plaintiffs have disavowed or disaffirmed the contract.

- Whether DoorDash made false representations of material fact.

- Whether DoorDash knew or should have known that its representations of material fact were false.

- Whether DoorDash represented material fact with such reckless disregard for the truth that knowledge of the falsity can be imputed to DoorDash.

- Whether DoorDash falsely represented material fact with the purpose of defrauding or deceiving consumers.

- Whether Plaintiffs justifiably relied or had a presumption of reliance on DoorDash's false representations of material fact given the true nature of DoorDash's false representation was not determinable through the exercise of ordinary intelligence or diligence.

- Whether Plaintiffs suffered actual damages because of their justifiable or presumed reliance on DoorDash's false representations of material fact.

- Whether DoorDash owed a duty of care and/or candor to Plaintiffs as a matter of law.

- Whether DoorDash, in breach of its duty of care and/or candor to Plaintiffs, negligently made false representations of material fact.

- Whether DoorDash, in breach of its duty of care and/or candor to Plaintiffs, negligently made representations of material fact with the intention that Plaintiffs would rely upon and act in response to the false representations.

- Whether DoorDash knew or should have known that Plaintiffs would rely on DoorDash's false representations of material fact.

- Whether Plaintiffs justifiably relied or had a presumption of reliance on and acted in response to DoorDash's false representations of material fact.

- Whether Plaintiffs suffered damages proximately caused by DoorDash's negligence.

- Whether DoorDash, in adopting, promoting, and/or charging its Express Delivery Fee, misrepresented material facts to consumers, like Plaintiffs, including the fact that:

  - DoorDash knew or should have known it had no ability to control the manner or means of how or when Dashers performed their deliveries;

  - DoorDash knew or should have known that "direct to you" advertisement is misleading;

  - DoorDash knew or should have known that Dashers can stack orders;

  - DoorDash knew or should have known that Dashers did not know whether a consumer had paid for an express delivery;

  - DoorDash knew or should have known that as soon as a consumer chose an expedited delivery, the time for the delivery would be extended beyond the range for a standard delivery; and

  - DoorDash knew or should have known that the pre-order delivery windows were misleading and likely to entice consumers, like Plaintiffs, into placing orders.

- Whether DoorDash, in adopting, promoting, and/or charging its Delivery Fee, misrepresented material facts to consumers, like Plaintiffs, including the fact that:

  - Dashers did not receive the Delivery Fee for their deliveries and that DoorDash retained the Delivery Fee completely;

  - DoorDash knew or should have known that its advertising tactics regarding discounts on the Delivery Fee were misleading;

  - DoorDash knew or should have known the Delivery Fee had nothing to do with the delivery of orders for consumers, like Plaintiffs, but instead related to the alleged cost to operate DoorDash's technology;

  - DoorDash knew or should have known the Delivery Fee was an advertising sales gimmick; and

- o   DoorDash knew or should have known that the pre-order delivery windows were misleading and enticed consumers, like Plaintiffs, into placing orders.

- Whether DoorDash, in adopting, promoting, and/or charging its Extended Range Delivery Fee, misrepresented material facts to consumers, like Plaintiffs, including the fact that:

  - o   DoorDash knew or should have known that consumers like Plaintiffs did not have normal delivery areas;

  - o   DoorDash knew or should have known that they created delivery areas based on its merchants' paid relationship with DoorDash without regard to closer delivery locations for consumers, like Plaintiffs, based on their location;

  - o   DoorDash concealed a material fact from Plaintiffs that DoorDash charges the Extended Range Fee as a manner of increasing profit independent of Plaintiffs' normal delivery area; and

  - o   DoorDash knew or should have known that the pre-order delivery windows were misleading and enticed consumers, like Plaintiffs, into placing orders.

- Whether DoorDash, in adopting, promoting, and/or charging its Marketing Fee, misrepresented material facts to consumers, like Plaintiffs, including the fact that:

  - o   DoorDash knew or should have known that consumers, like Plaintiffs, could not discover the hidden Marketing Fee through the exercise of ordinary diligence or intelligence;

  - o   DoorDash knew or should have known that consumers, like Plaintiffs, paid for promotional items for which they incurred and paid an unknown $0.99 that DoorDash collected; and

  - o   DoorDash knew or should have known that the pre-order delivery windows were misleading and enticed consumers, like Plaintiffs, into placing orders.

- Whether DoorDash engaged in racketeering activity through the predicate acts of mail and wire fraud, including:

  - o   Whether DoorDash used a persistent course of conduct over numerous years to send advertisements through the mail to consumers; and

  - o   Whether DoorDash used text messages and email communications to contact consumers.

- Whether DoorDash's predicate acts are part of its complex fraudulent scheme to defraud consumers through a series of solicitations, misrepresentations, and deceiving advertisements, statements, and pricing practices.

- Whether DoorDash engaged in a pattern of racketeering activity.

- Whether DoorDash's predicate acts are related or interrelated because they have the same or similar purposes, results, participants, victims, methods of commission, or other distinguishing characteristics.

- Whether DoorDash's predicate acts are continuous and involve both closed-ended and open-ended schemes.

- Whether Stride Bank is an "enterprise" under the RICO statute.

- Whether the DasherDirect Program is an "enterprise" under the RICO statute.

- Whether DoorDash's relationship with Stride Bank, Payfare, and the DasherDirect Program constitute an association in fact "enterprise" under the RICO statute.

- Whether the enterprise and the racketeering activity affect interstate commerce.

- Whether Plaintiffs sustained an injury as a result of DoorDash's racketeering activity.

81.201.        Notice: There are myriad methods for providing notice to the Class and Subclasses including internet publication, utilization of social media, and traditional published notice——all of which would be paid by DoorDash.

82.202.        The Class and Subclasses specifically exclude counsel, including counsels' employees, representing the Class and Subclasses, any judicial officer presiding over this matter, the members of the judicial officers' immediate families and judicial staff, and any individual whose interests are antagonistic to the interests of other Class and Subclass members.

## CAUSES OF ACTION AND CLAIMS FOR RELIEF AND CAUSES OF ACTION

83.203.        Based on all the allegations herein, PlaintiffPlaintiffs respectfully demandsdemand relief under the following nineeleven causes of action.

## FIRST CLAIM FOR RELIEF
(DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF)

~~84.~~204.        Plaintiffs reassert, reallege, and incorporate herein by reference the allegations set out in paragraphs 1 through ~~111 and assert~~203 when asserting the ~~following~~foregoing cause of action.

~~85.~~205.        Pursuant to Fed. R. Civ. P. 23(b)(2), Class-wide declaratory judgment and injunctive relief is appropriate because DoorDash has acted or refused to act on grounds that apply generally to all the Plaintiffs.

~~86.~~206.        More specifically, DoorDash has adopted a fee structure for its delivery services that is misleading and induces consumers to act to their detriment.

~~87.~~207.        DoorDash's method of giving consumers, including minor consumers, notice of the Terms and Conditions that DoorDash will likely argue apply in this case was inadequate to secure the consent of any consumer and, therefore, there is no contract between DoorDash and any consumer.

~~88.~~208.        Regardless of which method that consumers, like Plaintiffs, used to sign up, DoorDash's wrap agreement did not require or allow consumers, including minor consumers, to manifest assent to the ~~terms~~Terms and ~~conditions~~Conditions and Privacy Policy expressly~~.~~; consequently, there is no contractual relationship between DoorDash on the one hand and Plaintiffs, the Class, and Subclasses on the other. Instead, ~~consumers were able to continue using~~Plaintiffs registered and used the DoorDash ~~platform~~Platform without ~~visiting the page hosting the wrap agreement~~seeing or ~~even having knowledge or notice of its existence. Here, Plaintiffs did not know of~~reviewing the Terms and Conditions page.

~~89.~~209.        This claim for declaratory judgment seeks a determination that (a) ~~this action may proceed as a class action; (b)~~ there is no contract between DoorDash and Plaintiffs, the Class, and Subclasses; (~~c~~) ~~Plaintiffs are entitled to recover for their injuries incurred because~~

~~of DoorDash's misleading fee structure; (d) Plaintiffs are entitled to an award of attorneys'~~

~~fees~~b) this action may proceed as a class action before this court; and ~~expenses to be determined~~

~~by the Court; and (e~~(c) such other and further relief as is necessary and appropriate, including the

relief outlined in paragraph ~~119~~210 below.

~~90.~~210.          The Court must determine this issue of contract formation in which

Plaintiffs for themselves and their classes, challenge both DoorDash's purported contract and its

purported arbitration agreement. In trying to remove important determinations from the Court's

purview contrary to applicable law, DoorDash's Terms and Conditions refer to delegating issues

of "formation of this Arbitration Agreement" to the arbitrator, "including, but not limited to, any

claim that all or any part of this Arbitration Agreement is void or voidable[.]"[156] In doing so, the

arbitration agreement conflates issues of contract formation with issues of contract rescission

rendering the delegation language ambiguous and thus unenforceable, in addition to being

contrary to applicable law. In seeking declaratory relief, Plaintiffs will need limited, targeted

discovery on issues relating to formation including but not limited to changes DoorDash made to

its ~~signup~~sign up/registration page over the last ~~three~~four years and changes DoorDash has made

to its ~~terms~~Terms and ~~conditions~~Conditions over the last ~~three~~four years.

~~91.~~211.          To remedy the injuries that DoorDash's misleading fee structure has

caused, Plaintiffs are entitled to at least the following injunctive relief:

~~92.~~212.          A declaration that DoorDash adopt an open and straightforward fee

structure so that consumers will understand what they are paying for and how their fees are

distributed and allocated; and

---

[156] Ex. 16, *Consumer Terms and Conditions – United States (Including Puerto Rico)*, DOORDASH ¶ 14(d) (~~Feb. 3~~Apr. 28, 2023), https://help.doordash.com/legal/document?type=cx-terms-and-conditions&region=US&locale=en-US.

93.213.        A declaration that DoorDash cease and desist from its misleading and fraudulent practices by charging or advertising delivery fees in any form when it does not deliver.

**SECOND CLAIM FOR RELIEF**

(DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201 THAT THE ENTIRE TERMS AND CONDITIONS ARE UNENFORCEABLE AGAINST MINORS)

214.    Plaintiffs reassert, reallege, and incorporate herein by reference the allegations set out in paragraphs 1 through 213 when asserting the foregoing cause of action.

215.    Under the law of the State of Maryland, as well as the law of other United States jurisdictions, minors have the right to disaffirm contracts such as those at issue here and a parent or guardian can disaffirm a contract on behalf of a minor.

216.    Plaintiffs, on behalf of any minor whose interests they represent, hereby disaffirm any contract that a court may determine to have existed between Plaintiffs and DoorDash.

217.    The contracts between Plaintiffs and DoorDash on the other are void *ab initio* (or alternatively void or voidable) to the extent that any minor was the person who established or used a DoorDash account given their lack of contractual capacity and given DoorDash's own specified disaffirmance of any contract with minors or allowing them to use its technology or service.

218.    There exists, therefore, an actual controversy between the parties requiring a declaratory judgment.

219.    This claim for declaratory judgment seeks a determination that (a) the contracts between DoorDash and minor children are void *ab initio* (or alternatively void or voidable at the option of the minor children or their parents or guardians); (b) this action may proceed as a class action; (c) the minor children or their parents or guardians on their behalf have effectively voided

or otherwise disaffirmed the contracts by filing this lawsuit; and (d) such other and further relief as is necessary and appropriate.

220.     The Court must determine this issue of contract formation in which Plaintiffs for themselves and their classes, challenge both DoorDash's purported contract and its purported arbitration agreement as it relates to minor children. In trying to remove important decisions from the Court's purview contrary to applicable law, DoorDash's Terms and Conditions refer to delegating issues of "formation of this Arbitration Agreement" to the arbitrator, "including, but not limited to, any claim that all or any part of this Arbitration Agreement is void or voidable[.]"[157] In doing so, the arbitration agreement conflates issues of contract formation with issues of contract rescission, rendering the delegation language ambiguous, unenforceable, and contrary to applicable law. In seeking declaratory relief, Plaintiffs will need limited, targeted discovery on issues relating to formation including but not limited to changes DoorDash made to its sign up/registration page over the last four years, changes DoorDash has made to its Terms and Conditions over the last four years, and DoorDash's prohibitions against minors' use of its platform.

221.     Alternatively, this claim for declaratory judgment seeks a determination that (a) the arbitration clause is severable from the other Terms and Conditions; (b) the arbitration clause is unenforceable against the minor consumers; and (c) such other and further relief as is necessary and appropriate.

### THIRD CLAIM FOR RELIEF

### (DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201
THAT THE ARBITRATION AGREEMENT IS UNENFORCEABLE)

---

[157] *Id.*

~~94.~~222.        Plaintiffs reassert, reallege, and incorporate herein by reference the allegations set out in paragraphs 1 through ~~119 and assert~~221 when asserting the ~~following~~foregoing cause of action.

~~95.~~223.        In the event a court determines that a contract was formed when a consumer, including a minor consumer, signed-up and used DoorDash's services, declaratory relief is still necessary and appropriate.

~~96.~~224.        Arbitration clauses are severable from the whole of the contract in which they are contained.[158] To be enforceable, arbitration clauses require consideration independent of any consideration for the remainder of the Terms and Conditions.[159]

~~97.~~225.        In this case, the consideration for the arbitration agreement is illusory because DoorDash reserves the right to modify the ~~terms~~Terms and ~~conditions~~Conditions at any time. So, in paragraph 14(h), DoorDash says that "updates to these Terms and Conditions do not provide a new opportunity to opt out of the Arbitration Agreement for customers or Users who had previously agreed to a version of [these] Terms and Conditions. . . ." Thus, DoorDash retained the right to unilaterally change the terms and conditions without affording a subsequent opt-out right. As a result, the consideration is illusory.[160]

---

[158] *See generally Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70-71 (2010) ("[A]s a matter of 'substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract.'") (citations omitted). *See also Coady v. Nationwide Motor Sales Corp.*, 32 F.4th 288, 291 (4th Cir. 2022) ("[A]n arbitration provision is an 'independently enforceable contract' that is a 'severable part' of the larger agreement.").

[159] *See generally Jones v. Prosper Marketplace, Inc.*, No. GJH-21-893, 2022 WL 834210, at *12 (D. Md. March 21, 2022) ("To be binding and enforceable, contracts ordinarily require consideration.").

[160] *Id.* at *13 ("[O]ne party's unilateral right to amend an agreement at any time can constitute an 'illusory promise'") (citations omitted).

98.226.         Alternatively, in paragraph 3 of the Terms and Conditions, DoorDash "reserves the right to modify the terms and conditions of this Agreement . . . at any time. . . ." Because the modification agreement was contained within the same Terms and Conditions as the arbitration agreement, there was insufficient consideration to support an enforceable agreement to arbitrate.[161]

99.227.         Given the lack of consideration, the arbitration provision is unenforceable to Plaintiffs.

100.228.         This claim for declaratory judgment seeks a determination that (a) this action may proceed as a class action; (b) there is no enforceable arbitration agreement between DoorDash and the Plaintiffs; (c) Plaintiffs are entitled to recover for their injuries incurred because of DoorDash's misleading fee structure; (d) Plaintiffs are entitled to an award of attorneys' fees and expenses to be determined by the Court; (eand (c) such other and further relief as is necessary and appropriate, including the relief outlined in paragraph 127229 below.

101.229.         To remedy the injuries that DoorDash's misleading fee structure has caused, Plaintiffs are entitled to at least the following injunctive relief:

102.230.         A declaration that DoorDash adopt an open and straightforward fee structure so that consumers will understand what they are paying for and how their fees are distributed and allocated; and

---

[161] *See generally Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582, 594 (D. Md. 2013) (where one party reserves the right to alter the arbitration clause there is "'no real promise at all.'all'") (citations omitted). *See also Coady v. Nationwide Motor Sales Corp.*, No. 20-cv-1142-SAG, 2020 WL 6785352, at *5 (D. Md. Nov. 18, 2020) (where the arbitration provision and authority to change the terms and conditions are within the same document, a court can determine there is no consideration for the agreement to arbitrate).

103.231.     A declaration that DoorDash cease and desist from its misleading and fraudulent practices including advertising or assessing any delivery fee when DoorDash does not perform delivery services.

232.   **THIRD**Alternatively, this claim for declaratory judgment seeks a determination that (a) the arbitration clause is severable from the other Terms and Conditions; and (b) the arbitration clause is unenforceable against the minor consumers for the same reason concerning the lack of adequate consideration.

### **FOURTH** CLAIM FOR RELIEF

(DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201 THAT THE ARBITRATION PROVISION IS AN UNENFORCEABLE CONTRACT OF ADHESION)

104.233.     Plaintiffs reassert, reallege, and incorporate herein by reference the allegations set out in paragraphs 1 through 127 and assert232 when asserting the followingforegoing cause of action.

105.234.     In the event a court determines that a contract was formed when a consumer, including a minor consumer, signed-up and used DoorDash's services, and in the event a court determines that the consideration for the arbitration provision in the contract is sufficient, declaratory relief is still necessary and appropriate.

106.235.     The arbitration provision contains a waiver of significant rights including the right to a trial by jury, the right to bring an action as a class action, and the right to seek injunctive relief. It also imposes a drastically reduced statute of limitations.

Case 1:23-cv-01006-JRR   Document 13-1   Filed 05/05/23   Page 166 of 182

107.236.    The arbitration provision is itself a contract of adhesion in that was "drafted unilaterally by the dominant party and then presented on a take-it-or-leave-it basis to the weaker party who has no real opportunity to bargain about its terms."[162]

108.237.    A court can decline to enforce an arbitration provision that is "so one-sided as to oppress or unfairly surprise an innocent party" or when "there exists an egregious imbalance in the obligations and rights imposed by the arbitration clause."[163]

109.238.    The arbitration provision at issue is as one-sided as a contract provision could be. DoorDash receives protection from a jury, shelter from important kinds of relief, and a shield against collective claims. The consumers get nothing in return.

239.    Alternatively, given the oppressive nature of the contract of adhesions terms and the waiver of critical rights, consumers, like Plaintiffs, could only manifest assent to the contract through an affirmative acknowledgement separate and independent of any implicit consent purportedly provided by "signing up" for a DoorDash account.

110.240.    This claim for declaratory judgment seeks a determination that (a) this action may proceed as a class action; (b) the arbitration provision is a contract of adhesion; (c) the arbitration provision is null and void; (d) Plaintiffs are entitled to recover for their injuries incurred because of DoorDash's misleading fee structure; (e) Plaintiffs are entitled to an award of attorneys' fees and expenses to be determined by the Court; and (f) such other and further relief as is necessary and appropriate, including the relief outlined in paragraph 135 below.

111.241.    To remedy the injuries that DoorDash's misleading fee structure has caused, Plaintiffs are entitled to at least the following injunctive relief:

---

[162] *Mbongo v. Robinhood Markets, Inc.*, No. 714, 2022 WL 621797, at *4 (Md. Ct. of Spec. App. March 3, 2022).

[163] *Id.* (citations omitted).

161

~~112.~~242.    A declaration that DoorDash adopt an open and straightforward fee structure so that consumers will understand what they are paying for and how their fees are distributed and allocated; and

~~113.~~243.    A declaration that DoorDash cease and desist from its misleading and fraudulent practices including advertising or assessing any delivery fee when DoorDash does not perform delivery services.

### ~~FOURTH CLAIM FOR RELIEF~~

~~(DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201 THAT THE ENTIRE TERMS AND CONDITIONS ARE UNENFORCEABLE AGAINST MINORS)~~

~~30.    Plaintiffs reassert, reallege, and incorporate herein the allegations set out in paragraphs 1 through 135 and assert the following cause of action.~~

~~31.    Under the law of the State of Maryland, as well as the law of other United States jurisdictions, minors have the right to disaffirm contracts such as those at issue here and a parent or guardian can disaffirm a contract on behalf of a minor.~~

~~32.    Plaintiffs, on behalf of any minor whose interests they represent, hereby disaffirm any contract that a court may determine to have existed between Plaintiffs and DoorDash.~~

~~33.    The contracts between Plaintiffs and DoorDash on the other are void ab initio (or alternatively void or voidable) to the extent that any minor was the person who established or used a DoorDash account given their lack of contractual capacity and given DoorDash's own specified disaffirmance of any contract with minors or allowing them to use its technology or service.~~

~~34.    There exists, therefore, an actual controversy between the parties requiring a declaratory judgment.~~

35.    ~~This claim for declaratory judgment seeks a determination that (a) this action may proceed as a class action; (b) the contracts between DoorDash and minor children are void ab initio (or alternatively void or voidable at the option of the minor children or their parents or guardians); (c ) the minor children or their parents or guardians have effectively voided or otherwise disaffirmed the contracts by filing this lawsuit; (d) the minor children or their parents or guardians are entitled to restitution and interest thereon; (e) Plaintiffs are entitled to an award of attorneys' fees and expenses to be determined by the Court; and (f) such other and further relief as is necessary and appropriate.~~

~~114.~~244.      Alternatively, this claim for declaratory judgment seeks a determination that (a) the arbitration clause is severable from the other Terms and Conditions; <u>and</u> (b) the arbitration clause is unenforceable against the minor consumers~~; (c ) Plaintiffs are entitled to all appropriate damages; (d) Plaintiffs are entitled to an award of attorneys' fees and expenses to be determined by the Court; and (e) such other and further relief as is necessary and appropriate~~ <u>for the same reason concerning the lack of mutual assent absent an express affirmation of acceptance of the contract terms</u>.

### FIFTH CLAIM FOR RELIEF

<u>(RICO VIOLATION OF 18 U.S.C. § 1962(a))</u>

<u>245.    Plaintiffs reassert, reallege, and incorporate herein by reference the allegations set out in paragraphs 1 through 244 when asserting the foregoing cause of action.</u>

<u>246.    This cause of action is against DoorDash.</u>

<u>247.    DoorDash and/or Stride Bank and/or the DasherDirect Program are enterprises whose activities affect interstate commerce.</u>

<u>248.    DoorDash and/or Stride Bank and/or the DasherDirect Program used and invested income that was derived from a pattern of racketeering activity in an interstate enterprise.</u>

Specifically, DoorDash used and invested the racketeering income into the DasherDirect Program and invested into other programs, like DoorDash Capital. DoorDash made additional income from the invested racketeering income.

249.    DoorDash's mail and wire fraud constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

250.    As a direct and proximate result of DoorDash's racketeering activities and violations of 18 U.S.C. § 1962(a), Plaintiffs have been injured in their business and property in that they have suffered a monetary injury.

251.    WHEREFORE, Plaintiff requests that this Court enter judgment against DoorDash on this cause of action as follows:

252.    An award of actual damages, the precise measure of which is to be determined;

253.    An award of treble damages; and

254.    An award to attorney's fees and expenses.

### SIXTH CLAIM FOR RELIEF
### (RICO VIOLATION OF 18 U.S.C. § 1962(c))

255.    Plaintiffs reassert, reallege, and incorporate herein by reference the allegations set out in paragraphs 1 through 254 when asserting the foregoing cause of action.

256.    This cause of action is against DoorDash.

257.    Stride Bank and/or the DasherDirect Program is an enterprise engaged in and whose activities affect interstate commerce.  DoorDash is associated with the enterprise.

258.    DoorDash agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff.  Specifically, DoorDash recruited and hired Dashers; advertised the DasherDirect Program on the DoorDash website, including agreements between Stride Bank

and Payfare with Dashers; created the program's participation policies and rules; provided Dashers with the tools to participate in and register for the program; and steered and manipulated Dashers' participation in the program through heavy-handed and fraudulent conduct identified herein. DoorDash's heavy-handed and fraudulent conduct as part of its management of the DasherDirect Program includes, but is not limited to, holding Dashers' compensation for up to a week; implementing a Fast Pay for non-participating Dashers; creating rules that prohibited both participating in Fast Pay and the DasherDirect Program; managing the Dashers' funds for purposes of allocating those funds to Stride Bank by each individual Dashers' name who participate in the program; and using its pattern of racketeering activities to control and limit Dasher compensation, creating more leverage to direct or otherwise manipulate Dashers' participation in the DasherDirect Program.

259.    Pursuant to and in furtherance of their fraudulent scheme, DoorDash committed multiple related acts of mail and wire fraud.

260.    The mail and wire fraud set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

261.    DoorDash directly and indirectly has conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

262.    As a direct and proximate result of DoorDash's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property in that they have suffered monetary injury.

263.    WHEREFORE, Plaintiff requests that this Court enter judgment against DoorDash on this cause of action as follows:

264.    An award of actual damages, the precise measure of which is to be determined;

265.    An award of treble damages; and

266.    An award to attorney's fees and expenses.

## SEVENTH CLAIM FOR RELIEF

### (FRAUD OR DECEIT)

~~115.~~267.    Plaintiffs reassert, reallege, and incorporate herein by reference the allegations set out in paragraphs 1 through ~~142 and assert~~266 when asserting the ~~following~~foregoing cause of action.

~~116.~~268.    DoorDash made false representations or omissions of material fact to Plaintiffs, including but not limited to: DoorDash drivers would be paid delivery fees for making deliveries; DoorDash had the ability to control the time and manner of a consumer's delivery; an express order would be delivered directly to the consumer; drivers knew when orders were priority and direct to you; the Extended Range Fees arose from consumers' locations and applied to all consumers equally; advertised delivery windows represented true estimates of the prospective delivery time; advertised discounts represented actual discounts; each delivery fee was logically derived and not an unjustifiable advertisement or phantom charge passed back to the consumer by increasing a different charge/fee; promotional items did not include hidden fees that consumers paid; DashPass members received savings ~~that were misleadingly stated~~represented by strikethrough pricing; and menu items did not include commissions and fees including surcharges on credit card payments.

~~117.~~269.    DoorDash made false representations and omissions during each instance consumers, like Plaintiffs, placed an order on the DoorDash website or the DoorDash ~~app~~App and DoorDash advertised, charged and/or collected a Delivery Fee, an Express Fee, an Extended

Range Fee, a Marketing Fee, and/or a Commission Fee from consumers, like Plaintiffs, on their respective order.

118.270.      Among the false representations and omissions, in addition to those in paragraph 143268, that DoorDash made include, at least, the following:

a.   DoorDash, in adopting, promoting, and/or charging its Express Delivery Fee, knew or should have known that it had no ability to control the manner or means of how or when Dashers performed their deliveries;

b.   DoorDash knew or should have known that "direct to you" as used for the Express Delivery Fee advertisements was not only misleading but patently false because DoorDash knew Dashers could stack orders, Dashers did not know that a consumer had paid a direct delivery fee, and the delivery time would actually exceed that for a standard delivery without any warning that was possible;

c.   The inference that the Express Delivery Fee was for thepaid to Dashers;

d.   The Delivery Fee had nothing to do with the actual delivery of orders for consumers but instead related to the cost to operate the DoorDash Platform/technology;

e.   DoorDash knew or should have known the Express Delivery Fee was simply an advertising gimmick and not a real effort to get orders to consumers sooner;

f.   DoorDash established the Extended Range Delivery Fee but knew or should have known consumers did not have "normal delivery areas;"";

g.   DoorDash, in assessing the Extended Range Delivery Fee, knew or should have known the delivery fee was based on the restaurants' paid relationships with DoorDash and had nothing to do with the location of the consumer;

h.   DoorDash concealed that DoorDash charges the Extended Range Fee as a means of increasing profit;

i.   DoorDash knew or should have known the delivery windows it promised were illusory and merely intended to entice consumers into placing orders;

j.   DoorDash incorporated a "marketing fee" into the charges to consumers, knowing that consumers, in the exercise of ordinary diligence, could not discover the hidden fee;

k.   DoorDash knew or should have known that consumers were paying for promotional items through payment of a $0.99 marketing fee that was undisclosed and that misled consumers to believe they were getting something for free or at a reduced price;

l.   DoorDash knew or should have known that it charged and collected from consumers commission fees that it did not disclose and surreptitiously included in the price of menu items;

m.   DoorDash knew or should have known that the commission fees included credit card surcharges that it did not disclose and surreptitiously included in the price of menu items; and

n.   DoorDash knew or should have known that it used price drip, dark patterns, and partition pricing in advertising prices and fees to deceive consumers into transactions;

o.   DoorDash knew or should have known that its disclosure omitted, misstated, or incorrectly provided information about its prices and fees; and

n.p.   DoorDash knew or should have known that it provided misleading and false pricing and savings without disclosing such information to consumers.

168

119.271.    DoorDash knew, and had actual knowledge, that the representations it made to Plaintiffs were false.

120.272.    Alternatively, DoorDash acted with reckless disregard of the truth of its representations to Plaintiffs such that it would be reasonable to charge DoorDash with the falsity of its representations.

121.273.    DoorDash intended that Plaintiffs would act in reliance on DoorDash's false representations.

122.274.    Plaintiffs relied on DoorDash's false presentations and Plaintiffs' reliance was justified and justifiable—whether it was reasonable, justifiable, or mere reliance on fact[164]—was necessary and appropriate. Indeed, the law does not require one who has been defrauded to investigate the possibility of fraud before relying—as Plaintiffs did here—on the representations of another.

123.275.    As a direct and proximate result of DoorDash's fraudulent misrepresentations, Plaintiffs sustained damages.

124.276.    DoorDash acted with malice in making false representations and Plaintiffs are therefore entitled to recover punitive damages.

**SIXTHEIGHTH CLAIM FOR RELIEF**

(FRAUDULENT CONCEALMENT)

125.277.    Plaintiffs reassert, reallege, and incorporate herein by reference the allegations set out in paragraphs 1 through 152 and assert276 when asserting the followingforegoing cause of action.

---

[164] *See Field v. Mans*, 516 U.S. 59, 72-73 (1995).

126.278.      DoorDash took affirmative action to conceal a material fact that Plaintiffs could not have discovered even with the exercise of reasonable diligence.[165]

127.279.      DoorDash had a duty to disclose material facts because DoorDash's concealment of the facts underlying its express and extended range charges, and other fees and chargers, was intentional and effective. DoorDash hid material facts with "the attained object of creating or continuing a false impression as to that fact. Its "affirmative suppression of the truth" was made with an "intent to deceive."[166]

128.280.      DoorDash also had a duty to disclose material facts when DoorDash tried to obfuscate and confuse consumers with psychologically manipulative pricing structure to conceal the real nature of the charges.[167]

129.281.      DoorDash failed to disclose materials facts, including (a) that it was charging an express fee with the representation the order would be directly deliverydelivered to the consumer when DoorDash had no ability to control the time or manner of deliveries: (b) that it was charging an express fee with the representation the order would be delivered faster than the predicted order time for a non-express order when, in fact, the express delivery frequently took longer to be received; and (c) that DoorDash had no factual basis for imposing the extended range delivery fee; and that other fees and charges as detailed above were similarly misleading.

130.282.      DoorDash intended to defraud or deceive Plaintiffs.

131.283.      Plaintiffs took actions, namely using DoorDash's express service, in justifiable reliance on DoorDash'sits concealment. Plaintiffs' reliance—whether it was

---

[165] *Rhee v. Highland Development Corp.*, 182 Md. App. 516, 958 A.2d 385, 390 (Md. Ct. Special App. 2008).

[166] *Id.*

[167] *Lloyd v. Gen'l Motors Corp.*, 397 Md. 108, 916 A.2d 257, 275, n.11 (Md. App. 2007).

reasonable, justifiable, or mere reliance on fact[168]—was necessary and appropriate. Indeed, the law does not require one who has been defrauded to investigate the possibility of fraud before relying—as Plaintiffs did here—on the representations of another.

132.284.    As a direct and proximate result of DoorDash's fraudulent concealment, Plaintiffs sustained damages.

133.285.    Further, DoorDash acted with malice in failing to disclose material facts and Plaintiffs are therefore entitled to recover punitive damages.

## SEVENTHNINTH CLAIM FOR RELIEF
### (NEGLIGENT MISREPRESENTATION)

134.286.    Plaintiffs reassert, reallege, and incorporate herein by reference the allegations set out in paragraphs 1 through 161 and assert285 when asserting the followingforegoing cause of action.

135.287.    DoorDash owed a legal and statutory duty of care to Plaintiffs, including but not limited to a duty of care arising out of its role as an entity that directly or indirectly sold and/or marketed goods and services to Plaintiffs.

36.    In this case, Plaintiffs were wholly dependent on DoorDash and Plaintiffs were not sophisticated users operating on an equal playing field with DoorDash.

288.    Plaintiffs relied on DoorDash's false presentations and Plaintiffs' reliance— whether it was reasonable, justifiable, or mere reliance on fact[169]—was necessary and appropriate. Indeed, the law does not require one who has been defrauded to investigate the possibility of fraud before relying—as Plaintiffs did here—on the representations of another.

---

[168] *See Field v. Mans*, 516 U.S. 59, 72-73 (1995).

[169] *See Field v. Mans*, 516 U.S. 59, 72-73 (1995).

136.289.        DoorDash negligently made false statements of material fact about its delivery and service fees.

137.290.        DoorDash intended that Plaintiffs would act in reliance upon the false statements of material fact referenced in paragraph 144268 to 147270.

138.291.        DoorDash knew or should have known that Plaintiffs would rely on the false statements of material fact referenced in paragraph 144268 to 147270.

139.292.        Plaintiffs justifiably acted in reliance on the false statements of material fact referenced in paragraph 143268 to 146270.

140.293.        As a direct and proximate result of DoorDash's negligent misrepresentation, Plaintiffs sustained damages.

141.294.        Further, DoorDash acted with malice in making its misrepresentations and Plaintiffs are therefore entitled to recover punitive damages.

## EIGHTHTENTH CLAIM FOR RELIEF
### (UNJUST ENRICHMENT)

142.295.        Plaintiffs reassert, reallege, and incorporate herein by reference the allegations set out in paragraphs 1 through 169 and assert294 when asserting the followingforegoing cause of action. DoorDash owed a legal and statutory duty to Plaintiffs to not unfairly or unduly take advantage of them or to commit wrongful acts to enrich itself at Plaintiffs' expense.

143.296.        Plaintiffs conferred a benefit on DoorDash by placing orders for the delivery of food from merchants and paying for the delivery of food by Dashers.

144.297.        DoorDash knew and/or appreciated the benefit that Plaintiffs conferred.

145.298.        DoorDash accepted or retained the benefit under circumstances that would be inequitable to allow DoorDash to retain the benefit without the paying of value in return.[170]

146.299.        As a direct and proximate result of DoorDash's unjust enrichment, Plaintiffs sustained damages.

**NINTHELEVENTH CLAIM FOR RELIEF**

(VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT)

147.300.        Plaintiffs reassert, reallege, and incorporate herein by reference the allegations set out in paragraphs 1 through 174 and assert299 when asserting the followingforegoing cause of action.

148.301.        Plaintiffs are consumers under the Maryland Consumer Protection Act, Md. Code Ann. Com. Law. §13-101, et seq. in that they are actual or perspective purchasers, lessees, or recipients of consumer goods, consumer services, consumer realty, or consumer credit. *See* Md. Code Ann. Com. Law. §13-101(c)(1).

149.302.        DoorDash is a merchant under the Maryland Consumer Protection Act, Md. Code Ann. Com. Law. §13-101, et seq. in that it directly or indirectly either offers or makes available to consumers any consumer goods, consumer services, consumer realty, or consumer credit. *See* Md. Code Ann. Com. Law. §13-101(g)(1).

150.303.        DoorDash has engaged in unfair, abusive, or deceptive trade practices in violation of the Maryland Consumer Protection Act.

151.304.        Specifically, DoorDash has made false statements which have the capacity, tendency, or effect of deceiving or misleading consumers. *See* Md. Code Ann. Com. Law. §13-301(1).

---

[170] *Jackson v. 2019 Brandywine, LLC*, 180 Md. App. 535, 952 A.2d 304 (2008).

152.305.      In addition, DoorDash——in violation of the Maryland Consumer

Protection Act——has failed to state a material fact and its failure to state a material fact

deceives or tends to deceive consumers. *See* Md. Code Ann. Com. Law. §13-301(3).

153.306.      And in violation of the Maryland Consumer Protection Act, DoorDash has

engaged in deception, fraud, false pretense, false premise, misrepresentation, or knowing

concealment, suppression, or omission of any material fact with the intent thatto have a

consumer rely on the same with the promotion or sale of any consumer goods, consumer realty,

or consumer service. *See* Md. Code Ann. Com. Law. §13-303(9)(i).

154.307.      As a direct and proximate result of DoorDash's violation of the Maryland

Consumer Protection Act, Plaintiffs sustained damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, the Class, and Subclasses DEMAND:

A.      A jury trial on all issues so triable;

B.      Award Plaintiffs such preliminary injunctive and ancillary relief as may be

necessary to avert the likelihood of consumer injury during the pendency of this action and to

preserve the possibility of effective final relief, including but not limited to, temporary and

preliminary injunctions, and an order freezing assets;

C.      EnterEntry of a permanent injunction to prevent DoorDash from engaging in

future fraudulent or misleading pricing practices and violations of Maryland Consumer

Protection Act, including but not limited to prohibiting DoorDash from advertising or collecting

any delivery fee whatsoever of any kind unless such fee is collected for and paid to delivery

drivers and prohibiting DoorDash from advertising and collecting any hidden marketing fee;

D.      Award such relief, including monetary damages consistent with the law, as the

Court finds necessary to redress injury to consumers like Plaintiffs resulting from Defendants'

deceptive and fraudulent actions, including but not limited to, rescission or reformation of

contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; ~~and~~

> E.    Award treble damages; and

~~E.~~F.    Award Plaintiff the costs of bringing this action together with attorneys' fees, as

well as such other and additional relief as the Court may determine to be just and proper.


On this ~~14th~~5th day of ~~April~~May, 2023.            Respectfully submitted:

                                            /s/ Thomas R. Bundy, III
                                            Thomas R. Bundy III
                                            Federal Bar No. 15265
                                            LAWRENCE & BUNDY LLC
                                            8115 Maple Lawn Boulevard
                                            Suite 275
                                            Fulton, MD 20789
                                            Telephone:    (240) 500-3595
                                            Facsimile:    (240) 657-1109
                                            Thomas.Bundy@lawrencebundy.com

                                            Leslie J. Bryan
                                            (Admitted *Pro hac vice* ~~To be submitted~~)
                                            LAWRENCE & BUNDY LLC
                                            1180 West Peachtree Street, NW
                                            Suite 1650
                                            Atlanta, Georgia 30309
                                            Telephone:    (404) 400-3350
                                            Facsimile:    (404) 609-2504
                                            Leslie.Bryan@lawrencebundy.com

                                            Andrew D. Herman
                                            (Admitted *Pro hac vice* ~~To be submitted~~)
                                            LAWRENCE & BUNDY LLC
                                            1775 Pennsylvania Ave., NW
                                            Suite 650
                                            Washington, D.C. 20006
                                            Telephone:    (202) 350-3397
                                            Andrew.Herman@lawrencebundy.com

                                            Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2023, I electronically filed the foregoing **FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, MONETARY DAMAGES, INJUNCTIVE RELIEF, AND DEMAND FOR JURY TRIAL** with the Clerk of the Court using the CM/ECF system and sent a copy thereof via certified mail to the following:

The Corporation Trust, Inc.
2405 York Road, Suite 201
Lutherville-Timonium, MD 21093

(Resident Agent for DoorDash)

I also sent a copy via FedEx to the following counsel who signed the Waiver of Summons:

Michael Holecek
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angels, CA 90071-3197
MHolecek@gibsondunn.com

(Counsel on Waiver Summons
For DoorDash, Inc.)


/s/ Thomas R. Bundy III
Thomas R. Bundy III
Federal Bar No. 15265
LAWRENCE & BUNDY LLC
8115 Maple Lawn Boulevard
Suite 275
Fulton, MD 20789
Telephone:      (240) 500-3595
Facsimile:      (240) 657-1109
Thomas.Bundy@lawrencebundy.com

Counsel for Plaintiffs